UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

GUAM INDUSTRIAL SERVICES, INC.,    )
    )
    Plaintiff,    )
    )
vs.    )    No.  05-CV01599
    )
DONALD H. RUMSFELD, Secretary of    )    RMU
Defense, et al.,    )
    )
    Defendants.    )
    )

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS MOTION
## FOR A TEMPORARY RESTRAINING ORDER

As requested by the Court, Plaintiff Guam Industrial Services, Inc., d/b/a Guam Shipyard ("GIS" or "Guam Shipyard"), submits this Memorandum in support of its Motion for a Temporary Restraining Order. This Memorandum addresses issues related only to the TRO that we seek in order to restrain repairs of the SS Petersburg in a Singapore shipyard in violation of law until this matter is heard upon our Motion for Preliminary Injunction . We refer the Court to our Memorandum in Support of Motion for Preliminary Injunction for the broader relief requested against the government's unlawful practice of consistently and  regularly repairing vessels under the Navy's jurisdiction in foreign shipyards in violation of statute and of the government's own policies. We request also that the Court set a schedule for further proceedings to consider and review the broader declaratory and injunctive relief we have requested against this continuing practice, following full briefing and the opportunity for discovery.

### Introduction

GIS seeks the immediate intervention of the Court to enjoin the government from unlawfully proceeding with repairs to the SS Petersburg at the  Keppel Shipyard in Singapore in violation of 10 U.S.C. § 7310(a) ("Section 7310(a)").  The statute prohibits non-voyage repairs to vessels homeported in the U.S. and subject to the Navy's jurisdiction from being repaired in

shipyards outside the U.S. and Guam, reflecting Congress' firm policy to maintain a strong and secure U.S. shipyard repair industry to support the Navy.  The Defendants' actions are therefore in excess of their statutory authority, contrary to established procedures, and in violation of GIS' legal rights, thereby exposing it's shipyard, Guam Shipyard, to irreparable injury.

Decisions by this and other circuits compel the conclusion that the requested relief is appropriate to prevent irreparable injury to Guam Shipyard.

### Need for Immediate Relief: The current status

We are informed, ---and shall submit a supplemental Declaration to incorporate this recent information[1]--- that the SS Petersburg has arrived at the Singapore shipyard in the last 24 hours, on or about the late evening of August 22 EST, and that repairs have not yet begun. We are informed that repairs would, in ordinary course, begin within the next few days. It takes a few days to prepare a vessel for repair and maintenance work.  On the early morning of Saturday, May 13 ( or possibly late on Friday, May 12)  and  after we filed the Complaint on May 10 seeking to enjoin the practice, the SS Petersburg left Guam at nighttime and began sailing to Singapore even before any contract was formally awarded. At that time Plaintiff did not know for sure whether a contract had been awarded to Singapore but believed that it had either been awarded or that award was imminent.On Tuesday, August 16, Guam Shipyard's president asked the ship's operator if a contract had been awarded. He got no response.  Not until Friday, May 19, did the operator inform Guam Shipyard  that the contract had been awarded to Singapore on Tuesday, May 16,  several days after the vessel had  already been sailing, and after the government was fully aware of the filing of this action and that we were requesting preliminary injunctive relief in the Complaint. On Friday, August 19, we requested the government to voluntarily defer the commencement of repairs in order to avert the need for

---

[1] A supplemental declaration of Mathews Pothen is expected be ready and filed by 11 a.m.

immediate TRO relief. On Monday, August 22, the government advised us that it would not agree to such voluntary deferment. It is apparent to us that the Defendants are seeking to accelerate the repair process unnecessarily in order to defeat any requested injunctive relief. There is no need for such hurry. It takes months to prepare a vessel for repair and a few days or even a few weeks will not matter. The vessel's private operator, acting as agent for MARAD which operates this vessel that is under the jurisdiction of the Navy as a pre-positioned vessel, obviously will not be harmed.[2] There is no real harm to the government in a delay until the merits are considered. Certainly any harm to the Singapore shipyard should be totally ignored. It has no legal right to perform the repairs. The Navy is knowingly violating a statute and therefore has taken the risk of this relief being granted. The Navy and MARAD have known about our Complaint seeking injunctive relief since at least August 12 when the Complaint was served on them, and the vessel sailed the next day. The timing of this sequence is most interesting and strongly suggests an unseemly and unnecessary rush to foreclose interim relief, as we expect the government will now argue irreparable harm to it, having consciously proceeded to accelerate repairs. But with full notice of the pendency of this action, the ship nevertheless set sail on August 13 and the contract was awarded on August 16. The government must, therefore bear the risk of its decision to continue repairs in the face of this action. The equities therefore strongly support the granting of a TRO.

---

Wednesday, August 24, the time by which the Court has requested our reply brief.

[2] . This operator, IASC, is an agent-contractor for MARAD and therefore is subject to MARAD's control as to contract performance. It is not, as the government apparently claims, an indispensable party because it does not own the vessel and as an agent is subject to MARAD"s control. MARAD may terminate the IASC contract for convenience.

## I.     Factual Background

GIS, a corporation organized and existing under the laws of the U.S. Territory of Guam,

owns and operates Guam Shipyard.  Pursuant to the Defense Base Closure and Realignment Act

of 1990, P.L. 101-510 ("BRAC"), the Naval Ship Repair Facility Guam ("SRF-Guam") was

closed as an active military installation on September 1, 1997.  Guam Shipyard now operates this

facility as a private shipyard.  (Pothen Decl. Para. 2)[3]

Guam Shipyard has extensive experience in ship repairs, and remains the only U.S.

owned and operated private shipyard located west of the International Dateline.  As such, Guam

Shipyard is the only United States citizen-owned and controlled shipyard facility that can service

United States Navy, Military Sealift Command ("MSC"), and MARAD ships that are under the

jurisdiction of the Secretary of the Navy in the Pacific and Indian Oceans.  It has a work force of

approximately two hundred and fifty (250) employees, that can swell to approximately three

hundred and fifty (350) employees when necessary - all of whom are United States citizens.

(Pothen Decl. Para. 1, 2)

The SS Petersburg (T-AOT 9101) is a government-owned tanker that is part of the United

States Ready Reserve Force ("RRF"), a select group of ships within the National Defense

Reserve Fleet, which are maintained by the DOT's MARAD and funded from the Navy-

controlled National Defense Sealift Fund.  Although the SS Petersburg is part of the RRF, it is

currently activated for duty with the Prepositioning Program, a program funded and administered

by the US. Navy and under the direction of the Navy's Military Sealift Command (the "MSC

Prepositioning Program").  (Pothen Decl. Para. 4 and U.S. Government's Inventory of Ships in

the MSC Prepositioning Program, a true an accurate copy of which is attached to the Pothen

---

[3] References are to the Declaration of Mathews Pothen, President of Plaintiff GIS, submitted in
support of the Motion for Preliminary Injunction, and to the exhibits attached to the Pothen
Declaration.

Declaration as Exhibit 3)

Prepositioning ships are strategically positioned in key ocean areas, making it possible to deploy equipment, fuel, and supplies to support U.S. military forces on short notice during times of war or as a result of other contingencies. Prepositioning ships are subdivided into three separate elements: Combat Prepositioning Force Ships; Maritime Prepositioning Force Ships; and Logistics Prepositioning Ships. All prepositioning ships are under the operational control and jurisdiction of the U.S. Navy's MSC area commands, providing direct support for the Navy's fleet commanders. Day-to-day control of these ships is exercised by one of three Maritime Prepositioning Ship squadrons ("MPSRONs"). Each MPSRON is under the command of a Navy Captain. (Pothen Decl. Exh. 3)

The SS Petersburg is part of and assigned to MPSRON THREE, which has jurisdiction over, directs, and controls the ships of the MSC Prepositioning Program in the Western Pacific Ocean. In addition to being a component part of the U.S. Navy's MSC Prepositioning Program, and administratively reporting to the Prepositioning Program Manager at MSC Headquarters in Washington, D.C., MPSRON THREE is an operational asset of the Navy's Seventh Fleet. (Pothen Decl. Para. 4 and Exh. 3)

Under the auspices of MPSRON THREE, the SS Petersburg has been prepositioned for the last three years in the U.S. Territory of Guam at the Delta-Echo Pier in Apra Harbor, approximately 300 yards from the Guam Shipyard. It's mission is to provide direct offshore petroleum distribution services to the Defense Logistic Agency ("DLA"). While the American Bureau of Shipping (the "ABS") had designated Norfolk, Virginia as the SS Petersburg's homeport, MARAD, in a recent press release announcing new ship manager contracts for RRF ships, listed Guam as the homeport of the SS Petersburg. Guam is the port from which the SS Petersburg operates as a unit of MPSRON THREE and is its primary depot for loading and off-

loading fuel(s).[4]

Since June, 2004, the SS Petersburg has been scheduled for drydocking repair and maintenance. On June 21, 2005, Interocean American Shipping Corporation ("IASC"), pursuant to its contract with and acting as an agent for MARAD, issued a solicitation to bidders for repair and drydock work for the SS Petersburg - RFP # 05-G-207-077 ("RFP"). This solicitation was issued to both United States and foreign shipyards. Guam Shipyard submitted a responsive proposal for the award of this work. IASC, as MARAD's agent, awarded the repair and drydock contract for the SS Petersburg to a shipyard in Singapore. Upon information and belief, the SS Petersburg departed for Singapore on or about August 14, 2005 for performance of said repair and drydock work. (Pothen Decl. Para 5, 9 and Solicitation of Bids for Drydock Work for the SS Petersburg, a true an accurate copy of which is attached to the Pothen Declaration as Exhibit 1). We understand that the vessel arrived in Singapore late in the evening of August 22 EST.

The awarding of repair contracts for RRF ships to foreign shipyards has been ongoing. Specifically, over the past seven years, GIS has submitted proposals for repair and dry-dock work to other RRF vessels, but many of the contracts for such work have also been awarded to various foreign shipyards, to the detriment of Guam Shipyard and other similarly situated private shipyards. The records in these prior contract proposals will be available to the Court at the hearing to support this prior history.

If the Guam Shipyard loses the repair work on the SS Petersburg and continues to lose repair work on Navy vessels to foreign shipyards, it will continue to suffer irreparable injury that threatens its economic viability. Plaintiff GIS therefore has standing to maintain this action as an aggrieved party within the zone of interests protected by the applicable statutes and policies.

---

[4] Additionally, Ambyth Shipping and Trading, Inc., a Guam corporation, provides the SS

## II.    Legal Background

This action was filed on August 10, 2005. It seeks declaratory and injunctive relief to prevent the government from continuing its practice of repairing and maintaining vessels under the Navy's jurisdiction and control in foreign shipyards in violation of 10 U.S.C. § 7310(a).

The statute, an express agreement between DoD and DOT, and the contract that DOT has with the operators of vessels in the Navy's RRF, all provide the legal background for this case, and they all reflect a vital national policy to protect the economic stability and viability of the United States shipyard industry in the face of increased foreign competition, and, furthermore, all advance a strong national security interest in ensuring that U.S. naval vessels are adequately and appropriately handled and maintained by properly regulated U.S. shipyards.

Section 7310(a) explicitly prohibits the United States Government from awarding non-voyage repair contracts for naval vessels homeported in the United States, like the SS Petersburg, to foreign shipyards. The relevant statutory language reads:

> **Vessels with homeport in United States**. - A navel vessel (or any other vessel under the jurisdiction of the Secretary of the Navy) the homeport of which is in the United States may not be overhauled repaired, or maintained in a shipyard outside the United States or Guam, other than in the case of voyage repairs.

10 U.S.C. 7310(a).

Furthermore, pursuant to paragraph 5(b) of a Memorandum of Agreement between DoD and DOT (the "MOA"), DoD and MARAD, on behalf of DOT, expressly confirm that "[a]ll shipyard and ship repair facility work to RRF ships will be accomplished by MARAD (either directly or through its ship operating companies) and performed in the United States (except for necessary voyage repairs while overseas), in accordance with the statute and DOT regulations." (Pothen Decl. Exh. 2)

---

Petersburg with all husbanding requirements in Guam.

Moreover, paragraph 1.2 of MARAD's contract with its ship manager subcontractors including IASC, effective July 30, 1996 (the "1996 MARAD Ship Manager Contract"),[5] requires that "The Ship Manager as an Agent of the U.S. Government will abide by and conform to all Federal statutes during ALL PHASES of this contract." Paragraph H.1 of this contract, which details "Special Contract Requirements," specifically requires that all repair work to RRF ships be performed in a United States shipyard:

> All repair and or upgrading work required in conjunction with the contract. . . necessary to meet all requirements of this contract shall be accomplished in a US. shipyard or US. ship repair facility, unless the work is an emergency. (Pothen Decl. Exh. 2)

### III.    Analysis

**A.    GIS Is Entitled To A Preliminary Injunction Under The Law Of This Circuit, and therefore temporary restraining relief should be granted.**

*Washington Metropolitan Area Transit Commission v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977), has for over twenty-five years set the standard to be applied by district courts in this Circuit in considering requests for preliminary injunctive relief:

> In considering whether to grant preliminary injunctive relief, the court must consider whether:
>
> (1) the party seeking the injunction has a substantial likelihood of success on the merits;
>
> (2) the party seeking the injunction will be irreparably injured if relief is withheld;
>
> (3) an injunction will not substantially harm other parties; and
>
> (4) an injunction would further the public interest.

*CSX Transportation, Inc. v. Williams*, 406 F.3d 667, 670 (D.C. Cir. 2005), citing *Holiday Tours*, 559 F.2d at 843 (D.C. Cir.1977).

---

[5] Upon information and belief, all subsequent MARAD ship manager contracts contain similar requirements that all non-emergency repair work to RRF ships be performed in a U.S. shipyard.

Application of the *Holiday Tours* standard is to be approached with flexibility, such that the particular circumstances of each case are considered. As such, Plaintiff GIS is not required to prevail on every factor. *International Long Term Care, Inc. v. Shalala*, 947 F. Supp. 15, 17 (D.C. Cir. 1996). More of one factor may compensate for less of another factor. *Id.* "If the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak." *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995). Furthermore, "when the other three factors strongly favor interim relief, a court may grant injunctive relief when the moving party has merely made out a 'substantial' case on the merits." *International Long Term Care*, 947 F. Supp. at 17.

This Court also is entitled to grant relief in this matter pursuant to its general equitable powers as well as pursuant to 5 U.S.C. § 705 (Administrative Procedure Act), which provides:

> When an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review. On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court, including the court to which a case may be taken on appeal from or on application for certiorari or other writ to a reviewing court, may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings.

Therefore, pursuant to *CSX Transportation, Inc.* and *Holiday Tours*, *supra*, and under the Administrative Procedure Act, this Court possesses the authority to prevent Defendants from continuing to solicit bids from and/or award contracts to foreign shipyards in connection with non-voyage repairs of navy vessels homeported in the United States, including, but not limited to, the current award for the SS Petersburg.

### 1.    Guam Shipyard And Similarly Situated Private Shipyards Will Suffer Severe And Irreparable Injury In The Absence Of Immediate Relief.

. If MARAD allows IASC to accomplish the SS Petersburg repair work in Singapore, the result will be a loss of $14,000,000.00 in revenues to Guam Shipyard, as well as the forced

layoff for a significant time period of the majority of the shipyard's regular work force of two hundred and fifty (250) United States citizens (Pothen Decl. Para. 6). Furthermore, if this Court permits Defendants to continue the repairs in Singapore, the United States' private shipyard industry will be jeopardized in the face of increased foreign competition. There are also obvious national security issues implicated in having vessels assigned to the Navy's prepositioned fleet to be war-ready repaired in foreign yards.

In a recent case from this Circuit, the Court of Appeals in *CSX Transportation, Inc. v. Williams*, 406 F.3d 667, 670 (D.C. Cir. 2005), utilized the *Holiday Tours* standard to reverse the district court's denial of a preliminary injunction and remand the case to the district court with the direction to enter a preliminary injunction.

In *CSX Transportation*, an exclusive rail carrier of hazardous materials sufficiently demonstrated that it would suffer irreparable injury absent such an injunction to enjoin the enforcement of the D.C. law, which would prohibit rail or truck transport of certain hazardous materials within a 2.2 mile zone around the United States Capitol Building. The Court of Appeals appears to have been primarily persuaded by the fact that rerouting the trains transporting the banned materials around D.C., as the D.C. law would require, would significantly decrease the capacity and flexibility of carrier's rail network, thereby causing irreparable injury to the carrier. In concluding that the carrier's injury was "properly considered irreparable," the Court of Appeals appeared to have been influenced by the affidavit of the carrier's Vice President for Operations Research and Planning, which detailed specific ways in which complying with the D.C. law would decrease the efficiency of the carrier's rail system, and *Long Island R.R. Co. v. Int'l Association of Machinists*, 874 F.2d 901, 911 (2d Cir. 1989), which it cited for the proposition that "'a general cessation of rail service' constituted irreparable harm." *CSX Transportation*, 406 F.3d at 674. Ironically, the U.S. Government, arguing as a

friend of the court, asserted that the rerouting required under the D.C. law "create[d] security risks because it [would] increase the length of time hazardous materials [were] in transit." *Id.* at 674, citing the Memorandum of the U.S. Government. The U.S. Government further asserted that the D.C. law "would disrupt 'the national system of hazardous materials shipment.'" Id. at 674, citing the Memorandum of the U.S. Government.

Like the plaintiff in *CSX Transportation*, Guam Shipyard and other similarly situated private U.S. shipyards will suffer irreparable injury in the absence of the requested relief. If Defendants are permitted to continue to solicit bids from and/or award contracts to foreign shipyards in connection with non-voyage repairs of navy vessels homeported in the United States, including, but not limited to, the SS Petersburg, Guam Shipyard's business will be devastated, and it may not be economically feasible to keep the facility open during the months of November, December, and January. Even a temporary layoff of the shipyard's two hundred and fifty (250) regular employees would be devastating, since during that time, GIS' U.S. citizen employees, most of whom are paid by the hour, undoubtedly would seek employment elsewhere. Furthermore, the impact of this continued practice on the United States' private shipyard industry is difficult, if not impossible to ascertain. Finally, the harm to Guam Shipyard and other similarly situated shipyards cannot be redressed by a later suit for damages, because the United States Government is probably not answerable in monetary damages for such harm under the doctrine of sovereign immunity.

**2.    The Irreparable Harm To Guam Shipyard And Other Similarly Situated Shipyards Far Outweighs Any Harm Defendants Might Suffer If Injunctive Relief Is Granted.**

In contrast to the irreparable harm that would be suffered by Guam Shipyard and its U.S. citizen employees, the U.S. Government will not suffer from interim relief against repairs of the SS Petersburg in a foreign shipyard. The repair process has been ongoing since June, and there

11

is no urgency to a temporary lull in repairs while this matter is more carefully considered by this Court. The government cannot demonstrate any injury that would arise from the proper enforcement of Section 7310(a), the established procedures detailed in the MOA between DoD and DOT, and the contractual provisions of the 1996 (and subsequent) MARAD Ship Manager contracts, as there are U.S. shipyards such as the Plaintiff fully capable of performing all repairs and maintenance on vessels. Instead, the threat of immediate and irreparable injury to Guam Shipyard and its employees and similarly situated shipyards and their employees weighs heavily in favor of the limited relief GIS seeks. GIS has detailed, *supra*, the economic impact that the loss of repair work for the SS Petersburg would have on Guam Shipyard in particular and the domestic shipyard industry in general.

Courts of this Circuit have weighed the balancing of harms under like circumstances and have held that the potential harm to the government is minimal compared to the potential harm caused by the government's failure to follow the law. *See Petties v. District of Columbia*, 238 F.Supp.2d 114, 125 (D.D.C. 2002). In *Petties*, this Court held that special education students and their parents satisfied the balancing of harms requirement for a preliminary injunction mandating that the District of Columbia school system continue paying providers of special education services at levels agreed upon in a settlement of an earlier suit, where, though the District had budget concerns, these could not be allayed by ignoring a duty to provide educational benefits under the Individuals with Disabilities Education Act ("IDEA"). In so doing, this Court pointed to its own language from a sister case seven years prior: "[D]ifficult financial constraints do not relieve the District of Columbia from its statutory obligations. Unless...relief is provided by the City Council or, in this case, the Congress, '[t]he Court's role...is to enforce existing law, not to recast the statute to ameliorate the District's financial crisis.'" *Petties v. District of Columbia*, 881 F.Supp. 63, 70 (quoting *Lampkin v. District of*

*Columbia*, 879 F.Supp. 116, 126 (D.D.C. 1995)).

Like the plaintiff in the *Petties* decisions, any interest the government has in continuing to flout the law is far outweighed by the potential harm that will befall Guam Shipyard and other similarly situated private U.S. shipyards should Defendants be permitted to continue to solicit bids from and/or award contracts to foreign shipyards in connection with non-voyage repairs of navy vessels homeported in the United States, including, but not limited to, the SS Petersburg,

### 3.    The Public Interest Would Be Served By Such Injunctive Relief.

The public interest lies in the proper enforcement of Section 7310(a) and in securing the legal rights of U.S. private shipyards provided by statute. *See Whitaker v. Thompson*, 248 F.Supp.2d 1, 16 (D.D.C. 2002) ("it is clearly in the public interest to ensure that governmental agencies…fully comply with the law"). In fact, in this case, the public interest plainly is identical to the interest of Guam Shipyard and other like situated shipyards, since the United States Government cannot demonstrate any injury that would arise from the proper enforcement of Section 7310(a), the established procedures detailed in the MOA between DoD and DOT, and the contractual provisions of the 1996 (and subsequent) MARAD Ship Manager contracts. In addition to the previously addressed economic impact that the continued solicitation of bids from and/or award of contracts to foreign shipyards would have on the domestic shipyard industry, thereby harming the public interest, such awards to foreign shipyards present a significant national security risk, opening the door to even further, perhaps "calamitous," injury to the government and the public. *See CSX Transportation*, 406 F.3d at 674 ("this court does not minimize the calamitous consequences of a terrorist attack on a rail car transporting Banned Materials through the District").

### 4.    GIS Is Likely To Prevail On The Merits Of Its Challenge To Defendants' Actions.

**(a)** **Section 7310(a) Expressly Prohibits The U.S. Government From Awarding Non-Voyage Repair Contracts For Naval Vessels Homeported In The United States to Foreign Shipyards.**

The crux of this case is that Defendants have and continue to solicit bids from and/or award contracts to foreign shipyards in connection with non-voyage repairs to all RRF ships, or at a minimum, to all RRF ships activated for duty with the Navy's MSC Prepositioning Program, in violation of the plain language of Section 7310(a), which expressly limits such non-voyage repair work to shipyards found in the United States or its territories.  Congress enacted Section 7310(a) with the clear intention of protecting the domestic shipyard industry in the face of increased foreign competition:

> This country's shipbuilding industry is in serious danger of disappearing. That fact is indisputable. There is no commercial shipbuilding ongoing in the world's greatest maritime nation. Further, naval shipbuilding is fast becoming equally scarce. For example, where once seven shipyards were building attack submarines, today that number is two, and is expected to become one. Only one yard builds aircraft carriers. Only two build destroyers. One of the greatest tasks before the Congress and the Administration is the preservation of the shipbuilding industrial base. With drastic reductions in naval shipbuilding, the only way our domestic shipyards can survive is through a return to commercial shipbuilding. The business is out there; it just isn't coming to the United States because foreign governments subsidize their shipbuilding industries. The shipbuilding initiative included in the committee bill will help to rectify that situation. It will facilitate the construction in American shipyards of commercial vessels, some for export. That is precisely what is needed. In order to both preserve what remains of our domestic shipbuilding industry and assist private shipyards in affecting the transition from total dependence on defense spending to commercial construction, help is needed.

H.R. REP. 103-200, H.R. Rep. No. 200, 103RD Cong., 1ST Sess. 1993, Additional View of Herbert Bateman.

All requirements of the statute have been met with respect to the SS Petersburg.  It is a naval vessel under the jurisdiction of the Secretary of the Navy.  While Defendants may suggest that the SS Petersburg falls under DOT's jurisdiction, jurisdiction need not be exclusive – i.e.

DoD/naval jurisdiction does not preclude DOT jurisdiction. *See United States v. Corey*, 232 F.3d 1166, (9th Cir. 2000) ("there is no question that domestic lands may fall under the concurrent jurisdiction of the state and federal governments"). Furthermore, any suggestion that the limiting language in Section 7310(a) was intended to include foreign shipyards is ludicrous.

### (b)    The Expressed Intention of Congress Is Unambiguous.

Additionally, the actions and practices of Defendants in permitting the solicitation of bids from and the awarding of a contract to a foreign shipyards in connection with non-voyage repairs to the SS Petersburg were arbitrary, capricious, not otherwise in accordance with the law, in excess of statutory authority, short of statutory right, and without observance of procedure required by law, and thus will likely be held to be unlawful and set aside, in accordance with the 5 U.S.C. § 706(2) (Administrative Procedure Act).

Under the Administrative Procedure Act, a court may set aside formal agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Agency decision-making is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Manufacturers Association v. State Farm*, 463 U.S. 29, 43 (1983). Courts review an agency's interpretation of statute under the well known and established *Chevron* standard. *See Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). Under the *Chevron* standard, if the "intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842-43. In the instant case, there is little doubt about the intention of Congress as expressed in Section 7310(a) - non-voyage

repairs to all RRF ships, or at a minimum, to all RRF ships activated for duty with the Navy's MSC Prepositioning Program, are to be performed at shipyards found in the United States or its territories.

<strong>(c)    GIS Is Likely To Prevail On The Merits Of Its Challenge To Defendants' Actions Because Defendants Failed To Follow Their Own Required Procedures, Thereby Violating The Due Process Rights Of And Substantially Prejudicing GIS.</strong>

Even if this Court were to hold that Defendants have the authority to solicit bids from and/or award contracts to foreign shipyards in connection with non-voyage repairs to all RRF ships, or at a minimum, to all RRF ships activated for duty with the Navy's MSC Prepositioning Program, GIS can still demonstrate that it is likely to succeed on the merits because the U.S. Government and its agents have violated their own mandates and required procedures. Such violations make Defendants' actions unlawful and have deprived GIS of its legal rights.

The MOA between, and promulgated by, DoD and DOT, includes very specific standards that are required of DoD and MARAD, on behalf of DOT. Paragraph 5(b) expressly confirms that "[a]ll shipyard and ship repair facility work to RRF ships will be accomplished by MARAD (either directly or through its ship operating companies) and performed in the United States (except for necessary voyage repairs while overseas), in accordance with the statute and DOT regulations."

Contrary to these express terms of Paragraph 5(b), shipyard and ship repair facility work to the SS Petersburg, a RRF ship, appears as if it will be performed at Sembawang Shipyard in Singapore. Though GIS doing business as Guam Shipyard submitted a responsive proposal for the award of this very type of work, IASC, acting as MARAD's agent, has apparently rejected Guam Shipyard's proposal and awarded the repair and drydock contract for the SS Petersburg to a foreign shipyard. Although GIS has not received written notice of the award as procurement regulations require, the vessel began sailing for Asia on August 13.

MARAD's own contracts with its ship manager subcontractors, including IASC, requires that ship managers, as agents of the U.S. Government, will abide by and conform to all Federal statutes during all phases of the contract. Further, Paragraph H.1 of these contracts specifically requires that all repair work to RRF ships be performed in a United States shipyard.

It is undisputed that Defendants are bound by their own procedures and contracts, and it is not free to disregard them. *See Morton v. Ruiz*, 415 U.S. 199, 235 (1974) ("where the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures"); *Vitarelli v. Seaton*, 359 U.S. 535, 575 (1959) (government action that failed to comply with applicable departmental regulations is illegal and of no effect); *Montilla v. INS*, 926 F.2d 162, 164 (2d Cir. 1991) (agency may not with impunity ignore or disregard procedural regulations.); *Gulf States Manufacturers, Inc. v. N.L.R.B.*, 579 F.2d 1298, 1308-09 (5th Cir. 1978) (executive agency is bound by its own regulations, whether published or not, and failure to follow those regulations renders its decision invalid). Before Defendants extinguish the collective rights of the U.S. private shipyard industry, they must comply, at a minimum, with their own internal procedures. *See, e.g., Gulf States Manufacturers, Inc.*, 579 F.2d at 1309, quoting *Morton v. Ruiz, supra*. Despite the clear and unambiguous case law prohibiting Defendants from ignoring or disregarding their own procedures, that is exactly what has happened in this case.

Respectfully submitted,

By: /s/ Thomas Earl Patton
Thomas Earl Patton (D.C. No. 009761)
John B. Montgomery (D.C. No. 460221)
David Taylor (D.C. No. 91280)
*Attorneys for Plaintiff*
TIGHE PATTON ARMSTRONG
  TEASDALE, PLLC
1747 Pennsuylvania Ave. N.W. Suite 300
Washington, D.C. 20006-4604
Tel. (202) 454 2800
Fax (202) 454- 2805


OF COUNSEL:

ARMSTRONG TEASDALE LLP
Edwin L. Noel (Mo. No. 24184)
F. Scott Galt (Mo. No. 56548)
One Metropolitan Square, Suite 2600
St. Louis, MO. 63102-2740
TEL: (314) 621-5070
FAX: (314) 621- 5065

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 23d day of August, 2005, a true and correct copy of the foregoing document was filed electronically with the Clerk of Court to be served by operation of the Court's electronic filing system and by hand delivery on Dan Van Horn, Assistant U.S. Attorney, or was served via electronic mail and hand delivery via U.S. Mail, postage prepaid, upon the following non-participants in Electronic Case Filing:

_____ /s/Thomas Earl Patton _____