UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| GUAM INDUSTRIAL SERVICES, INC. ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> ) <br> RUMSFELD ET. AL. ) <br> ) <br> Defendants. ) <br> ) | Civil Action 05-01599 (RMU) |

DECLARATION OF WILLIAM H. CAHILL

1. I, William H. Cahill, hereby declare the following in response to Guam Industrial Services, Inc.'s (GIS) suit for temporary restraining order, injunctive relief and declaratory judgment.

2. I am employed by Maritime Administration ("MARAD"), United States Department of Transportation, which is responsible for maintaining the National Defense Reserve Fleet (NDRF), including the Ready Reserve Force. The Secretary of Transportation maintains this fleet of vessels for national defense purposes pursuant to 50 App. U.S.C. § 1744. The Ready Reserve Force (RRF) is the high readiness subset of the NDRF established to support rapid deployment of U.S. military forces. Vessels in the NDRF are public vessels owned by the United States Department of Transportation, acting by and through the Maritime Administration. They are used for defense sealift functions and in support of military contingency operations.

3. I am the Acting Director of the Office of Ship Operations for the Maritime Administration (MARAD), Department of Transportation. In my capacity as Acting Director, I am responsible for ensuring the Ready Reserve Force (RRF) is maintained to meet MARAD statutory responsibilities.

4. MARAD contracts with commercial ship operators to maintain and operate the RRF. (Attachment A, 2005 Ship Manager contract, Section C, p. 1)[1] Vessels are kept in either maintenance phase (Phase M) or operational phase (Phase O). When vessels are in Phase O, they remain under the administrative control of MARAD even though they are under the operational control of the Military Sealift Command (MSC). (C.3.3.2 and C.2.2.3.2 in Section C of the 2005 Ship Manager Contract, Attachment A, pp 5 and 16-17). Under the contract, prepositioned vessels are in Phase O.

5. The SS PETERSBURG is a tanker in the Ready Reserve Force which has been specially outfitted with an Offshore Petroleum Discharge System (OPDS). This system permits the discharge of fuel from up to four miles offshore to locations where a port is unavailable. It is one of three tankers of this kind in the world, all in MARAD's RRF. Two of the tankers are prepositioned overseas for rapid deployment in the support of the national defense. The PETERSBURG is ordinarily prepositioned in Guam and its sister ship the CHEASAPEAKE is prepositioned in Diego Garcia nearer the Middle East. The third vessel, the POTOMAC, is located in MARAD's Beaumont Reserve Fleet in Texas and is maintained in a lesser readiness status.

---

[1] The 2005 Ship Manager contract is at https://voa.marad.dot.gov/programs/ship_manager/final.asp

6. MARAD has entered into a ship manager services contract with Interocean American Shipping (IAS) for the PETERSBURG and the CHESAPEAKE. Iinterocean Ugland Management (IUM), IAS's predecessor, has operated these vessels under contract with MARAD for many years. The 1993 contract cited by GIS was modified and then replaced with a ship manager services contract in 2000. MARAD recently awarded new ship manager contracts at the end of July 2005. The language in both those contracts differs significantly from the contract language attached to GIS's filing. The current ship manager contract, awarded July 27, 2005, under which these repairs are being made provides the following in Section C:

> 2.4.6 Performance of Repair Work
> All repair and/or up-grading work required in conjunction with the contract (including all surveys and correction of sea trial deficiencies, or any other deficiencies that may be noted up to time of delivery and acceptance previously noted or not) necessary to meet all requirements of this contract shall be accomplished in a U.S. ship repair facility, unless the work is for emergency, or mission essential repairs, **or for pre-positioned ships which are deployed overseas, or for any vessel forward deployed outside of the United States.**

*Emphasis added.* (Attachment A, p. 8) [2]

7. MARAD's Ship Managers, including IAS, acquire maintenance and repair through approved commercial purchasing methods, not as agents of the government. (Enclosure B; Attachment J-2 Ship Manager (SM) Subcontract

---

[2] When IAS issued the original solicitation in June 2005, the current ship manager contract had not been awarded. However, that same language permitting repairs in foreign shipyards was included in Clause H.1 of the 2000 contract:

> **H.1 PERFORMANCE OF REPAIR WORK**
> All repair and or upgrading work required in conjunction with the contract (including all surveys and correction of sea trial deficiencies, or any other deficiencies that may be noted up to time of delivery and acceptance previously noted or not) necessary to meet all requirements of this contract shall be accomplished in a U.S. ship repair facility, unless the work is for emergency, or mission essential repairs, or for pre-positioned ships which are deployed overseas, or for any vessel forward deployed outside of the United States.

Policies, of the 2005 Ship Manager contract, p. 10) Under the approved procedures, the ship manager prepares the solicitation package, statement of work, terms and conditions, bidder's lists, develops cost estimates, awards the contracts and oversees performance. MARAD does approve award recommendations for procurements of this size.

8. The repairs covered by the solicitation are a required drydocking survey, a special survey and a tailshaft survey as well as other necessary repairs. The repairs required by the solicitation are necessary to comply with regulatory requirements and to ensure the readiness of the vessel. The Certificate of Inspection (COI) for the PETERBURG expired on August 5, 2005. In addition, the American Bureau of Shipping (ABS) drydocking survey and special survey requirements for the vessel are due on September 30, 2005 and the ABS tailshaft survey is due on August 31, 2005. By regulation, all of these repairs and surveys must be satisfactorily completed before the United States Coast Guard can issue a new COI. In addition to the repairs originally contemplated by the solicitation, additional emergency repairs are required due to deficiencies found in a Coast Guard inspection performed August 8-10, 2005 before the ship departed for the shipyard in Singapore. Due to the deficiencies, the Coast Guard only authorized the ship to sail via a one-way waiver and a planned Shipyard Availability exercise (i.e., conducted to test readiness even during shipyard repairs) had to be cancelled. The repairs must be completed and the COI restored before the ship can be available to perform its mission. Documented public vessels, like the PETERSBURG and other RRF vessels cannot operate without a current COI.

9. IAS's solicitation included a requirement for the repairs to occur on or about the first week in August 2005. The procurement schedule attached to the solicitation shows a performance period of 35 calendar days beginning August 3rd. (Attachment C) The performance schedule was necessitated by the expiration of the COI and the rapidly approaching due dates for completion of the regulatory surveys, and an "out of service" period for the vessel agreed upon with the Department of Defense. Given the strategic importance of this unique asset, the repairs must be completed with all speed to return the ship to readiness.

10. GIS submitted a bid on the IAS procurement, but eventually indicated that their drydock was not available for performance until November 15th. (Attachment D) In addition, GIS indicated the repairs would take 82 days when program estimates and other offerors indicated the work could be performed in 35-45 days. This schedule means that the PETERSBURG would be unavailable to perform its critical mission from now until February 2006, at the earliest, assuming the work was completed on time by GIS.

11. The PETERSBURG left for Singapore August 12, 2005. I am informed by IAS that while an award decision had been made at that time, additional funding was required before the contract could be awarded so the contract was awarded August 16th. The vessel arrived at Keppel Shipyard in Singapore August 22nd. IAS informs me that while the ship is actually scheduled to enter the drydock portion of the facility for 20 days beginning August 28, significant work is being done pier side on the other repairs that were required under the contract and in preparation for the drydocking and other surveys. Work began pier side on the

vessel yesterday, August 23rd Singapore time, and has already proceeded to the point where the ship is disabled and unable to move under its own power. The following work is in process: Pressure Vacuum valves have been removed from the Cargo System; Reefer stores are being transferred to temporary storage; Main Fire Pump has been disabled; Ship's Fire Protection System has been disabled; Main Steam Stops have been disconnected; Main Turbine bolts have been loosened; Multiple pumps in the engine room have been disabled; Cargo tank staging is being loaded; and the Main Switch Board has been disconnected.

12. A stop-work-order now would cost the United States approximately $20,000 per day. The IAS's crew and technical personnel cost alone are about $10,000 per day, with additional costs for per diem and continued services (electric, water, phone) from the shipyard and security. There would also be significant but as yet unquantified delay and disruption costs from the shipyard. Furthermore, even a short delay could impact the ability of the ship to enter the drydock as scheduled on August 28th and a loss of this drydocking window could seriously impact schedule, cost and mission readiness. If this was to occur, it might be necessary for MARAD to relocate the vessel at significant cost to the government.

13. An injunction on performing any repairs to the PETERSBURG at the Keppel shipyard would have a significant impact on the readiness of the vessel to perform its mission since the ship is unusable in its current state. It would also be extremely costly. The PETERSBURG is unable to sail under its own power and would have to be towed back to Guam. I estimate the tow would take 22 days and cost approximately $350,000-400,000. Since the tow could not be arranged

instantaneously, additional costs would be incurred until a tow can be arranged and the shipyard would certainly be entitled to recover for services provided during that time. Furthermore, even if the ship returned to Guam, and assuming that GIS was awarded a contract to perform the repairs, GIS's facility remains unavailable until November 2005 when the repairs would have taken twice as long under optimal circumstances. Lastly, since IAS has executed the contract with the Singapore shipyard, there will be significant costs associated with terminating that contract. The value of IAS's contract with Keppel is $2,985,020. MARAD would be required to pay these additional costs because the MARAD's ship manager contract with IAS clearly permits repairs in foreign shipyards for vessels prepositioned overseas. (See Section C.4.2.6, Attachment A, p. 8)

I hereby declare, pursuant to 28 U.S.C.A. 1746 under penalty of perjury, that the above declaration is true and correct to the best of my knowledge.

_____                            8/23/05
William H Cahill                                              Date
Acting Director
Office of Ship Operations

Solicitation DTMA8R04004 – RRF Ship Manager Services                          Amendment 0013

SECTION C -- DESCRIPTIONS AND SPECIFICATIONS

C.1    INTRODUCTION

PERFORMANCE WORK STATEMENT (PWS) FOR READY RESERVE FORCE (RRF) SHIP MANAGER SERVICES

1.1 Mission

The Ready Reserve Force (RRF) is the high readiness subset of the Maritime Administration's (MARAD), Department of Transportation (DOT), National Defense Reserve Fleet (NDRF) established to support the rapid deployment of U.S. military forces. As a key element of strategic sealift, the RRF is specifically structured to transport military unit equipment during initial surge for U.S. forces deploying anywhere in the world.

1.2 Background

This is a performance based service contract (PBSC) issued by MARAD for maintenance and operational services for the RRF. Previous fixed price contracts for these services were awarded in 1988, 1993, and 2000 to U.S. commercial ship operating firms. MARAD expects that this PBSC will improve quality of service, productivity, and maximize cost savings during performance. It is the policy of the Federal Government that agencies use PBSC methods to the maximum extent practicable when acquiring services.

1.3 General Scope

Ship Managers shall maintain assigned RRF ship(s) in Fully Mission Capable Readiness Status and efficiently activate and operate these vessels in support of national emergencies and defense objectives. Services required include labor and supervision to equip, provision, supply, replace, upgrade, maintain or repair structures, equipment, machinery, outfitting, spare parts or supplies. The Ship Manager shall provide administrative support to ensure that all requirements of this contract are accomplished in a timely and efficient manner. Administrative support includes: management personnel, technical support, supplies, materials and services necessary to maintain and operate assigned ships, to the extent that such materials, reporting, and services are not specified as being provided by the Government.

1.3.1 Reimbursables: The omission of any particular item required for the performance of this performance work statement (PWS) does not make the item Government furnished or reimbursable unless expressly provided for in Attachment J-9. All work to be reimbursed shall be authorized by Task Order (TO) prior to commencement of work. All work is to be carried out under competent supervision and completed in a timely and lawful manner.

1.4 Definitions and Abbreviations

Definitions and abbreviations used throughout the contract, Technical Exhibits (TEs) and attachments are contained in TE-1 Section 2.

of readiness. A retention crew is not an ROS crew, although they may be given the option of becoming a nucleus crewmember. They are not required to obtain the same level of training (Attachment J-13) as an ROS crew would have, nor do they have the same benefits (permanent billets) as ROS crewmembers. If joining the Phase O crew, they must meet standard FOS requirements (see Sections C.5.10 and C.5.4.1). They are not required to maintain internal vessel security.

The Ship Manager is not required to obtain a layberth for the RRF-10 vessels as part of its proposal, however, during the course of the contract, MARAD may request its assistance at obtaining layberth services as a Prime. RRF-10 vessels with outport locations are listed in TE-4.

2.2.3.2 Phase O - Operation: This Phase involves the operation of the vessel for a specific mission or exercise. The vessel is to be operated in accordance with standard commercial practice and the RRF Operations Management Manual (TE-1). In Phase O the ship is normally under Military Sealift Command's (MSC) operational control.

2.2.4 While in Phase M and Phase O, maintain the vessel in a C-1 or C-2 status.

2.2.5 MARAD recognizes that events will occur which will result in a C-3 or C-4 status.

2.2.5.1 Notify the COTR within 24 hours of discovery whenever an event occurs which would place the vessel in a C-3 or C-4 status.

2.2.5.2 Initiate planning and as directed by TO take necessary action to correct promptly a C-3 or C-4 deficiency and return the vessel to the required readiness level. Submit a change to the current year Business Plan to reflect corrective actions.

2.2.6 MARAD recognizes that the vessel will have to be scheduled for C-5 status periods due to regulatory inspections, upgrades, and major maintenance periods.

2.2.6.1 Identify these periods within the vessel's business plan. (CDRL M-0005) The Ship Manager may be expected to adjust its proposed C-5 periods per the direction of the COTR when fleet-wide readiness is evaluated.

2.2.6.2 While the C-5 period must be kept to a minimum, evaluate cost against premium time and work acceleration expenditures in returning the ship to its required C-rating status.

2.3 Preventative Maintenance Plan Development

2.3.1 Develop two (2) preventative maintenance plans for each vessel one (1) for Phase M and one (1) for Phase O. Compliance with these Plans, and any of their modifications, is considered a performance measurement under the QASP. The preventative maintenance plans shall take into consideration all facets of inspection, testing, and conditioning the vessel's machinery, equipment, outfitting, and spaces (including structure, habitability areas, cargo areas, etc). The preventative maintenance plans shall include all regulatory body inspections and tests, as required.

2.3.1.1 A ship-specific Phase M Preventative Maintenance Plan, which incorporates both regulatory and preventative maintenance actions, shall be developed when the vessel is inactive. It shall reflect the assigned ROS-4; ROS-5 or deep lay up status (RRF-10). This plan shall be developed so as to

will place the vessel in a C-3 or C-4 status and enter the deficiency into MARAD's RMS at the next opportunity. All other repair items, upgrades, and enhancements shall be entered into MARAD's RMS at the discretion of the Ship Manager for funding consideration

2.4.5.1 In the event that a situation or condition develops that poses a threat to life, limb, property or the environment, take immediate action to protect or preserve the same.

2.4.6 Performance of Repair Work

All repair and/or up-grading work required in conjunction with the contract (including all surveys and correction of sea trial deficiencies, or any other deficiencies that may be noted up to time of delivery and acceptance previously noted or not) necessary to meet all requirements of this contract shall be accomplished in a U.S. ship repair facility, unless the work is for emergency, or mission essential repairs, or for pre-positioned ships which are deployed overseas, or for any vessel forward deployed outside of the United States.

2.5 Business Plan Development (Maintenance and Repair)

2.5.1 The Business Plans shall encompass all known facets of the budget, scheduling, maintenance, repair, manning, training, regulatory compliance, and operation (if planned) of the vessel. The Business Plans shall identify all estimated resources and scheduling for successful execution.

2.5.1.1 Submit initial detailed estimates of activation, operation, and deactivation costs for each vessel by item.

2.5.2 Submit with the Business Plans an estimate, by category (ship work breakdown structure), for emergent work which may arise during the year. Base these estimates on their experience as a ship operator and on historical data.

2.5.3 Identify the required work; estimate the cost and schedule for projected actions, i.e., preventative maintenance, corrective maintenance, and regulatory surveys and inspections; define the necessary resources; and schedule the execution of these actions to sustain the vessel in its required readiness. Documentation of these proposed actions and scheduling is part of the vessel's Business Plan. (CDRL M-0012)

2.6 Business Plan Execution (Maintenance and Repair)

Execute the Current Year Business Plan for each assigned vessel in accordance with the respective Plan's scope and schedule, subject to the obligation of funds. This shall be applicable regardless if vessel is in Phase O or M. Report status of individual tasks within the plan utilizing RMS. Maintain all data in RMS reflecting start and completion dates (planned and actual); work items (planned, in progress, and completed); method to complete; obligated and actual costs; and other supporting data elements as required by the system. (CDRL M-0013)

2.6.1 Maintain a historical database of work and repairs accomplished, to include associated costs accurately categorized by equipment, system or space. Use RMS database to refine and justify outyear business plans.

And an (optional) submission of Photographs (digital, if possible,) for use by MARAD in briefings or public affairs articles.

3.2.7.2 Maintain throughout both Phases the onboard property, inventory and currency of MSC, USCG, and other nautical publications and instructions.

3.2.7.3 Report any discrepancies (inventory and/or currency) to the COTR (for items, which MARAD furnishes,) and undertake necessary efforts to replace or update the deficient items.

3.2.7.4 Ensure missing documents or publications are obtained prior to the completion of load-out or departure from CONUS, whichever occurs first. Items in the Standard Administrative Yellow Filing cabinet onboard each vessel are found in CDRL BUS-0004.

3.2.7.5 Embarkation of military personnel. Ship Managers and Masters may be required to support the embarkation of Government personnel including military as passengers, supercargo personnel, and/or observers as directed by MARAD. This includes military stationed as a temporary security force, for example Guardian Mariners.

3.2.7.5.1 The Ship Manager shall provide berthing, food, medical, laundry, and cleaning services comparable to the equivalent shipboard rating. These services shall be provided on a cost reimbursable basis. Entertainment for embarked military is not required and it is not a reimbursable nor an allowable expense. No additional exercise facilities beyond what is available for the crew shall be provided.

3.2.7.5.2 COMSC has instructions which address Master's responsibility and relationship with military personnel, allocation of space, shipboard safety, behavior and discipline, weapons security and other related subjects. (See MSC SOM Chapter 2 Section 7)

If issues arise regarding weapons/ammunition, advise MAR-613 by the fastest means possible.

3.2.8 Chart Ordering and Nautical Publications. Ship Managers will gain access to nautical publications and charts (paper copies) ordering service by having a representative attend the MSC provided course (see J-13). Upon authorization which is provided in writing after completion of the course, Ship Managers shall obtain nautical publications and charts for vessels prior to operation and dispose of them during deactivation in accordance with direction from the COTR.

3.2.9 Slop Chest. Ship Managers will obtain all slop chest items at their own expense, operate the slop chest, and dispose of all materials in accordance with their own corporate procedures. MARAD will no longer reimburse slop chest materials.

3.3 Operations

3.3.1 General. Provide all resources and support equipment required to accomplish continuous ship operations for at least 180 consecutive days in accordance with good commercial practice and the laws and regulations of the United States. Ships are required to maintain operational sea speed listed in TE-7 or notify COTR immediately.

3.3.2 Arrange for port services when in port including anchorages and alongside facilities. Ship Managers must expect and be ready for simultaneous operations of vessels. Although most RRF

operations are point-to-point service, Ship Managers must remain flexible to changing operational requirements because there are a variety of worldwide missions for RRF ships. Generally, but not always, RRF ships are under the OPCON of MSC. RRF ships are owned by MARAD and the Ship Manager is contractually obligated to MARAD. Administrative control of the RRF remains with MARAD despite mission or operation assigned. See TE-1, Section 2 for Naval operational terminology.

3.3.3 Maintain vessels such that they achieve the minimum operational speed designated in TE-7. Failure to routinely meet operational speed requirements will result in an investigation to determine root causes, such as, but not limited to, severe weather, improper loading, operational or mission considerations, or failure to perform preventative or routine maintenance.

3.3.3.1 If an RRF ship is unable to comply with naval sailing orders during Operations, because the Master determines compliance is not feasible or it jeopardizes the safety of the ship, the Master, as Ship Manager's representative, must advise the naval operational commander and MARAD (COTR, MAR 611 and MAR-613 and if activated, the Crisis Management Team) within one (1) hour by immediate precedence message, unless message traffic is restricted by the naval commander. The message must include intended actions and reasons for not accepting naval operational direction.

3.3.3.2 Keep the naval operational command and MARAD (see Section 3.3.3.1) fully informed of the ship's status until it is capable of complying.

3.3.4 Operations Plan. Develop, implement, manage and maintain the Ship Manager developed ship-specific Operations Plan. Compliance with the Operations Plan, and any of its modifications, is considered a performance measurement under the QASP.

3.3.5 Bunkering

Provide general policy and ship specific plan for bunkering the ship in accordance with Federal, State, and local environmental regulations.

3.3.5.1 Ensure crew members are familiar with the ship's bunkering plan and conduct bunkering operations with the utmost care for environment in strict compliance with the bunkering plan.

3.3.5.2 Bunkering is normally performed after the vessel is reported RFS and accepted by MSC.

3.3.5.3 Bunkering instructions can either be provided in the MSC activation message or by the COTR.

3.3.5.4 Vessels under MSC OPCON must request bunkering instruction from the MSC area commander. The MSC area commander will instruct the vessel to use bunkers or procure bunkers commercially as a reimbursable. Bunkers are GFP or reimbursable (at the discretion of the Government). During operations, request information on availability of bunkers from the local MSC area commander before arriving in port.

3.3.5.4.1 Maintain list of crewmembers to have viewed bunkering video.

3.3.5.4.2 Inventory of oil spill response kit - semi-annually. Coordinate with COTR.

3.7.2.2 <u>Non Commercial Items</u> - Purchases for supplies and services that do not qualify as commercial items (as determined by the MARAD ACO) shall include all appropriate clauses that flow-down from the SM Contract.

3.7.3 <u>Subcontract terms</u> - The subcontract shall not include any language implying or stating that it is an agent of the Federal Government, and the SM shall not sign as "agent" or 'SM for MARAD." The subcontract shall not include terms that bind the Government to the results of arbitration, judicial determination, or voluntary settlement between the prime contractor and subcontractor.

3.7.4 <u>Insurance</u> - The SM shall require insurance from subcontractors to protect Government property in an amount appropriate to the subcontract, which shall be determined on a case-by-case basis. Typically, when a vessel is transported to a shipyard facility for a repair availability, MARAD requires the following types of insurance and minimum coverage during the entire performance of the subcontract:

(1) Workmen's Compensation, including Longshoremen & Harbor Worker's Act coverage - no minimum.

(2) Employers Liability - $5 million bodily injury by accident, each accident - $5 million bodily injury by disease each accident - $5 million bodily injury by disease in the aggregate.

(3) Maritime Employers Liability (Jones Act) - $5 million for each person per occurrence and $5 million in the aggregate.

(4) Comprehensive General Liability - $5 million combined single per occurrence limit for bodily injury and property damage and $5 million in the aggregate.

(5) Ship Repairers Legal Liability - $5 million per vessel, per occurrence.

(6) Pollution Liability - $5 Million per occurrence.

The SM shall ensure that indemnification extends to MARAD, and the insurance certificate shall name the United States of America as a secondary source certificate holder as owner, along with the SM as vessel operator. Such policies shall contain a statement that there is no recourse against the USA for payment of premium. The SM shall stipulate that upon request the subcontractor shall provide a copy of all original insurance policies within 5 calendar days. The SM shall ensure that the coverage does not contain exclusions that would effectively negate coverage for all but third party liabilities. All such insurance will contain 30 calendar days advance notice of cancellation or of any non-renewal which is the option of the insurer be provided in writing to the U.S. Department of Transportation, Division of Marine Insurance, MAR-575, Room 8117, 400 Seventh Street, SW, Washington, DC 20590.

The SM shall obtain and review proof of insurance coverage (i.e., certificate of insurance, policy). The ACO may request that the SM send the subcontractor insurance to the MARAD Division of Marine Insurance for review.

Date: 06/10/05 Rev 1 -KS

# S.S. PETERBURG
## Drydock / Repair Availability  RFP # 05-G-207-077
## PROCUREMENT SCHEDULE

| EVENT | ACTION | WORKING DAYS | START | FINISH |
|---|---|---|---|---|
| **MARAD Region Review - Technical** *(Review/Acceptance of Specification – Prior to submittal of entire RFP package to MARAD Region ACO)* | CR | 10 | April 2005 | 5/16/05 |
| IAS Received MARAD Regional – Technical Review *R. Boldt went over final comments w/IAS G.H while at IAS office on 5/16/05. | CR | 1 | 5/16/05 | 5/16/05 |
| (*1)RFP to Region for Review (Electronic) then to Headquarters (5 days review per each) | IAS | 5 | 06/02/05 | ~~06/09/05~~ 06/17/05 |
| Authorize RFP Issuance (Note: IAS will only issue upon review/acceptance of specification and or entire RFP pkg – based on estimated amount) | CR | 1 | 6/17/05 | 6/17/05 |
| Issue RFP | IAS | 1 | 06/17/05 | 06/17/05 |
| Solicitation Time *(calendar days)* | | 22 (Calendar Days) | 06/17/05 | 07/08/05 |
| Vessel Site Inspection / Bidder Conference | IAS | 2 | 06/27/05 | 06/28/05 |
| Open | IAS | 1 | 07/08/05 | 07/08/05 |
| Initial Evaluation | IAS | 1 | 07/08/05 | 07/08/05 |
| Negotiation / BAFOs w/Competitive Yards | IAS | 5 | 07/11/05 | 07/15/05 |
| Prepare Award Recommendation | IAS | 2 | 07/18/05 | 07/19/05 |
| (*1)MARAD Region Review *(working days)* | CR | 5 | 07/19/05 | 07/25/05 |
| (*1)MARAD Headquarter Review *(working days)* | HDQR | 5 | 07/25/05 | 07/19/05 |
| Authorize Contract Award | CR | 1 | 07/29/05 | 07/29/05 |
| Award to Vendor | IAS | 1 | 07/29/05 | 07/29/05 |
| **NTP** | IAS | 1 | 08/03/05 | 08/03/05 |
| Performance Period - *(Calendar Days)* | IAS | **35** | 08/03/05 | 09/06/05 |

(*1)IAW:  SM Contract Section J-2, Section 11.0 SUBCONTRACT REVIEW AND APPROVAL:
Review and Consent Requirements for Ship Manager w/ Approved Commercial Purchasing Systems.

**Rodriguez, Janis <MARAD>**

**From:** Suarez, Karen [karen.suarez@ium.com]
**Sent:** Friday, July 29, 2005 12:12 PM
**To:** Gilmour, Paul <MARAD>; Nancarrow, Trevor
**Subject:** SS PETERSBURG RFP # 05-G-207-077 DRY DOCK

Paul,

Karen is out today, but here is the information you requested.

Evelyn Maldonado
Contracts Secretary

---

**From:** Herman Agustin [mailto:HAgustin@guamshipyard.net]
**Sent:** Wednesday, July 27, 2005 2:56 AM
**To:** Suarez, Karen
**Cc:** Mathews Pothen
**Subject:** RE: SS PETERSBURG RFP # 05-G-207-077 DRY DOCK CERTIFICATION LTR

Karen,

Our present schedule is as fols:

NIAGARA FALLS Regular Overhaul (ROH) 25 Jul ~ 22 Sep 2005 – negotiated and in progress
CONCORD Regular Overhaul (ROH) 03 Oct ~ 16 Nov 2005 – present schedule (negotiations O/A 11 ~ 16 Aug 2005)

Petersburg (Proposed 82 days) 15 Nov 2005 ~ 05 Feb 2006

San Jose Mid-Term Availability (MTA) 20 Feb ~ 21 Mar 2006 – projected

V/R
Herman

---

**From:** Suarez, Karen [mailto:karen.suarez@ium.com]
**Sent:** Wednesday, July 27, 2005 12:57 AM
**To:** Herman Agustin
**Cc:** Mathews Pothen
**Subject:** RE: SS PETERSBURG RFP # 05-G-207-077 DRY DOCK CERTIFICATION LTR
**Importance:** High

Mr. Agustin,

If you are reading emails, right now can you please contact IAS as soon as possible.
I have questions in regards to your submitted schedule for the PETERSBURG. In particular,
what actual date are you referencing as your start date?.

Please respond.

Regards,
Karen Suarez
8/23/2005

IAS Contracting Officer
856-770-5620

---

**From:** Herman Agustin [mailto:HAgustin@guamshipyard.net]
**Sent:** Tuesday, July 26, 2005 12:40 AM
**To:** Suarez, Karen
**Cc:** Mathews Pothen
**Subject:** SS PETERSBURG RFP # 05-G-207-077 DRY DOCK CERTIFICATION LTR

Please find attached.

---

This message was scanned by ATX
12:39:25 AM ET - 7/26/2005

---

This message was scanned by ATX
2:54:44 AM ET - 7/27/2005