## SUPPLEMENTAL DECLARATION/AFFIDAVIT OF

## MATHEWS POTHEN

1. On Tuesday, August 16, 2005, I directed my staff to contact Interocean American Shipping Corporation (IASC) to inquire about the status of the solicitation for repair of SS Petersburg. By email from IASC dated Friday August 19, 2005, we were informed that it had awarded the contract for repair of SS Petersburg (Contract 05-G-207-077) to Keppel Shipyard in Singapore on Tuesday, August, 16th. Attached is a copy of that email notification.

2. On Tuesday morning, August 23, 2005, I contacted a knowledgeable source in Singapore and was informed that SS Petersburg had not yet arrived in Singapore, but was expected to arrive that afternoon. Based on my extensive experience in repairs such as those scheduled for Petersburg, I can say that several days of work will be necessary before Petersburg can be dry-docked and repairs commenced. Among other things, a large amount of equipment and small craft must be off-loaded from Petersburg and a docking conference scheduled before the ship can be put in the dry-dock.

I declare under penalty of perjury, pursuant to 28 U.S.C. subsection 1746, that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed on this _August 24, 2005_.

_____
Mathews Pothen
President & CEO
Guam Industrial Services Inc.
dba Guam Shipyard

# REPORT TO CONGRESS

# ON

# REPAIR OF MILITARY SEALIFT COMMAND SHIPS

Prepared by:
Commander, Military Sealift Command
Washington, DC 20398

May 2004

# REPAIR OF MILITARY SEALIFT COMMAND SHIPS

## REQUIREMENT

Fiscal Year 2004 Defense Appropriations Conference Report 108-283 directed that the Secretary of the Navy submit to the congressional defense committees a report (1) describing the Navy's policy for repairing Military Sealift Command (MSC) ships in foreign shipyards, (2) analyzing trends in funding for and level of repair work done on MSC ships in foreign and domestic yards, and (3) reviewing the consequences of reallocating MSC ship repair work to domestic shipyards. The conferees expressed concern that a disproportionate number of MSC ships are being repaired in foreign shipyards.

## EXECUTIVE SUMMARY

This report responds to the conferees' direction and addresses the repair of government owned and demise chartered MSC ships. From Fiscal Years 2001-2003, over 89% of MSC repair dollars were awarded to domestic shipyards, which for the purposes of 10 U.S.C. §7310, include shipyards in the U.S. and Guam. To meet the Navy's operational requirements, MSC ships operate at a higher operational tempo than Navy combatant ships. Each MSC ship provides at least 270 days per year of operational capability to the operating forces of the Fleet Commanders and the MSC fleet is sized accordingly by the Chief of Naval Operations (CNO). The remaining 95 days in each year are allocated to training and preventative and corrective maintenance. Any increase in time required for maintenance could necessitate an increase in MSC force structure or, alternatively, decrease in MSC support of fleet operational requirements.

All MSC ships must be maintained in a safe material condition sufficient to accomplish assigned missions and to protect crew, cargo, and the vessel itself. At the same time, MSC recognizes it is national policy to repair its ships in shipyards located in the U.S. and Guam to the fullest extent. Accordingly, MSC regularly evaluates the operational and maintenance schedules of its ships to ensure that they will be repaired in domestic yards to the greatest extent practicable without degrading mission requirements. Analysis shows that the vast majority of MSC vessels are being repaired in domestic shipyards.

## MSC SHIP INSPECTION AND REPAIRS

The data presented in this report relies on the contract award prices for scheduled maintenance availabilities and major voyage repairs for Fiscal Years 2001-2003 of U.S. government owned and bareboat-chartered ships. This three-year period captures one of the two major planned shipyard availabilities during a vessel's five-year maintenance cycle. MSC uses a five-year maintenance cycle for classification and certification policies and procedures, which is consistent with international maritime practice. All MSC ships receive annual American Bureau of Shipping (ABS) surveys and those ships that have U.S. Coast Guard certificates also receive U.S. Coast Guard inspections. These surveys and inspections are necessary to maintain ship class and certification.

1

Over the three fiscal years covered by this report, MSC spent an average of 89% of its overall repair and maintenance expenses in domestic shipyards. An average of 15% of the overall expenses were in Guam. For every fiscal year since 1998, MSC has maintained a Class Justification for Other Than Full and Open Competition (J&A) to authorize award of noncompetitive contracts for ship repair to Guam Shipyard in Santa Rita, Guam. 10 U.S.C §2304(c)(3) and FAR 6.302-3(a)(2)(i) provide authority to award noncompetitive contracts "…to maintain a facility, producer, manufacturer, or other supplier availability for furnishing supplies or services in case of a national emergency or to achieve industrial mobilization." In support of the J&A, Commander, U.S. Pacific Fleet (COMPACFLT) determined that maintaining a private ship repair capability as a mobilization base facility on Guam is a matter of vital strategic importance for future defense operations in the Western Pacific. In each fiscal year since Guam Shipyard became a private ship repair facility, the total dollar value of MSC ship repair contracts awarded to the yard has continually increased.

## NAVY POLICY FOR REPAIRING MSC SHIPS IN FOREIGN SHIPYARDS

The Navy fully complies with 10 U.S.C. §7310, which prohibits Navy ships homeported in the U.S. from being overhauled, repaired, or maintained in foreign shipyards, except in the case of voyage repairs. The Navy does not designate homeports for the auxiliary vessels operated by MSC. The Navy requires, as a matter of policy, that these vessels be considered "homeported in the U.S." for purposes of 10 U.S.C. §7310, unless the vessel will remain deployed overseas for a period exceeding two years. MSC ships designated as "homeported overseas" are not subject to the statute and must be specifically approved as such by the Assistant Secretary of the Navy (Research, Development, and Acquisition). When so approved, all maintenance and repair on these ships may be accomplished in foreign shipyards. If an MSC ship designated "homeported overseas" returns to the U.S. at any time during its overseas assignment, the national policy governing "U.S. homeported" ships applies (i.e., it must be repaired by shipyards located in the U.S. or Guam) and the vessel's homeport status is reevaluated. If an MSC vessel is homeported in the U.S., only voyage repairs[1] may be performed in a foreign shipyard.

Combatant commanders determine whether missions require an MSC vessel to be forward deployed or to remain forward deployed. To remain forward deployed and mission capable, these vessels may require repair. However, only vessels forward deployed for more than two years and approved by the Assistant Secretary of the Navy (Research, Development and Acquisition) may have repair work, other than voyage repairs, accomplished by a foreign shipyard. An MSC ship that will be forward deployed for less than two years may only procure repair of safety or mission essential items, that is, voyage repairs, from foreign shipyards. Of the 115 ships in the active MSC fleet, an average of approximately 30 ships were forward deployed for more than two years to support DoD activities overseas during Fiscal Years 2001-2003.

---

[1] Voyage repairs include (1) corrective maintenance on mission or safety essential items necessary for a ship to deploy, to continue on its deployment or comply with regulatory requirements, or (2) scheduled maintenance only to the extent that said maintenance is absolutely necessary to ensure machinery and equipment operational reliability (e.g., diesel top end overhaul) or to comply with regulatory requirements. (See COMSCINT 4700.15A.)

2

## TRENDS IN FUNDING AND LEVEL OF REPAIR WORK ON MSC SHIPS IN FOREIGN AND DOMESTIC YARDS

Over the past three fiscal years (Fiscal Years 2001-2003), MSC awarded an average of 79% of its availabilities and 89% of its ship maintenance and repair dollars to repair facilities located in the U.S. and Guam. During that time, MSC conducted 90 availabilities and awarded over $254 million for the repair of MSC ships at repair facilities located in the U.S. and Guam. During this period, MSC conducted 24 availabilities and awarded a total of $32 million to foreign shipyards for the repair of its ships. A total of 11 availabilities, valued in excess of $43 million, were awarded to Guam Shipyard.

From Fiscal Year 2001 to Fiscal Year 2003, the total number of availabilities increased 50% due to higher overseas operational tempo and a greater number of scheduled availabilities. During this period the availabilities awarded to domestic shipyards increased 54% while availabilities awarded to foreign shipyards increased by only 33%. As the number of availabilities and the dollars awarded increased significantly, the percent of dollars spent in the domestic shipyards remained relative stable. From Fiscal Years 2001-2003, MSC at no time awarded more than 14% of its repair dollars or 26% of its availabilities to foreign shipyards.

There will always be mission critical or emergency repairs that must be made and that have the potential to increase the amount of money spent in foreign shipyards. For example in the second quarter of Fiscal Year 2004, the USNS SHUGHART (T-AKR 295), a Large Medium Speed Roll-on/Roll-off ship, experienced a major fire while operating overseas in support of Operation IRAQI FREEDOM II and may have to be repaired in a foreign shipyard. The unpredictability of these types of incidents makes projections of overall spending levels and distributions between U.S. and foreign shipyards difficult. However, MSC is committed to expending its ship repair funds in domestic shipyards, as long as it is feasible to do so without degrading mission requirements.

## CONSEQUENCES OF REALLOCATING MSC SHIP REPAIR WORK TO DOMESTIC SHIPYARDS

MSC's forward deployed ships are vital national assets. The ability of its Naval Fleet Auxiliary Force ships to deliver fuel and supplies at sea to U.S. Navy combatant assets and our allies enables these warships to remain on-station for longer periods of time. By not having to return to port to refuel and re-supply, these ships maintain a high level of operational capability and fleet readiness to defend against threats. Other ships, such as those in the Special Mission and Prepositioning Programs, accomplish their primary mission by being and remaining forward deployed for extended periods. MSC also employs time-chartered ships for certain missions. These ships are privately owned, and either their owner or operator is responsible for their maintenance and repair. Time-chartered ships are not subject to the requirements of 10 U.S.C. §7310 and overseas repair work performed on them is subject to applicable U.S. ad valorem taxes.

If MSC were required to reallocate repair work accomplished in foreign shipyards to domestic shipyards, there would be a degradation of operational capabilities and a substantial increase in actual dollar costs primarily because of increased transit costs. Such a change would essentially restrict the Navy from accomplishing any overseas overhaul, maintenance or repair, including emergent voyage repairs, on ships without homeport designations. In the broadest sense, such a reallocation would seriously degrade the Navy's operational mission by adding substantial transit time (time out of service) to the repair schedule required for MSC ships, and could require a larger, more expensive, force structure to support Navy and operational requirements. The current inventory of MSC ships can only satisfy combatant commanders by having vessels remain forward deployed. If these ships must return to the U.S. or Guam for repair, by definition they will not be forward deployed and will not be able to satisfy the requirements.

Enclosure (1) displays the 24 availabilities accomplished in foreign shipyards during Fiscal Years 2001-2003 and lists the estimated transit time (one way) and the fuel cost of that transit time for each ship being repaired if it had been required to accomplish the repair work in a domestic shipyard. In most instances, transit time to Guam, Hawaii and the nearest CONUS coast are listed. Guam and Hawaii are typically the nearest domestic shipyards to forward deployed assets in the western Pacific and parts of the Indian Ocean. However, the capabilities of those shipyards are limited. Guam has one Naval Sea Systems Command (NAVSEA) certified drydock capable of handling large ships, while no private Hawaiian shipyard has a NAVSEA certified drydock.

Had the MSC ships that were repaired in a foreign shipyard during Fiscal Years 2001-2003 been required to accomplish all repair work in U.S. shipyards and then return to their forward deployed location, over 577 days of mission capability would have been lost to transit time with an increase in cost of over $7.5 million. This scenario assumes the closest domestic port to each ship was capable of accomplishing the repair. If all vessels had been required to return to the nearest CONUS coast for repair, over 1,380 days of mission capability would have been lost with an increased cost related to the transit of over $19.8 million dollars. These costs do not include the additional cost of canal fees should the vessel return via the Suez or Panama Canals. Those fees range from $40k to $400k per transit depending on the size of the vessel.

**SUMMARY**

Reallocating MSC ship repair work to domestic shipyards would seriously degrade MSC's mission of supporting the combatant fleet and would also result in a substantial increased cost. During Fiscal Years 2001-2003, MSC awarded an average of 79% of its availabilities and 89% of its award dollars in the U.S. and Guam. The Department of the Navy and MSC are firmly committed to conducting the maximum amount of repair work practicable in domestic shipyards and ensuring that MSC ships are repaired in foreign shipyards only when directed by operational necessity and allowed by law.

4

**Transit Times and Additional Cost for Return of Vessels to US Shipyard**

**Transit Time in Days (one way)**

| | Ship Name | Repair Yard Location | Economical Speed (Bbls/day) | Fuel Price ($/Bbl) | Average Daily Cost | Transit Time to Guam | Transit Time to Hawaii | Transit Time to CONUS West Coast | Transit Time to CONUS East Coast | Transit Time to CONUS | Additional Cost Guam (includes round trip xsit) | Additional Cost Hawaii (includes round trip xsit) | Additional Cost CONUS (includes round trip xsit) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| FY01 | CATAWBA | Bahrain | 180 | $41.16 | $8,586 | 30 | 38 | 45 | n/a | 45 | $395,198 | $503,506 | $592,704 |
| | DIEHL | Singapore | 350 | $41.16 | $14,406 | 7.2 | 16.3 | 25 | n/a | 25 | $207,446 | $469,898 | $720,300 |
| | ERICSSON | Singapore | 350 | $41.16 | $14,406 | 7.2 | 16.3 | 25 | n/a | 25 | $207,446 | $469,898 | $720,300 |
| | PECOS | Singapore | 350 | $41.16 | $14,406 | 7.2 | 16.3 | 25 | n/a | 25 | $207,446 | $469,898 | $720,300 |
| | RAPPAHANNOCK | Singapore | 350 | $41.16 | $14,406 | 7.2 | 16.3 | 25 | n/a | 25 | $207,446 | $469,898 | $720,300 |
| | INVINCIBLE | Singapore | 70 | $41.16 | $2,881 | 22 | 43 | 50 | n/a | 50 | $126,773 | $247,763 | $288,120 |
| FY02 | WATSON | Australia | 850 | $40.32 | $34,272 | 10 | 18 | n/a | 28 | 28 | $685,440 | $1,233,792 | $1,919,232 |
| | CATAWBA | Bahrain | 160 | $40.32 | $6,451 | 30 | 38 | 45 | n/a | 45 | $387,072 | $490,281 | $580,608 |
| | HENSON | Canary Islands | 220 | $40.32 | $8,870 | n/a | n/a | n/a | 18 | 18 | n/a | n/a | $319,294 |
| | BOWDITCH | Japan | 220 | $40.32 | $8,870 | 4 | 10.1 | 14.3 | n/a | 14.3 | $70,965 | $179,182 | $253,698 |
| | SUMNER | Singapore | 220 | $40.32 | $8,870 | 7.7 | 17.5 | 22.3 | n/a | 22.3 | $136,604 | $310,464 | $395,020 |
| | ERICSSON | Singapore | 350 | $40.32 | $14,112 | 7.2 | 16.3 | 25 | n/a | 25 | $203,218 | $460,051 | $705,600 |
| | INVINCIBLE | Singapore | 70 | $40.32 | $2,822 | 22 | 50 | 43 | n/a | 43 | $124,186 | $282,240 | $242,726 |
| | KAISER | Singapore | 350 | $40.32 | $14,112 | 7.2 | 16.3 | 25 | n/a | 25 | $203,213 | $460,051 | $705,600 |
| | RAPPAHANNOCK | Singapore | 350 | $40.32 | $14,112 | 7.2 | 16.3 | 25 | n/a | 25 | $203,213 | $460,051 | $705,600 |
| | RED CLOUD | Singapore | 850 | $40.32 | $34,272 | 12 | 21 | 28 | n/a | 28 | $822,528 | $1,439,424 | $1,919,232 |
| FY03 | POMEROY | Australia | 850 | $36.54 | $31,059 | 10 | 18 | n/a | 28 | 28 | $621,180 | $1,118,124 | $1,739,304 |
| | WATKINS | Australia | 850 | $36.54 | $31,059 | 10 | 18 | n/a | 28 | 28 | $621,180 | $1,118,124 | $1,739,304 |
| | WATSON | Portugal | 850 | $36.54 | $31,059 | n/a | n/a | n/a | 8 | 8 | n/a | n/a | $496,944 |
| | GUADALUPE | Singapore | 350 | $36.54 | $12,789 | 7.2 | 16.3 | 25 | n/a | 25 | $184,162 | $416,921 | $639,450 |
| | INVINCIBLE | Singapore | 70 | $36.54 | $2,558 | 22 | 50 | 43 | n/a | 43 | $112,543 | $255,780 | $219,971 |
| | PECOS | Singapore | 350 | $36.54 | $12,789 | 7.2 | 16.3 | 25 | n/a | 25 | $184,162 | $416,921 | $639,450 |
| | OBSERVATION ISLAND | Singapore | 700 | $36.54 | $25,578 | 11 | 25 | 43 | n/a | 43 | $562,716 | $1,278,900 | $2,199,708 |
| | YUKON | Singapore | 350 | $36.54 | $12,789 | 7.2 | 16.3 | 25 | n/a | 25 | $184,162 | $416,921 | $639,450 |



# GUAM SHIPYARD

P.O. Box 13010
Santa Rita, Guam  96915
(671) 339-3365/5258 Fax (671) 339-3610/4198

**INVOICE**

INVOICE NO: 001568
DATE: JULY 18, 2001

INTEROCEAN UGLAND MANAGEMENT CORPORATION
TWO ECHELON PLAZA, SUITE 300
221 LAUREL ROAD
VOORHEES, NJ 0843-2349

ATTENTION: ACCOUNTING DEPARTMENT
FAX: 1-856-770-1633

| SALESPERSON | P.O. NUMBER | VESSEL | JOB ORDER NO. | TERMS |
|---|---|---|---|---|
| H. AGUSTIN | N/A | SS PETERSBURG | 0094-0010-0000 | NET 30 DAYS |

| QUANTITY | DESCRIPTION | UNIT PRICE | AMOUNT |
|---|---|---|---|
| 1 LOT | TO BILL YOU FOR THE LABOR AND MATERIALS TO REPAIR FORECASTLE HYDRAULIC CRANE REPAIRS | $ 52,716.00 | |
| | TOTAL BILLED UNDER P.O. #502380 | (30,204.07) | $ 30,204.07 |
| | BALANCE: PENDING NEGOTIATION FOR ADDITIONAL P.O. | $ 22,511.93 | |
| | SUB TOTAL | | $ 30,204.07 |
| | GRT | | 1,208.17 |
| | **TOTAL DUE** | | **$ 31,412.24** |

A 2% Finance Charge will be charged after 30 days from the date of invoice. A $35.00 Service Fee will be charged for all returned checks.

Make all checks payable to: GUAM SHIPYARD
If you have any questions concerning this invoice, call: Cynthia D. Pizarro **at (671) 339-3365** or E-mail at
**cpizarro@shipyard.guam.net**

*We appreciate your business!*

INTEROCEAN UGLAND MANAGEMENT                                                                 018339

| REFERENCE NO. | INVOICE NO. | INVOICE DATE | INVOICE AMOUNT | AMOUNT PAID | DISCOUNT TAKEN | NET CHECK AMOUNT |
|---|---|---|---|---|---|---|
| 018009 | 001561 PETERSBURG | 7/20/01 | 3224.00 | 3224.00 | 0.00 | 3224.00 |

ENTERED  9/11/01



# GUAM SHIPYARD

P.O. Box 13010
Santa Rita, Guam 96915
(671) 339-3365/5258 Fax (671) 339-3610/4198

# INVOICE

INVOICE NO: 001561
DATE: JULY 11, 2001

INTEROCEAN UGLAND MANAGEMENT CORPORATION
TWO ECHELON PLAZA, SUITE 300
221 LAUREL ROAD
VOORHEES, NJ 0843-2349

ATTENTION: ACCOUNTING DEPARTMENT
FAX: 1-856-770-1633

| SALESPERSON | P.O. NUMBER | VESSEL | JOB ORDER NO. | TERMS |
|---|---|---|---|---|
| H. AGUSTIN | 006107 | SS PETERSBURG | 0094-0011-0000 | NET 30 DAYS |

| QUANTITY | DESCRIPTION | UNIT PRICE | AMOUNT |
|---|---|---|---|
| 1 LOT | TO BILL YOU FOR THE PROVISION OF SERVICE TO 4 EACH MOORING WIRES | | 3,100.00 |
| | SUB TOTAL | | $ 3,100.00 |
| | GRT | | 124.00 |
| | TOTAL DUE | | $ 3,224.00 |

Make all checks payable to: GUAM SHIPYARD
If you have any questions concerning this invoice, call: Cynthia D. Pizarro at (671) 339-3365 or E-mail at
cpizarro@shipyard.guam.net

*We appreciate your business!*

INTEROCEAN UGLAND MAN[redacted]

101405

| REFERENCE NO. | [redacted] NO. | INVOICE DATE | INVOICE AMOUNT | AMOUNT PAID | DISCOUNT TAKEN | NET CHECK AMOUNT |
|---|---|---|---|---|---|---|
| 005127 | 000964 PETERSBURG | 09/13/2000 | 3319.68 | 3319.68 | 0.00 | 3319.68 |



# GUAM SHIPYARD

P.O. Box 13010
Santa Rita, Guam 96915
(671) 339-3365/5258 Fax (671) 339-3610/4198



INVOICE NO: 000964
DATE: JANUARY 27, 2000

INTEROCEAN UGLAND MANAGEMENT CORPORATION
TWO ECHELON PLAZA, SUITE 300
221 LAUREL ROAD
VOORHEES, NJ 0843-2349

| SALESPERSON | P.O. NUMBER | VESSEL | JOB ORDER NO. | TERMS |
|---|---|---|---|---|
| F. WISSING | 500498 | S/S PETERSBURG | 0094-0009-0000 | DUE UPON RECEIPT |

| QUANTITY | DESCRIPTION | UNIT PRICE | AMOUNT |
|---|---|---|---|
| | TO BILL YOU FOR THE FOLLOWING SERVICES: | | |
| 64 HRS | LABOR TO CLEAN, MEASURE, MACHINE SEAL COMPONENT FOR TECH REP | $42.00 | $2,688.00 |
| 12 HRS | STRAIGHTEN 4" X 20' TUBE | 42.00 | 504.00 |
| | SUB TOTAL | | $3,192.00 |
| | GRT | | 127.68 |
| | TOTAL DUE | | $3,319.68 |

*[signature]* C/E
SS PETERSBURG
9-13-00

Make all checks payable to: GUAM SHIPYARD
If you have any questions concerning this invoice, call: Cynthia D. Pizarro **at (671) 339-3365** or E-mail at
cpizarro@shipyard.guam.net

*We appreciate your business!*

INTEROCEAN UGLAND MANAGEMENT                                                                 **102480**

| REFERENCE NO. | INVOICE NO. | INVOICE DATE | INVOICE AMOUNT | AMOUNT PAID | DISCOUNT TAKEN | NET CHECK AMOUNT |
|---|---|---|---|---|---|---|
| 007145 | 001568 PETERSBURG | 7/23/01 | 31412.24 | 31412.24 | 0.00 | 31412.24 |



**STATEMENT OF ACCOUNT**

...or Hawa...
...ANA BRANCH
PO BOX BH
AGANA GU 96910
DIRECT TELEPHONE INQUIRIES TO THE PHONE
NUMBER ON THE OTHER SIDE OF THIS STATEMENT

ACCOUNT NUMBER 0038-090631

STATEMENT PERIOD
01/01/02 THROUGH 01/31/02

BF

BUSINESS CHECKING

PAGE 3 OF 3
E    170                                            H      38
         GUAM INDUSTRIAL SERVICES INC
         DBA GUAM SHIPYARD

| Description | Date | Amount |
|---|---|---|
| IRS         USATAXPYMT  011602 220201622795275 | 01/16 | 22,742.18 |
| DEBIT MEMO | 01/17 | 87.50 |
| BANKOH BY PHONE TRANSFER  020117 REF#0000011  TO 0038090534 | 01/18 | 2,500.00 |
| BANKOH BY PHONE TRANSFER  020123 REF#0000013  TO 0038090534 | 01/24 | 40,000.00 |
| BANKOH BY PHONE TRANSFER  020124 REF#0000011  TO 0038090534 | 01/25 | 121,500.00 |
| IRS         USATAXPYMT  012902 220202941784161 | 01/29 | 34,232.91 |
| DEPOSITS/CHECKS PAID FEE | 01/31 | 61.50 |

DEPOSITS AND OTHER CREDITS

| Description | | Date | Amount |
|---|---|---|---|
| MERCHANT SERVICE INTERCHNG  020101 102201966995 | | 01/02 | 1,379.69 |
| CUSTOMER DEPOSIT | | 01/04 | 7,697.86 |
| BOH FUNDS    TRANSFER  010702 020107000163702 | | 01/08 | 36,681.74 |
| CUSTOMER DEPOSIT | | 01/09 | 1,370.00 |
| BOH FUNDS    TRANSFER  010802 020108000160702 | | 01/09 | 18,612.56 |
| CUSTOMER DEPOSIT | | 01/11 | 205,638.65 |
| DFAS PACIFIC   VENDOR PMT  020115 N6175502M0007  RMR*IV*001719*PI*384.00*384.00\REF*GC*N6  175502M0007\DTM*003*011127\ | | 01/16 | 384.00 |
| CUSTOMER DEPOSIT | | 01/17 | 27,146.71 |
| CUSTOMER DEPOSIT | | 01/24 | 300,000.00 |
| CUSTOMER DEPOSIT | | 01/29 | 2,274.47 |
| MERCHANT SERVICE DEPOSIT | 201966 | 01/07 | 22,375.53 |
| MERCHANT SERVICE DEPOSIT | 201966 | 01/16 | 2,275.00 |
| MERCHANT SERVICE DEPOSIT | 201966 | 01/18 | 2,064.35 |
| MERCHANT SERVICE DEPOSIT | 201966 | 01/31 | 61,994.88 |

Handwritten annotation next to 01/09 $18,612.56 entry (circled): "ST PETERSBURG PROJECT IN# N87 FULL PAYMENT"

CHECKING
ACCOUNT SUMMARY

| | |
|---|---|
| OPENING BALANCE ON 01/01/02 | 387,328.91 |
| TOTAL OF 10 DEPOSITS FOR | 632,837.45 |
| TOTAL OF 4 OTHER CREDITS FOR | 57,057.99 |
| TOTAL OF 167 CHECKS FOR | 508,389.16 |
| TOTAL OF 16 OTHER DEBITS FOR | 387,779.49 |
| CLOSING BALANCE ON 01/31/02 | 181,055.70 |
| AVERAGE DAILY BALANCE | 208,756.71 |

V1EMBER FDIC            Please report any errors or omissions within 30 days, otherwise statement will be considered correct.
JDA-1G (Rev 8-1998)        NOTICE: SEE REVERSE SIDE AND ACCOMPANYING STATEMENT(S) FOR IMPORTANT INFORMATION.

@ LENDER