**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

GUAM INDUSTRIAL SERVICES, INC.,   :
                                :
          Plaintiff,           :     Civil Action No.:    05-1599 (RMU)
                                :
          v.                :     Document No.:    4
                                :
DONALD H. RUMSFELD,         :
     Secretary of Defense *et al.*,   :
                                :
          Defendants.       :

## <u>MEMORANDUM OPINION</u>

### Denying the Plaintiff's Motion for a Temporary Restraining Order

## I. INTRODUCTION

This matter comes before the court on the motion of Guam Industrial Services ("GIS") for a temporary restraining order ("TRO"). GIS owns and operates Guam Shipyard, which repairs and otherwise services maritime vessels. Compl. ¶ 2. The Guam Shipyard is the only U.S.-citizen owned and controlled commercial shipyard west of the International Dateline. *Id.* GIS claims that the United States Navy's ("Navy") bid proposal and contract award practices with shipyards not located in the United States or Guam violate 10 U.S.C. § 7310. GIS seeks to enjoin the defendants[1] from soliciting bid proposals and contracting for repairs of Navy vessels from shipyards not located in either the United States or Guam. GIS now seeks a TRO to prevent the defendants from servicing the Navy vessel SS Petersburg by a shipyard in Singapore.

---

[1] Donald Rumsfeld, Secretary of the U.S. Department of Defense ("DoD"), Gordon England, Secretary of the Department of Navy ("Navy"), Norman Mineta, Secretary of the Department of Transportation ("DOT"), and John Jamain, Acting Administrator of the Maritime administration ("MARAD"), collectively, the "defendants."

Because GIS has not demonstrated that the SS Petersburg's homeport is in the United States, it fails to demonstrate a substantial likelihood of success on the merits. Because the harms alleged by the plaintiff concern loss of business, GIS fails to demonstrate irreparable harm. Because the Navy's military interest in expeditious Navy vessel repairs is compelling, the public interest does not favor the plaintiff. Accordingly, the court denies the plaintiff's motion for a TRO.[2]

## II. BACKGROUND

The plaintiff owns and operates Guam Shipyard, located in the U.S. Territory of Guam. Pl.'s Mot. at 4. The Guam Shipyard employs approximately two hundred and fifty people – all U.S. citizens, and is "the only United States-citizen owned and controlled shipyard that can service United States Navy, Military Sealift Command ("MSC"), and [Maritime Administration, ("MARAD")] ships that are under the jurisdiction of the Secretary of Navy and located in the Pacific and Indian Oceans." *Id.*

A select group of Navy vessels are part of the Navy's Prepositioning Program, a program funded and administered by the Navy and controlled by the Navy's Sealift Command. *Id.* at 4; Defs.' Opp'n at 2. These ships are positioned by the Navy in strategic oceanic locations, "making it possible to deploy equipment, fuel, and supplies to support U.S. military forces on short notice during times of war or as a result of other contingencies." *Id.* at 5.

The Navy also maintains a fleet of maritime vessels in the United States Ready Reserve Force ("RRF"), which are a select group of ships within the National Defense Reserve Fleet, are

---

[2] Although the plaintiff requests a hearing in this matter, the court is not required to provide the plaintiff a hearing where one is unnecessary. *Johnson v. Holway*, 329 F.Supp.2d 12, 14 n. 1 (D.D.C. 2004) (denying the plaintiff's request for an evidentiary hearing because the existing record was sufficient); Local Civil Rule 65.1(d) (requiring a hearing on an application for a preliminary injunction no later than 20 days after its filing, unless the court earlier decides the motion on the papers).

maintained by the DOT's MARAD, and are funded from the Navy-controlled National Defense Sealift Fund.  *Id.* at 2; Pl.'s Mot. at 2-3.

The Navy vessel SS Petersburg is designated both within the Prepositioning Program and the National Defense Reserve Fleet.  *Id.* at 4-5.  While on assignment as a vessel in the RRF, the SS Petersburg is maintained and controlled by the DOT's MARAD, but when activated under the Navy's strategic Prepositioning Program, the vessel is maintained and controlled by the Navy and the Navy's Military Sealift Command.  Def.'s Opp'n at 2.

The SS Petersburg has been located or "prepositioned" in the U.S. Territory of Guam at the Delta-Echo Pier in Apra Harbor for the past three years.  *Id.* at 5.  Daily control of the SS Petersburg is delegated to one of three Maritime Prepositioning Ship squadrons ("MSPRONs").  *Id.*  The vessel's specific mission while located in Guam is to provide offshore petroleum distribution services to the Defense Logistic Agency.  *Id.*

On June 21, 2005, the Interocean American Shipping Corporation ("IASC"), a corporation that provides ship management services to MARAD for the SS Petersburg, Defs.' Opp'n, Attach. 2, Cahill Decl. ¶ 6, began soliciting bids for drydock work and repairs of the SS Petersburg, Pl.'s Mot., Attach. 1, Pothen Decl. ¶ 9.  In response to this solicitation, the Guam Shipyard submitted a bid proposal.  *Id.*  On August 16, 2005, IASC accepted a bid from the Keppel Shipyard in Singapore for the repair work to the SS Petersburg.  Cahill Decl. ¶ 11; Pl.'s Mot. at 1.

Although the SS Petersburg will not enter the drydock portion of the Singapore shipyard until August 28, 2005, repair work on the SS Petersburg commenced on August 23, 2005. Cahill Decl. ¶ 11.  Upon learning that repair work on the SS Petersburg had begun, the plaintiff, on

August 23, 2005, filed its instant motion for a TRO.  Because the plaintiff's alleged harm had already commenced, the court ordered an expedited briefing schedule.  As all submissions have now been made, the court turns to the merits of the plaintiff's motion.

### III.  ANALYSIS

#### A.  Legal Standard for a Motion for a Temporary Restraining Order

This court may issue interim injunctive relief only when the movant demonstrates:

> (1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction is not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction.

*Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1066 (D.C. Cir. 1998) (quoting *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995)); *see also World Duty Free Americas, Inc. v. Summers*, 94 F. Supp. 2d 61, 64 (D.D.C. 2000).  It is particularly important for the movant to demonstrate a substantial likelihood of success on the merits.  *Cf. Benten v. Kessler*, 505 U.S. 1084, 1085 (1992) (per curiam).  Indeed, absent a "substantial indication" of likely success on the merits, "there would be no justification for the court's intrusion into the ordinary processes of administration and judicial review."  *Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 38 F. Supp. 2d 114, 140 (D.D.C. 1999) (internal quotation omitted).

The four factors should be balanced on a sliding scale, and a party can compensate for a lesser showing on one factor by making a very strong showing on another factor.  *CSX Transp., Inc. v. Williams*, 406 F.3d 667, 670 (D.C. Cir. May 3, 2005) (citing *CityFed Fin. Corp.*, 58 F.3d

at 747).  "An injunction may be justified, for example, where there is a particularly strong likelihood of success on the merits even if there is a relatively slight showing of irreparable injury." *CityFed Fin. Corp.*, 58 F.3d at 747.

Because interim injunctive relief is an extraordinary form of judicial relief, courts should grant such relief sparingly.  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).  As the Supreme Court has said, "[i]t frequently is observed that a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion."  *Id.* (citation omitted).  Therefore, although the trial court has the discretion to issue or deny a preliminary injunction, it is not a form of relief granted lightly.  In addition, any injunction that the court issues must be carefully circumscribed and tailored to remedy the harm shown.  *Nat'l Treasury Employees Union v. Yeutter*, 918 F.2d 968, 977 (D.C. Cir. 1990) (citation omitted).

**B.  The Plaintiff Fails to Demonstrate a Substantial Likelihood of Success on the Merits**

**1. The United States and Guam Are Discrete Entities under 10 U.S.C. § 7310(a)**

Under 5 U.S.C. § 7310, a Navy vessel, "the homeport of which is in the United States," may only be serviced by shipyards in the United States or Guam.  5 U.S.C. § 7310.  The plaintiff contends that the SS Petersburg's homeport is in Guam,[3] Pl.'s Mot. at 5, an assertion that the defendant does not dispute.  Defs.' Mot. at 11.

The parties dispute whether Guam and the United States are synonymous, for purposes of determining a ship's homeport under the statute.  The defendant states that the statute's reference

---

[3] Curiously, the plaintiff also contends that the SS Petersburg's homeport is Newport, Virginia. Pl.'s Reply at 6; Pl.'s Mot. at 5.

to "shipyards 'outside of the United States or Guam' shows that the term 'United States' does not include Guam for purposes of the statute." Defs.' Mot. at 11. The plaintiff argues that the defendants' contention that Guam and the United States are treated differently under the statute "is a new cloth argument . . . Guam is a territory of the United States. Its citizens are citizens of the United States. They vote in United States elections. It has a congressperson . . . [t]he mere fact that the statute does not contain the words 'and Guam' following 'United States' cannot operate to exclude Guam wholesale from the protection of the statute." Pl.'s Reply at 3. The court does not agree.

Contrary to the plaintiff's assertions, the statutory language controls. *In re England,* 375 F.3d 1169, 1178 (D.C. Cir. 2004) (establishing that courts "begin with the plain language of the statute in question"). Statutory interpretation always begins, although it does not always end, with the language of the statute. *Id.* Section 7310(a) unequivocally sets forth a distinction between the United States and Guam. To alleviate any confusion as to whether Guam is considered part of the United States for purposes of 10 U.S.C. § 7310, the parties needs only to review the plain text of the statute. *Id.* Section 7310(a) covers only those ships "the homeport of which is in the United States." 10 U.S.C. § 7310(a). The statute makes no mention of ships homeported in Guam. *Id.* Further, when the statute references the shipyards where those vessels covered by the statue may be serviced, the statute delineates the two, stating that repairs may not be done "in a shipyard outside the United States or Guam." *Id.* This level of specificity demonstrates that the statute envisions a distinction between the United States and Guam. Section 7310(b) likewise distinguishes between the United States and "a territory of the United States." The statute distinguishes between Guam and the United States, and the court will

6

construe this distinction so as not to render it meaningless. *Reiter v. Sonotone Corp.*, 442 U.S. 330, 338-339 (1979) (stating that the court is "obliged to give effect, if possible, to every word Congress used," in finding that the respondent's proposed construction "would have us ignore the disjunctive 'or' and rob the term [in question] of its independent and ordinary significance"). The court can fathom no way to ignore the disjunctive "or" preceding Guam in 10 U.S.C. § 7310(a) without directly contradicting *Reiter*, nor would such an interpretation make sense.

Contrary to the clear and unambiguous language of the statute, the plaintiff also contends that Navy regulations, instructions, and memoranda demonstrate that Guam and the United States are synonymous under the statute. Although the plaintiff cites no law in support of the proposition that an agency interpretation of a statute can alter the meaning of the plain language of the statute, the court will consider the plaintiff's arguments, as they bear on whether the agency has acted within its discretion under the statute.[4]

## 2. The *Chevron* Analysis

In determining whether an agency proffers a permissible interpretation of a statute it administers, the court employs the two-step Chevron analysis. *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984). As a threshold matter, the court "must first exhaust the traditional tools of statutory construction to determine whether Congress has spoken to the precise question at issue." *Halverson v. Slater*, 129 F.3d 180, 184 (D.C. Cir. 1997) (internal quotations omitted). If, after applying accepted canons of construction, the court determines that

---

[4] The plaintiff also argues that the other clauses within 10 U.S.C. § 7310(a) support its claims. Pl.'s Reply at 4-5. Because the court finds that the SS Petersburg is not a naval vessel "the homeport of which is in the United States," the statute's locale restrictions, which the plaintiff's claims are predicated are not triggered. For that reason, the court need not consider those arguments.

Congress has spoken to the precise issue, "then the case can be disposed of under the first prong of Chevron." *Halverson*, 129 F.3d at 184 (internal quotations omitted). If the court determines that the statute is silent or ambiguous with regard to the issue, however, the second prong of Chevron directs the court to defer to a permissible agency construction of the statute. *Id.* (internal quotations omitted).

With regard to Chevron step one, "the starting point, and the most traditional tool of statutory construction, is to read the text itself." *S. Calif. Edison Co. v. Fed. Energy Regulatory Comm'n*, 195 F.3d 17, 23 (D.C. Cir. 1999). The court should not limit itself to examining a statutory provision in isolation but must look to the language and design of the statute as a whole, as "[i]t is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.,* 529 U.S. 120 (2000); *S. Calif. Edison*, 195 F.3d at 23. In addition, the court may look to legislative history. *Citizens Coal Council v. Norton*, 330 F.3d 478, 481 (D.C. Cir. 2003). To evaluate omissions of language, courts take note that "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Halverson*, 129 F.3d at 186 (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)). This canon of construction, however, applies only to sections enacted within the same legislative act. *Id.*

The Supreme Court further stated that an agency interpretation is entitled to deference when "it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the

exercise of that authority. *United States v. Mead Corp.*, 533 U.S. 218, 226-227 (2001). The

court, quoting *Chevron*, reiterated that if Congress "left a gap for an agency to fill, there is an

express delegation of authority to the agency to elucidate a specific provision of the statute by

regulation" and therefore, "any ensuing regulation is binding in the courts unless procedurally

defective, arbitrary or capricious in substance, or manifestly contrary to the statute." *Id.* at 227

(citing *Chevron*, 467 U.S. at 843-844).

### 3. The Secretary of Navy's Interpretation of 10 U.S.C. § 7310(a) is Reasonable

The face of the statute at issue does not provide a method for determining a Navy vessel's

homeport designation. Because of this ambiguity, the court must look to an agency interpretation

and determine whether that interpretation is reasonable. *Chevron*, 467 U.S. at 845.

Under 5 U.S.C. § 301, "the head of an Executive department or military department may

prescribe regulations for the government of his department." 5 U.S.C. § 301 (1966). Specific to

the Navy, 10 U.S.C. § 5013(g) provides that the Secretary of the Navy may "prescribe regulations

to carry out his functions, powers, and duties under this title." The "powers" and "duties" under

10 U.S.C. § 5013 include, *inter alia*, "the functioning and efficiency of the Department of the

Navy," "the formulation of policies and programs by the Department of the Navy," and "the

effective and timely implementation of policy, program, and budget decisions and instructions of

the President or the Secretary of Defense relating to the functions of the Department of the Navy."

10 U.S.C. § 5013(c). From these statutory provisions, the court is satisfied that the Secretary of

the Navy has the requisite "delegated authority to . . . make rules carrying the force of law."

*Mead Corp.*, 533 U.S. at 226-227. The court now turns to whether the Secretary of the Navy's

interpretation of 10 U.S.C. § 7310(a) is reasonable.

Section 7310 governs the issuance of bid proposals and contracts for repair work to Navy vessels. 10 U.S.C. § 7310(a). It provides that Navy vessels "the homeport of which is in the United States may not be overhauled, repaired or maintained in a shipyard outside the United States or Guam, other than in the case of voyage repairs." *Id.*

Commander Military Sealift Command Instruction 4700.15A ("COMSC 4700.15A") encompasses the Secretary of the Navy's interpretation of 10 U.S.C. § 7310(a). Defs.' Opp'n, Ex. B., and provides a methodology for a vessel's homeport designation, stating that

> [s]ince [Military Sealift Command] does not designate homeports for ships, the Assistant Secretary of the Navy . . . for Research, Development and Acquisition . . . has established that ships deployed overseas which do not regularly return to the United States *(i.e. remain overseas for periods exceeding 2 years)* shall be considered homeported overseas. All other ships shall be regarded as homeported in the United States.

COMSC 4700.15 at 4(b) (emphasis in original).[5]

The Secretary of the Navy's exercise of authority, in creating a methodology for determining the homeport designation of a Navy vessel, is reasonable because it constitutes a logical method for determining whether a ship is homeported at a particular location – by virtue

---

[5] The plaintiff cites COMSC 4700.15A for the proposition that Guam and the United States are one and the same for purposes both of the statute and the COMSC. Pl.'s Reply at 4 (citing the COMSC provision that if drydocking is available in "the United States or Guam" then regularly scheduled maintenance will not be performed in a foreign shipyard"). This position is unsupportable for the same reasons set forth in the court's analysis of 10 U.S.C. § 7310(a) *supra* at 3.B.1. – that a basic cannon of construction is to avoid meaningless interpretations. *Reiter*, 442 U.S. at 338-339. Like the interpretation of the disjunctive 'or' present in *Reiter* and 10 U.S.C. § 7310(a), in an instance in which two items separated by the conjunctive 'and' it makes little sense to interpret those items as synonymous. By way of illustration, to say that "Donald Rumsfeld *and* the Secretary of Defense are defendants to this civil action" makes little sense where Donald Rumsfeld *is* in fact the Secretary of Defense. One or the other would suffice. The only way in which the two are squared would be in an instance in which Donald Rumsfeld is not the Secretary of Defense. In other words, the conjunctive 'and' directs that the item preceding it and that succeeding it be different. So to for the phrase "the United States *and* Guam," in the Navy regulations. Had the drafter intended for the two to be the same, a set of parentheses, or even an a.k.a., would have been apropos.

of the length of time that the vessel has been ported at that location. *Chevron*, 467 U.S. at 845

(holding that if the agency's interpretation "represents a reasonable accommodation . . . we

should not disturb it unless it appears from the statute or its legislative history that the

accommodation is not one that Congress would have sanctioned").[6]

Because the SS Petersburg has been located in Guam for the past three years, Pl.'s Mot. at

5, it is "homeported overseas." COMSC 4700.15A, 4(b). As such, the plaintiff has failed to

establish a substantial likelihood that the SS Petersburg is homeported in the United States, and

thus the plaintiff has failed to demonstrate that 10 U.S.C. § 7310(a) prohibits certain shipyards,

including the Keppel Shipyard in Singapore, from providing repair services.

### 4. The DoD Ship Management Contract Does not Prohibit Repair Work by Non-U.S. and Non-Guam Shipyards

In the alternative, the plaintiff alleges that it has a substantial likelihood of prevailing on

the merits because the "Memorandum of Agreement between DoD and DOT, DoD and

MARAD, on behalf of DOT, confirm that '[a]ll shipyard and ship repair facility work to RRF

ships will be accomplished by MARAD (either directly or through its ship operating companies)

and performed in the United States (except for necessary voyage repairs while overseas), in

accordance with the statute and DOT regulations.'" Pl.'s Mot. at 7. Although the plaintiff

---

[6] The court is mindful of the D.C. Circuit's caution that even in instances in which the district court concludes that an agency action or interpretation is reasonable, the court must still heed the traditional notions of statutory interpretation to ensure faithfulness to the statutes text. *Halverson*, 129 F.3d at 184-185 (holding that the district court erred in failing to ascertain the plain meaning of the statute and whether the Agency's interpretation of the statute, albeit reasonable, conflicted with another portion of the statute). In the present context, 10 U.S.C. § 7310(a) does not indicate the method by which the vessel's homeport shall be determined. Rather, the responsibility for defining the scope of homeport vessels is vested in the Secretary of the Navy. 10 U.S.C. § 5013. In this case, the Secretary of the Navy's characterization of homeport vessels as based on the time spent by the vessel in a particular location is not inconsistent with the statute.

references the Memorandum of Understanding, it does not attach that document to its pleadings. According to the defendants, the Memorandum of Understanding cited by the plaintiff has been superceded, and the language cited by the plaintiff is not contained in the current agreement. Defs.' Mot., Attach. 1, Calhill Decl. ¶ 6.  The new provision restricts repair work to U.S. ship repair facilities, "unless the work is for emergency, or mission essential repairs, or for pre-positioned ships which are deployed overseas, or for any vessel forward deployed outside of the United States." *Id.*, Attach. A, § 2.4.6.  The document is identified as "Solicitation DTMA8R04004 – RRF Ship Manager Services, Amendment 0013." *Id.*  The court is unsure whether this document indeed is the superceding document to the Memorandum of Understanding cited by the plaintiff.

Without a copy of the Memorandum of Understanding, or additional argument on this point, the court cannot determine which document controls.  The plaintiff has not supplied the court with an argument concerning its standing to enforce the provisions of a contract to which it is not a party.  Regardless, the plaintiff bears the burden of demonstrating a substantial likelihood of success on the merits.  *Mova Pharm. Corp.,* 140 F.3d at 1066.[7]  The plaintiff has failed to do so here.

---

[7]  Because the court finds that the plaintiff has failed to demonstrate a substantial likelihood of success on the merits, the court does not consider the defendant's indispensable party argument under Federal Rule of Civil Procedure 19(a).  Defs.' Opp'n at 7.

## C.  The Plaintiff Fails to Demonstrate Irreparable Harm[8]

The plaintiff argues that "if Guam shipyard loses the repair work on the SS Petersburg

and continues to lose repair work on Navy vessels to foreign shipyards, it will continue to suffer

irreparable injury that threatens its economic viability."  Pl.'s Mot. at 6.  Because the sole issue

for the Court in resolving the instant TRO is whether the commencement of work by the

Singapore shipyard on the SS Petersburg will cause irreparable harm, and because that factor

alone, by the plaintiff's own admission, will not cause any irreparable harm, the plaintiff's

motion fails.

In the D.C. Circuit, "economic loss does not, in and of itself, constitute irreparable harm."

---

[8]  In addition to economic loss, the plaintiff makes three additional arguments.  The plaintiff states that

> GIS's U.S. citizen employees, most of whom are paid by the hour, undoubtedly would seek employment elsewhere.  Furthermore, the impact of this continued practice on the United States' private shipyard industry is difficult, if not impossible to ascertain.  Finally, the harm to Guam shipyard and other similarly situated shipyards cannot be redressed by a later suit for damages, because the United States Government is probably not answerable in monetary damages for such harm under the doctrine of sovereign immunity.

Pl.'s Mot. at 11.  Perhaps wisely, the defendant chose not to address these arguments in its opposition.  These arguments lack merit.  The court is unable to determine from this statement whether the plaintiff is advocating for the U.S. citizen employees whose jobs will be lost, or making a difficulty-in-finding-new-labor argument.  In either event, the plaintiff has proffered no legal argument to support these assertions.  *See Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060 (stating that the plaintiff bears the burden of establishing the elements of a TRO). Additionally, plaintiff's statement that the "impact of this continued practice on the United States' private shipyard industry is difficult, if not impossible to ascertain," *id.,* is vexing.  The court is unclear whether the plaintiff is advocating for the entire shipyard industry.  The difficulty and impossibility of ascertaining the impact of the continued practice seems to undermine the plaintiff's entire case – that certain economic loss will come from the continued practice.  Lastly, plaintiff's sovereign immunity argument, as a basis for not being able to redress the economic harm in a later suit is baseless.  The plaintiff provides no legal argument in support of this conclusory statement.  *Id.*  Indeed from plaintiff's statement, that the United States Government is "probably not answerable in monetary damages," the plaintiff seems unconvinced as to its own argument.

*Wisconsin Gas Co. v. Fed. Energy Regulatory Comm.*, 758 F.2d 669, 674 (D.C. Cir. 1985) (stating that "[t]he key word in this consideration is irreparable. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation weighs heavily against a claim of irreparable harm"). Nevertheless, a TRO may be the appropriate equitable remedy "where the loss threatens the very existence of the movant's business." *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 n. 2 (D.C. Cir. 1977).

The plaintiff alleges that it will lose $14,000,000 in revenue as a result of not receiving the contract for repair work to the SS Petersburg. Pl.'s Mot. at 10. The plaintiff does not allege that this loss threatens the plaintiff's business, but rather that as a result of this loss, and other losses of repair work for on Navy vessels to foreign shipyards, the plaintiff "will continue to suffer irreparable injury that threatens its economic viability." Pl.'s Mot. at 6. The plaintiff fails to demonstrate irreparable harm flowing from the loss of the SS Petersburg contract. Absent a demonstration that this loss threatens the plaintiff's business, the pure economic loss resulting from the contract award for the SS Petersburg to the Singapore shipyard fails as a matter of law. *Wisconsin Gas Co.*, 758 F.2d at 674.

Also, were the plaintiff able to demonstrate that the loss of the SS Petersburg contract as well as the continued loss of other business would threaten the plaintiff's existence, the plaintiff has failed to demonstrate any expediency warranting a TRO in this case. According to the plaintiff, the defendants have engaged in the solicitation and awarding of contract proposals to non-U.S. and non-Guam shipyards for the past seven years. Pl.'s Mot. at 6. The ongoing nature

14

of the plaintiff's alleged economic harm undercuts any claim that irreparable harm would occur without immediate intervention of the court. *Nat'l Wildlife Found. v. Burford*, 835 F.2d 305 (D.C. Cir. 1987) (holding that a plaintiff seeking a TRO must demonstrate, *inter alia*, "irreparable injury . . . absent the injunction"); *Virginia Petroleum Jobbers Ass'n v. Fed. Power Comm'n,* 259 F.2d 921 (D.C. Cir. 1958) (stating that to succeed on a motion for TRO, the plaintiff must demonstrate that irreparable harm will ensue in the absence of expedited court intervention).

Furthermore, the plaintiff admits that it is currently completing repair work on the USNS Niagra Falls and will shortly begin work on the USNS Concord.  Pothen Decl. ¶ 6.  Alas, it seems that the defendants' actions are not completely preventing the plaintiff from procuring any work, but rather that the defendants' actions are merely adding market competitors the plaintiff would rather not face.

The plaintiff cites *CSX Transportation, Inc. v. Williams,* 406 F.3d 667 (D.C. Cir. 2005) in support of its position that the specter of economic loss is an important factor in assessing irreparable harm.  Pl.'s Mot. at 10-11.  The plaintiff's reliance on *CSX Transportation* for this proposition is misplaced.  In *CSX Transp.*, the D.C. Circuit found that the Terrorism Prevention in Hazardous Materials Transportation Emergency Act of 2005, passed by the District of Columbia City Counsel, covered the same subject matter of the Federal Railroad Safety Act, 49 U.S.C. §§ 20101-20153 ("FRSA").  *CSX Transport., Inc.*, 406 F.3d at 672-674.  FRSA provides that a locality may enact a more stringent law only if, *inter alia*, the law "does not unreasonably burden interstate commerce."  49 U.S.C. § 20106.  The D.C. Circuit's consideration of the commercial impact of the subject action of the TRO came within the context of a specific

15

requirement of the FRSA, not as a generalized factor for a court to consider in TROs generally. For these reasons, the plaintiff's claim of irreparable injury fails.

### D. The Plaintiff Fails to Demonstrate Equitable Factors

The final two factors for the court to consider in ruling on the TRO, are balancing injuries of other parties and a consideration of the public interest, *Mova Pharm. Corp.*, 140 F.3d at 1066, favor the defendants. First, to the balance of injuries. The plaintiff alleges that the economic impact to the plaintiff outweighs the impact to the government, which has "no urgency to a temporary lull in repairs while the matter is more carefully considered by this court." Pl.'s Mot. at 12. The defendants, by contrast, argue that the harms to them will be great, stating that the SS Petersburg's readiness for service, as a member vessel of the Ready Reserve Force, is of "strategic importance" necessitating that repairs be completed "with all speed to return the ship to readiness." Cahill Decl. ¶ 9. As one of two vessels supporting the Operational and Contingency Plans in the Pacific Command Area, "it is vital that SS Petersburg remain on station and available for duty at all times. In any contingency . . . these vessels are expected to quickly provide fuel to designated military units in remote locations . . . [a]ny time away from its duty station affects [Navy's] ability to execute any of its plans in a contingency or national emergency." Def.'s Opp'n, Attach. 4, Giles Decl. ¶ 2. The court concludes that the defendants interest in military readiness outweighs any speculative economic losses to the plaintiff. *Gentex Corp. v. U.S.*, 58 Fed.Cl. 634 (2003) (giving serious consideration to national defense concerns).

With regard to the public interest, for much the same reasons stated above, the court holds that the public interest lies with the defendants in assuring military preparedness. While the public certainly has an interest "in securing the legal rights of U.S. private shipyards," Pl.'s

Mot. at 13, that interest certainly yields to the national defense. Surely, in times of war, the public would prefer a working Navy vessel repaired in Singapore, to a lame one drydocked in Guam.

### IV. CONCLUSION

For the foregoing reasons the court, this 24th day of August, 2005, denies the plaintiff's motion for a temporary restraining order. An order consistent with this Memorandum Opinion is issued contemporaneously herewith.

RICARDO M. URBINA
United States District Judge