## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

---

GUAM INDUSTRIAL SERVICES, INC.,

      Plaintiff,

      v.,                          No. 05CV-01599 (RMU)

DONALD H. RUMSFELD, et. al.,

      Defendants

---

### PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER

Plaintiff submits this reply to the Government's Opposition to Plaintiff's Motion for a Temporary Restraining Order. In the few hours available pursuant to the Court's scheduling order, we set forth our response to the Government's main points as follows:

1. Plaintiff proceeded as expeditiously as possible and there is nothing to the Government's contention that we waited. Indeed, we filed the Complaint on August 10 before being certain of the status of the contract award and alleged that Plaintiff had lost the contract "on information and belief." In fact, the contract was not even awarded until August 16. Defendants do not dispute that Guam Shipyard was not informed of the contract award until August 19, after they had already caused the vessel to sail for Singapore. The vessel continued to proceed to Singapore after the Motion for Preliminary

Injunction was filed and the Defendants knew that injunctive relief was requested, therefore taking the deliberate risk that repairs might be stayed.

2. Very significantly, Defendants do not dispute that a Prepositioned vessel is "under the jurisdiction of the Navy" within the meaning of 10 U.S. C. § 7310, and that it therefore is subject to the provisions of that statute.They claim only that ready reserve vessels are under MARAD's jurisdiction. They admit that the vessel is "activated for duty"under the Prepositioning Program administered by the Navy. They admit that the vessel is under the operational control of the Navy. ( Cahill Decl. Para. 4). The fact that the vessel is under the "administrative" control of MARAD does not affect its status of being under the Navy's jurisdiction. As shown in our motion, the MSC website states that the vessels are under Navy administrative control. There is no rule that the vessel cannot be under a dual agency jurisdiction and still subject to 10 U.S.C. § 7310.

3. Quite clearly, the private operator of this government vessel is not an "indispensable party" because complete relief can be granted in its absence and its interests are fully protected by the Defendants. This is because IAS, the private operator, merely operates the vessel as an agent of MARAD under a contract that is terminable for convenience. Therefore it has no vested rights, contract or otherwise, in the determination of where the vessel is repaired. As Defendants admit, MARAD must approve the repair contract issued by IAS. The repair is funded by the Navy.  MARAD and the Navy cannot escape their statutory duty by delegating performance to a private operator.  In addition, it is clear from Defendants' opposition that the repair schedule and terms are actually controlled and managed by the Navy consistent with its operational needs. Under Rule 19, Fed. R.Civ. P., IAS is not an "indispensable party" as defined in that rule because

2

relief can be granted in its absence. It is a party whose joinder is in the discretion of the Court under Rule 19(b). Moreover, Rule 19 does not support dismissal or denial of relief; instead it provides that a person who should be joined shall be ordered joined by the Court. IAS is aware of this action and may intervene or be ordered to be joined at any time. Moreover, its interests are clearly fully protected by the Defendants who vigorously oppose Plaintiff's motion. This is an action seeking APA relief against the government and such relief is not available against a private party.

The authorities such as the *Naartex* case cited by the Defendants all recognize that the action should proceed and the non-joined party should be ordered joined if possible.

4. <u>Likelihood of Success.</u>  On issues pertaining to likelihood of success, the Defendants resort to extraordinarily tortured mangling of the law and the facts:

(1). Guam is part of the United States. Incredibly, Defendants argue that the statute does not cover Guam because it is not within the definition of the "United States." We note first that none of the relevant agency directives or written policies has ever taken that position; this is a new whole cloth argument. The Government's own policy documents state the contrary, as we show below.  Guam is a territory of the United States. Its citizens are citizens of the United States. They vote in United States elections. It has a congressperson.  The Defendants cite no support for their novel proposition. The mere fact that the statute does not contain the words "and Guam" following "United States" cannot operate to exclude Guam wholesale from the protection of the statute. As we have shown, the statute is designed to protect U.S. shipbuilding interests and American jobs.  This Congressional intent applies as well to Guam. Guam Shipyard workers are Americans. Congress has "directly spoken to the precise question" and thus

meets the *Chevron* test for determining if an agency has adhered to a statute. 476. U.S. at 842. To the extent that the Navy's COMSC instruction memo has any binding legal effect, it must be consistent with this Congressional intent; if not it is invalid.

There are only two kinds of ports under the statute, United States ports and "foreign" ports, according to the MARAD and MSC policy documents. If Guam is not a "United States" port, then the Government must be contending that it is a "foreign port" and this would surely be startling news to the Congress that enacted 10 U.S.C. § 7310 and there is no evidence or support for the proposition that Guam is a "foreign" port.

The Navy's own COMSC instruction document submitted by the Defendants indeed supports the construction that Guam is in the United States. It states that if drydocking is available in "the United States or Guam" then regularly scheduled maintenance will not be performed in a foreign shipyard. Thus their contention here that Guam is not in the United States and not subject to the protection of 10 U.S..C. § 7310 is flatly contradicted by the very policy memorandum they seek to rely on. According, the Defendants' own argument that deference must be given to an agency's construction of a statute requires the Court to find that Guam is in the United States.

Most significantly perhaps, the Navy's MSC in a May, 2004 report to Congress, stated flatly that Guam, along with Hawaii and CONUS (Conitinental U.S.) shipyards, is a 'domestic shipyard." ! (Pothen Suppl Decl)

(2). In fact, the COMSC memo supports Plaintiff's position on all pertinent issues. The Defendants claim first that the repairs are "voyage repairs" permitted in a foreign shipyard. This is a hugely strained interpretation not supported by common sense or by COMSC. A "voyage repair" is not a scheduled maintenance or overhaul; it is one

necessary for safety or continued ability to be deployed while a ship is actively underway. COMSC's memo states that "voyage repairs do not include corrective maintenance actions that may be deferred until the the next scheduled regular overhaul and drydocking availability in the United States or Guam." (COMSC Para.4 b.) Here, the S.S. Petersburg was admittedly stationed in Guam in port and the RFP was issued months in advance and was therefore a regularly scheduled maintenance and repair effort while the vessel was in a U.S. port, not on a "voyage." If the Defendants are right, then any maintenance would be "voyage repair" and the exception would swallow the rule.

In a May 2004 report to Congress on its compliance with 10 U.S. C § 7310, the Navy's Miltary Sealift Command (MSC) stated: "MSC ships are repaired in foreign shipyards only when directed by operational necessity and allowed by law." (Pothen Suppl Decl) (emphasis added) Was MSC deceiving Congress when it made that representation? Certainly the repairs on the S.S. Petersburg are not required to be done in a foreign port out of "operational necessity."

(3). COMSC states that "ready reserve" vessels are under the jurisdiction of MARAD. It does not state that they are not also under the Navy's jurisdiction. But even if it is a valid reading of the statute to exclude from Navy jurisdiction ready reserve vessels, and it is not, it does not apply to prepositioning vessels such as the S.S. Petersburg, which are controlled and operated by the Navy as part of the Navy's fleet. The Defendants have not even tried to refute our showing that the S.S. Petersburg is part of the Navy's Seventh Fleet under the control of a Navy captaion. Nor have they denied that the vessel is funded by Navy appropriations, including funds for repairs.

(4). The Defendants then claim that the S.S. Petersburg is not "homeported" in the United States because its homeport is Guam. This contention again flies in the face of the statute, which provides clearly that Guam is part of the United States. Moreover, the regular official homeport of the S.S. Petersburg is Norfolk, as shown in our motion, and Guam is a prepositioned station for it. If the Navy can manipulate homeports as it chooses, it can escape 10 U.C.C. § 7310 altogether in every case merely by positioning a vessel abroad and then arranging repairs in foreign yards.

COMSC states the Navy's policy flatly contrary to its present arguments as to homeporting. COMSC states that "ships shall only be considered homeported overseas for the purpose of accomplishing maintenance and repair when specifically approved as such by ASN (RD &A." (emphasis added) COMSC also states that COMSC shall request approval for an overseas homeport designation and "shall maintain the list of ships approved as homeported overseas…" Defendants have not shown this Court that the S.S. Petersburg is on any list of approved foreign homeports, and they cannot do so because it is officially listed as homeported in  Norfolk.

(5). The MOA exclusion of necessary overseas repairs does not operate where the vessel is in the United States, as is the S.S. Petersburg. It is only an exclusion for vessels legitimately  in foreign countries that require "necessary" repairs.

(6) The new version of the ship management contract is not materially different from the prior version that we cited in our motion. It provides that all MARAD vessels shall be repaired in the United States unless they are deployed "overseas" and "outside of the United States," except in an emergency. Again, MARAD's own stated procedures require repairs in U.S. shipyards unless a vessel is  deployed in a foreign port.

5. <u>Irreparable harm.</u>

This action was filed on August 10, as soon as Plaintiff became aware that an award to Singapore was possible. The action sought injunctive relief and the Defendants were on notice at that time of this requested relief. On August 19 Plaintiff learned that the award was made to Singapore and immediately filed its motion for a preliminary injunction papers that day. This was the earliest that Plaintiff had any standing to do so. Plaintiff requested the government to defer any repairs voluntarily on August 19, and the government took until August 22 to refuse to do so. Plaintiff then filed its request for a TRO on August 23. In other words, Plaintiff moved as promptly as possible. The government during this time, knowing that injunctive relief was being sought, continued to sail the SS Petersburg to Singapore, and until the morning of August 23 Plaintiff believed the vessel was still sailing to Singapore. As soon as we learned that the vessel had arrived there, and upon the government's refusal to voluntarily stay repairs temporarily, we filed our request for a TRO. Thus, the Defendants themselves elected to ignore Plaintiff's efforts to stay repairs and to proceed "full steam ahead" in the face of requested injunctive relief and a temporary stay. The Court cannot therefore reward that precipitous conduct by concluding that the government will suffer irreparable harm that, if true, it brought on itself in the face of Plaintiff's loss of a major contract.

According to the Defendants, even now the SS Petersburg is not scheduled to begin repairs until August 28. It is presently not in drydock but receiving preliminary repairs pierside.

It is indeed correct that Plaintiff could not be assured of receiving the award if the solicitation were limited to U.S. shipyards. However, the Guam Shipyard sits 300 yards

from the S.S. Petersburg's berth. If Defendants had honored 10 U.S.C. § 7310 and limited

the procurement to U.S. yards, it is obvious that Plaintiff's yard would be the likely

awardee. Guam is thousands of miles from any other U.S. shipyard. It is the only U.S.

yard that in the past has regularly performed maintenance on the S.S. Petersburg during

the past 3 years while it was prepositioned in Guam (Pothen Suppl Decl). Common sense

suggests that only Guam Shipyard was a likely awardee if the solicitation were limited to

U.S. yards. Further, Guam Shipyard was the only U.S. yard that participated in "ship

check" inspection for prospective bidders. There is no evidence that any other U.S.

shipyard submitted a proposal for this repair work.

The Navy's submitted Declaration of LCDR Giles admits that the Government

has elected to bring this entire situation on itself by its decisions to sail the S.S.

Petersburg thousands of miles to a foreign port instead of having it repaired next door at

Plaintiff's shipyard. LCDR Giles states that is important to have the vessel repaired soon

that it can "return to its duty station with minimum disruption to the mission." Unstated,

of course, is that the duty station is Guam. The vessel did not have to incur the time and

expense of sailing to Singapore; it could have remained at its duty station at all times

during maintenance if Defendants had followed the statute.

6. The Public Interest. The real irreparable harm here unless relief is granted is to

the public interest and to the integrity of a Congressional statute.

The public interest is especially served by requiring the Navy to speak with one

voice and not tell Congress one thing and this Court another. As noted, in May 2004 the

Navy told Congress that repairs would  be made in foreign shipyards "only when directed

by operational necessity." Here, operational necessity would be supported by the ship remaining at its duty station in Guam.

This Court must not tolerate the Government's two-faced approach to an important statutory protection. While posturing to Congress that it respects the statute with respect to Guam being a domestic shipyard, it is telling this Court something different.


CONCLUSION

Everyone knows what is really going on here. The Government seeks to save money by using a cheaper foreign shipyard. While saving taxpayers' dollars is admirable, it cannot be done at the expense of a Congressional mandate to protect the vital U.S. ship repair industrial base.


Respectfully submitted,


TIGHE PATTON ARMSTRONG TEASDALE

By_____
    Thomas Earl Patton (D.C. Bar 009761)
    John Montgomery (D.C. Bar 460221)
    1747 Pennsylvania Ave. N.W. Suite 300
    Washington, D.C. 20006
    (202) 454 2800


CERTIFICATE OF SERVICE

I certify that I caused the foregoing pleading to be served by ECF filing this 24th day of August, 2005 and that all counsel have been so served.

_____
Thomas Earl Patton