**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

GUAM INDUSTRIAL SERVICES, INC., d/b/a Guam Shipyard,

Plaintiff,

v.

DONALD H. RUMSFELD, Secretary of Defense, et al.,

Defendants.

Civil Action No. 05-1599 (RMU)

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR RECONSIDERATION AND CORRECTION**

Defendants, by their undersigned attorneys and pursuant to LCvR 7(b), hereby respectfully submit the following memorandum of points and authorities in opposition to plaintiff's motion for reconsideration and correction of the Court's August 24, 2005 Memorandum Opinion (hereafter the "TRO Opinion") denying plaintiff's motion for a temporary restraining order.

**Background**

On August 26, 2005, plaintiff filed a motion for reconsideration and correction in which plaintiff moved that the Court (1) correct certain errors in the TRO Opinion concerning matters in the record, and (2) upon correction of those record errors,

reconsider its decision to deny a temporary restraining order. *See* Plaintiff's Motion for Reconsideration and Correction, And Supporting Points and Authorities (hereafter "Recon. Mot.") at p. 1. Defendants have no objection to any factual corrections that are necessary to make the TRO Opinion conform to the record. Defendants contend, however, that no such factual corrections provide grounds for interim injunctive relief. Accordingly, for the reasons explained more fully below, defendants oppose plaintiff's motion for reconsideration and request that the Court confirm its decision to deny plaintiff's motion for a temporary restraining order.

**Argument**

Plaintiff's motion for reconsideration is based on three arguments. First, plaintiff maintains that the Court failed to understand the difference between MARAD's Ship Manager Contract and a 1997 Memorandum of Agreement between MARAD and the Department of Defense, and overlooked provisions in those documents that, plaintiff contends, require the current repairs to SS PETERSBURG to be performed in a domestic shipyard. *See* Recon. Mot., ¶¶ 1-3 at pp. 1-3. Second, plaintiff asserts that making the current repairs to SS PETERSBURG in a foreign shipyard is contrary to the "controlling regulation," *id.*, ¶ 5 at p. 3, because the Department of the Navy's Military Sealift Command has not sought to have the ship's homeport changed from the United States to overseas. *See id.*, ¶¶ 4-5 at pp. 3-4. Third, plaintiff asserts that the public interest would be served by requiring the current repairs to SS PETERSBURG to be made in a domestic

shipyard because such action would further military preparedness and would aid in "preserving and protecting the American ship repair industrial base." *Id.*, ¶¶ 6-7 at p. 4. Each of these arguments will be addressed in turn.

**1. Neither the Ship Manager Contract Nor the Memorandum of Agreement Require SS PETERSBURG to be Repaired in a Domestic Shipyard or Create Any Rights Enforceable by Plaintiff.**

Plaintiff is correct to point out that MARAD's Ship Manager Contract and the 1997 Memorandum Agreement are different and distinct documents. The Ship Manager Contract is entered into by MARAD and Interocean American Shipping Corporation, a private corporation that is the vessel manager of SS PETERSBURG, pursuant to 50 App. U.S.C.A. § 1744(c)(2). *See* Complaint, ¶¶ 19-20 at p. 5. *See also* News Release MARAD 13-05, *U.S. Maritime Administration Ushers in New Contracts to Run Ready Reserve Force*, July 28, 2005. http://www.dot.gov/affairs/marad1305.htm. The 1997 Memorandum Agreement, on the other hand, is an interagency agreement between the U.S. Transportation Command, on behalf of the Department of Defense ("DoD"), and MARAD, on behalf of the Department of Transportation ("DOT"), "[t]o identify the relationship and responsibilities of the DoD and the DOT in the administration of the [National Defense Reserve Fleet]," a component of which is the Ready Reserve Force.[1]

---

[1] Plaintiff complains about the Court's statement at page 12 of the TRO Opinion that plaintiff did not attach this Memorandum of Agreement to its pleadings. *See* Recon. Mot., ¶ 1 at pp. 1-2. The Memorandum of Agreement was, in fact, not attached to plaintiff's motion for a temporary restraining order. Rather, as indicated in plaintiff's reconsideration motion, a portion of the Memorandum of Agreement was attached to the

*See* Memorandum of Agreement between Department of Defense and Department of Transportation (hereafter cited as "MOA"), dated 28 August 1997, ¶¶ 1-2 at p. 1 [copy attached as Exhibit 1]. *See also* 50 App. U.S.C.A. § 1744 (creating National Defense Reserve Fleet).

Plaintiff acknowledges that the version of MARAD's Ship Manager Contract on which it relied for purposes of its motion for a temporary restraining order has been superseded, but asserts "that [the current contract] contained the same provisions regarding repairs in U.S. shipyards." *See* Recon. Mot., ¶ 2 at p. 2. If this rather enigmatic statement is intended to mean that MARAD's current Ship Manager Contract prohibits the repair work on SS PETERSBURG from being performed in a foreign shipyard, plaintiff is mistaken. In fact, the pertinent language in the current contract differs significantly from the obsolete contract language plaintiff cited. *See* Declaration of William H. Cahill (hereafter "Cahill Dec.") [copy attached as Exhibit 2] , ¶ 6.[2]

Section C of the current Ship Manager Contract provides as follows:

> 2.4.6 Performance of Repair Work
> All repair work and/or upgrading work required in conjunction with the contract (including surveys and correction of sea trial deficiencies, or any other deficiencies that may be noted up to time of delivery and acceptance

---

Declaration of Mathews Pothen, which in turn was attached to plaintiff's separately-filed motion for preliminary injunction and was referenced in the motion for temporary restraining order. A complete copy of the Memorandum of Agreement is attached hereto as Exhibit 1, for the Court's convenience.

[2] This declaration was previously submitted by defendants as an attachment to their opposition to plaintiff's motion for a temporary restraining order.

> previously noted or not) necessary to meet all requirements of this contract shall be accomplished in a U.S. ship repair facility, unless the work is for emergency, or mission essential repairs, or **for pre-positioned ships which are deployed overseas, or for any vessel forward deployed outside of the United States**.

*See id.*(emphasis added to contract language).[3] The SS PETERSBURG is part of the Ready Reserve Force, is currently activated for duty under the Prepositioning Program, and is prepositioned in Guam. *See* Complaint, ¶¶ 13, 18 at pp. 4-5. As demonstrated in the TRO Opinion, it is reasonable to construe the exception in the Ship Manager Contract for "pre-positioned ships which are deployed overseas" and vessels "forward deployed outside of the United States" as being applicable to a ship, such as the SS PETERSBURG, that is prepositioned in Guam. *See* TRO Opinion at pp. 5-11. Thus, MARAD's Ship Manager Contract provides no support for plaintiff's contention that the current repairs to the SS PETERSBURG must be performed in a domestic shipyard.

Plaintiff is correct that the MOA has not been superseded and remains "an operative government policy statement and interpretation of its own duties;" however, plaintiff is incorrect to contend that the MOA proves that "the award of the repair contract [for SS PETERSBURG] to Singapore was unlawful." *See* Recon. Mot., ¶¶ 2-3 at p. 2.

---

[3] A complete copy of MARAD's current Ship Manager Contract is available on the internet at https://voa.marad.dot.gov/programs/ship_manager/final.asp.

The pertinent portion of the MOA provides as follows:

> All shipyard and ship repair facility work to [Ready Reserve Force] ships will be accomplished by MARAD (either directly or through is ship operating companies) and performed in the United States (except for necessary voyage repairs while overseas) in accordance with statue and DOT regulations.

MOA, Article 5, ¶ b at p. 3. This provision, by its own terms, does not apply to the repair work at issue for two reasons.

First, the MOA requires repairs to be performed in the United States "in accordance with statute and DOT regulations." Plaintiff has cited no DOT regulations that would require use of a domestic shipyard for the current repairs to SS PETERSBURG, and the Court has correctly concluded that the statute on which plaintiff relies, 10 U.S.C.A. § 7310(a), is not applicable here. *See* TRO Opinion at pp. 5-7. Thus, plaintiff has identified no statute or regulation that would trigger application of the "buy America" provision of the MOA.

Second, the provision expressly excepts "necessary voyage repairs while overseas." As stated above, the TRO Opinion demonstrates that it is reasonable to deem the SS PETERSBURG to be deployed "overseas" because "the United States and Guam are distinct entities under 10 U.S.C. § 7310(a)." *Id.* at p. 5. Further, the "controlling regulation," Recon. Mot., ¶ 5 at p. 3, defines "voyage repairs" to include "[c]orrective maintenance on mission or safety essential items necessary for a ship to deploy, or to continue on its deployment or comply with regulatory requirements" and "scheduled

maintenance" that is "absolutely necessary to ensure machinery and equipment operational reliability." *See* Commander Military Sealift Command Instruction 4700.15A, *Accomplishing Ship Repair in Foreign Ship Yards* (dated 2 February 2000) (hereafter "COMSCINST 4700.15A") [copy attached as Exhibit 3], www.msc.navy.mil/instructions/pdf/m470015a.pdf. The repairs that are currently being performed on SS PETERSBURG in Singapore fall within this definition. *See* Cahill Dec., ¶ 8. Thus, that repair work would be exempt from the "buy America" provision of the MOA even if that provision were otherwise applicable.

Plaintiff's reliance on the MARAD Ship Manager Contract and the MOA is predicated on the legal principal that "it is incumbent on agencies to follow their own procedures, and action that fails to comply with applicable regulations is illegal." *See* Recon. Mot., ¶¶ 1 & 3 at pp. 2-3. This principle, however, does not apply to either the Ship Manager Contract or the MOA. Consequently, even if one or both of those documents could properly be construed to require the repair work at issue to be performed by a domestic shipyard, the Ship Manager Contract and the MOA would still be of no help to plaintiff because neither of them creates any rights that plaintiff may enforce.

Plaintiff cites two dated Supreme Court opinions, *Morton v. Ruiz*, 415 U.S. 199 (1974), and *Vitarelli v. Seaton*, 359 U.S. 535 (1959), to support its claim that the Ship Manager Contract and the MOA amount to binding agency procedures or regulations.

*See* Recon. Mot., ¶ 3 at pp. 2-3. Neither case is remotely analogous to the situation presented here. Moreover, those decisions do not fully reflect current law.

In *Vitarelli*, the Supreme Court considered the dismissal of an employee of the Department of the Interior. Although the employee could have been dismissed without any reason, the Secretary of the Interior instead dismissed the employee for "national security" reasons. *See* 359 U.S. at 536. The Secretary had previously issued regulations governing discharge on national security grounds, but did not comply with those regulations in dismissing Vitarelli. *Id.* at 538. The Supreme Court acknowledged that the Secretary had the statutory authority to summarily discharge an employee in Vitarelli's status without giving a reason, but decided that the Secretary, having chosen to proceed against Vitarelli on national security grounds, was bound by the regulations that the Secretary had promulgated for such cases. *Id.* at pp. 539-40.

The regulations considered in *Ruiz* required the publication of directives that "inform the public of privileges and benefits available and of eligibility requirements." *See* 415 U.S. at p. 235 (internal quotes omitted). The Supreme Court found that the publication requirement was intended to benefit potential recipients of government assistance, and therefore invalidated a Bureau of Indian Affairs attempt to limit the benefits for otherwise eligible individuals based on an unpublished eligibility requirement. Specifically, the Court stated that "where rights of individuals are affected, it is incumbent upon agencies to follow their own procedures, [and] [t]his is so even

where the internal procedures are possibly more rigorous than otherwise would be required." *Id.*

Cases like *Vitarelli* and *Ruiz* represent the high point of the so-called *Accardi* doctrine, which "holds that government agencies are bound to follow their own rules, even self-imposed procedural rules, that limit otherwise discretionary decisions." *Wilkinson v. Legal Services Corp.*, 27 F. Supp. 2d 32, 34 n.1 (D.D.C. 1998) (*citing United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 267-68 (1954)). As the Court of Appeals for this Circuit has recognized, the Supreme Court "retreated" from the broad reading that plaintiff seeks to give the *Accardi* doctrine in *Schweiker v. Hansen*, 450 U.S. 785, 789-90 (1981), where the Court "refused to bind the Secretary of Health and Human Services to the internal rules set forth in a 13-volume Social Security Administration handbook." *See Jackson v. Culinary School of Washington, Ltd.*, 27 F.3d 573, 584 n.21 (D.C. Cir. 1994), *vacated on other grounds*, 515 U.S. 1139 (1995), *reinstated in pertinent part*, 59 F.3d 254, 255 (D.C. Cir. 1995).

Another judge of this Court has explained the current state of the *Accardi* doctrine as follows:

> While it can hardly be gainsaid that public officials must obey the law, in the administrative context, a more nuanced question arises as to what constitutes "law" binding on the agencies. The question is not posed in its broadest, jurisprudential sense. Rather the question is to what sources must a court look to determine whether a government actor is prohibited from taking the action (or inaction) alleged to have been wrongfully done (or not done).

*Wilkinson*, 27 F. Supp. 2d at p. 34 (footnotes omitted); *see, e.g., BP Exploration & Oil, Inc. v. Dep't of Transportation*, 44 F. Supp. 2d 34, 37-38 (D.D.C. 1999). *See also, e.g., In re Grand Jury Subpoena, Judith Miller*, 397 F.3d 964, 974-76 (D.C. Cir.) (holding *Ruiz* inapplicable to Department of Justice guidelines for issuing subpoenas to news media), *cert. denied*, 125 S. Ct. 2977 (2005); *Nat'l Small Shipments Traffic Conference, Inc. v. ICC*, 725 F.2d 1442, 1449 (D.C. Cir. 1984) (rejecting application of *Ruiz* where rule at issue "was not designed to protect either individual rights or wards of the federal government"); *Doe v. Hampton*, 566 F.2d 265, 280-81 (D.C. Cir. 1977) ("not every piece of paper emanating from a Department or Independent Agency is a regulation").

In this Circuit, "with regard to rules that have not been formally promulgated, the 'law' to which an agency will be bound are those rules to which it intended to be bound." *Wilkinson*, 27 F. Supp. 2d at 35 (footnote omitted); *accord*, *e.g., Jackson*, 27 F.3d at 584 ("[t]he touchstone for enforceability is agency intent"). Thus, in *Nat'l Latino Media Coalition v. FCC*, 816 F.2d 785, 788 n.2 (D.C. Cir. 1987), the Court of Appeals pointed out that "the 'binding' quality of a particular rule or statement will depend on whether the agency intended to establish a 'substantive' rule, one which is not merely interpretative but which creates or modifies rights that can be enforced against the agency." And, in *Vietnam Veterans v. Sec'y of the Navy*, 843 F.2d 528 (D.C. Cir. 1988), the Court of Appeals explained that "statements whose language, context and application suggest an intent to bind agency discretion and private party conduct -- the sort of statements

requiring compliance with § 553 [of the Administrative Procedure Act] -- will have that effect if valid; interpretative rules or policy statements will not, *regardless* of their validity." *Id.* at 537 (emphasis in original).

The nature and function of the Ship Manager Contract and the MOA demonstrate that those documents are not intended to provide plaintiff with any enforceable rights. The Ship Manager Contract and the MOA are not agency "procedures" or "regulations" as those terms are used for purposes of the *Accardi* doctrine. Rather, the documents are contracts: the Ship Manager Contract governs the relationship between MARAD and the private companies that manage vessels in the Ready Reserve Force; the MOA governs the relationship between DoD and DOT with respect to vessels in the National Defense Reserve Fleet, including the Ready Reserve Force.

Unlike the regulations involved in *Vitarelli* and *Ruiz*, the Ship Manager Contract and the MOA are not intended to regulate defendants' conduct with respect to the plaintiff. Although contracts obviously create rights and responsibilities that inure to the respective contracting parties, plaintiff is not a party either to a Ship Manager Contract or to the MOA. And, as the Court has previously observed, plaintiff has cited no authority for "its standing to enforce the provisions of a contract to which it is not a party." *See* TRO Opinion at p. 12. Therefore, plaintiff may not rely on the Ship Manager Contract or the MOA to support plaintiff's claims against defendants because plaintiff has no enforceable rights under either of those documents.

**2. COMSCINST 4700.15A Allows a Ready Reserve Force Vessel to be Repaired in a Foreign Shipyard Regardless of the Vessel's Homeport.**

In the TRO Opinion the Court held that 10 U.S.C.A. § 7310(a) did not apply to SS PETERSBURG because that ship's homeport is not "in the United States" for purposes of the statute. *See* TRO Opinion at pp. 5-11. This holding is consistent with the allegations in plaintiff's complaint, which indicate that SS PETERSBURG is "a naval vessel," *see* Complaint, ¶¶ 34 & 35 at pp. 7-8, that is "homeported . . . in Guam," *id.*, ¶ 18 at p. 5. Those allegations, of course, bind plaintiff for purposes of its motion for interim injunctive relief. *Bellefonte Re Insurance Co. v. Argonaut Insurance Co.*, 757 F.2d 523, 528-29 (2d Cir. 1985) ("[a] party's assertion of fact in a pleading is a judicial admission by which it normally is bound throughout the course of the proceeding"); *accord, Soo Line RR Co. v. St. Louis Southwestern Railway Co.*, 125 F.3d 481, 483 (7th Cir. 1997) (citing authorities).

In its motion for reconsideration, plaintiff argues that even if SS PETERSBURG is considered to be homeported outside the United States, defendants failed to follow the provisions of COMSCINST 4700.15A concerning maintenance and repair of such ships. In particular, plaintiff points to Paragraph 5.b(1) of the instruction, which states that "ships shall only be considered homeported overseas for the purpose of accomplishing maintenance and repair when specifically approved by [the Assistant Secretary of the Navy for Research, Development and Acquisition ("ASN (RD&A)")], and to Paragraph 6.b, which provides that the Commander of the Military Sealift Command "shall request

ASN (RD&A) approval for an overseas homeport designation" and "shall maintain a list of ships approved as homeported overseas." *See* Recon. Mot., ¶ 5 at p. 3. Plaintiff then asserts that SS PETERSBURG's omission from the "approved" list means that the ship must be deemed "homeported in the United States." *Id.*, at pp 3-4.

Plaintiff's argument overlooks another provision of COMSCINST 4700.15A which makes the procedures contemplated in Paragraphs 5.b(1) and 6.b inapplicable to ships such as SS PETERSBURG. COMSCINST 4700.15A contains several definitions of terms used in 10 U.S.C.A. § 7310(a), including the statutory term "vessel under the jurisdiction of the Secretary of the Navy." This definition expressly provides that "MARAD's Ready Reserve Force (RRF) vessels . . . are not considered to be under the jurisdiction of the Secretary of the Navy and therefore are not required to comply with the provisions of Title 10 U.S. Code Section 7310(a)." *See* COMSCINST 4700.15A, ¶ 4.d.

The Navy's definition of the statutory term "vessel under the jurisdiction of the Secretary of the Navy" is entitled to deference under the two-step *Chevron* analysis. *See* TRO Opinion at pp. 7-9 (*citing Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984)). First, the statute is silent with regard to the meaning of that term, thereby leaving "a gap for an agency to fill." *See United States v. Mead Corp.*, 533 U.S. 218, 227 (2001) (*quoting Chevron*, 467 U.S. at 843-44). Second, the Navy's definition of the term is reasonable. In this connection, it should be noted that 10 U.S.C.A. § 7310(a) deals with the overhaul, repair, and maintenance of naval vessels and

other vessels under the jurisdiction of the Secretary of the Navy. By statute, however, the maintenance of vessels in the National Defense Reserve Fleet, including vessels assigned to the Ready Reserve Force, is the responsibility of the Secretary of Transportation. *See* 50 App. U.S.C.A. § 1744 (a) ("[t]he Secretary of Transportation shall maintain a National Defense Reserve Fleet, including any vessel assigned to the Ready Reserve component of the fleet"). *See also* MOA, Article 5 ¶ b (acknowledging MARAD's responsibility for "[a]ll shipyard and ship repair facility work to RRF ships"). For purposes of a statute dealing with vessel "maintenance" such as 10 U.S.C.A. § 7310(a), it is logical and reasonable for the Secretary of the Navy to define his jurisdiction so as to conform to Congress's assignment of responsibility to "maintain" the vessels in question.

Plaintiff admits that SS PETERSBURG is "a government-owned tanker that is part of the United States Ready Reserve Force ('RRF'), a select group of ships within the National Defense Reserve Fleet, which are maintained by DOT's MARAD." *See* Complaint, ¶ 12 at p. 4. Thus, SS PETERSBURG, under the definition in COMSCINST 4700.15A, ¶ 4.d, is not a "vessel under the jurisdiction of the Secretary of the Navy." Consequently, 10 U.S.C.A. § 7310(a) does not apply to SS PETERSBURG (or to any other ship in the RRF), thereby making its homeport designation irrelevant and compliance with Paragraphs 5.b(1) and 6.b of COMSCINST 4700.15A unnecessary.

The Court's TRO Opinion did not address the impact of Paragraph 4.d of COMSCINST 4700.15A on plaintiff's attempt to apply 10 U.S.C.A. § 7310(a) to the SS

PETERSBURG.[4] This omission is not surprising in light of the highly expedited adjudication of plaintiff's motion for a temporary restraining order. Because the analysis set forth in the TRO Opinion is sufficient to demonstrate that plaintiff is unlikely to succeed on the merits even assuming the truth of plaintiff's factual allegations, further consideration of merits issues would have been superfluous as far as plaintiff's motion for interim injunctive relief was concerned.

In essence, the Court tested plaintiff's likelihood of success in a manner analogous to Fed. R. Civ. P. 12(b)(6). *See generally Nwachukwu v. Rooney*, 362 F. Supp. 2d 183, 191 (D.D.C. 2005) (legal standard for Rule 12(b)(6) motion to dismiss). That is, even assuming, consistent with the allegations in plaintiff's complaint, that SS PETERSBURG were a vessel under the jurisdiction of the Secretary of the Navy for purposes of Section 7310(a) -- which it is not -- the statute would still be inapplicable because SS PETERSBURG would then be "considered homeported overseas" pursuant to COMSCINST 4700.15A, ¶ 4.b.[5] *See* TRO Opinion at pp. 9-11.

Of course, assuming that SS PETERSBURG is subject to Navy jurisdiction for purposes of Section 7310(a) is very different from a ruling to that effect. Because the

---

[4] Paragraph 4.d of the instruction was discussed at pages 10-11 of defendants' opposition to plaintiff's motion for a temporary restraining order.

[5] Defendants note that Section 7310(a) would also be inapplicable even assuming the truth of plaintiff's allegations as to Navy jurisdiction because the statute does not apply to "voyage repairs" such as are currently being performed on SS PETERSBURG. *Compare* COMSCINST 4700.15A, ¶ 4.a (definition of "voyage repair") *with* Cahill Dec., ¶ 8 (description of repair work being performed on SS PETERSBURG).

TRO Opinion contains no such ruling, or even discusses the issue, the implicit premise underlying plaintiff's reconsideration motion -- that SS PETERSBURG is in fact under the jurisdiction of the Secretary of the Navy for purposes of Section 7310(a) -- is false, and plaintiff's invocation of Paragraphs 5.b(a) and 6.b of COMSCINST 4700.15A is without merit.

**3. The Public Interest Favors Denial of a Temporary Restraining Order.**

In the TRO Order, the Court held that "the public interest lies with the defendants in assuring military preparedness." *See* TRO Order at p. 16. Although plaintiff concedes that "military preparedness is of paramount interest," plaintiff asserts that this interest would be better served by making repairs to SS PETERSBURG at plaintiff's shipyard in Guam, the ship's duty station, rather than in Singapore. *See* Recon. Mot., ¶ 6 at p. 4. What plaintiff fails to mention, however, is that its drydock will not be available to begin the repair work until November 15, 2005, and that it would take plaintiff approximately twice as long as other shipyards to complete the repairs once begun. *See* Cahill Dec., ¶ 10.

Furthermore, plaintiff is simply wrong to assert that "the government has great latitude in scheduling" the repair work. *See* Recon. Mot., ¶ 6 at p. 4. In fact, the repairs are essential for the continued operation of SS PETERSBURG, are required so that the ship can be available to perform its mission, and must be completed with all speed to return the vessel to readiness. *See* Cahill Dec., ¶¶ 8-9. By contrast, under the leisurely

repair schedule plaintiff proposed, "the PETERSBURG would be unavailable to perform its critical mission from now until February 2006, at the earliest, assuming the work was completed on time by [plaintiff]." *Id.*, ¶ 10. Plaintiff's proposal is obviously not consistent with the public interest in military preparedness.

Plaintiff also contends that there is a "great interest . . . in preserving and protecting the American ship repair industrial base." *See* Recon. Mot., ¶ 7 at p. 4. Defendants do not disagree; however, as the Court has previously observed, "it seems that the defendants' actions are not completely preventing the plaintiff from procuring any work, but rather that the defendants' actions are merely adding market competitors the plaintiff would rather not face." *See* TRO Opinion at p. 15. Shielding plaintiff's business from market competition is hardly a matter of overwhelming public importance.

**Conclusion**

Therefore, based on the foregoing and on the entire record herein, defendants respectfully request that the Court (1) deny plaintiff's motion for reconsideration and (2) confirm the Court's previous decision denying plaintiff's motion for a temporary restraining order. A proposed Order is submitted herewith.

Respectfully submitted,

_______________________________________

KENNETH L. WAINSTEIN
D.C. Bar No. 451058
United States Attorney

______________________________________
R. CRAIG LAWRENCE
D.C. Bar No. 171538
Assistant United States Attorney

______________________________________
DANIEL F. VAN HORN
D.C. Bar No. 924092
KATHLEEN M. KONOPKA
Assistant United States Attorneys

United States Attorney's Office
Civil Division, Room E-4816
555 Fourth Street, N.W.
Washington, D.C. 20530
(202) 514-7168
daniel.vanhorn@usdoj.gov