**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____ )
                                        )
GUAM INDUSTRIAL SERVICES, INC.,         )
d/b/a Guam Shipyard,                    )
                                        )
        Plaintiff,                      )
                                        )
            v.                          )    Civil Action No. 05-1599 (RMU)
                                        )
DONALD H. RUMSFELD, Secretary of        )
Defense, et al.,                        )
                                        )
        Defendants.                     )
_____ )

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR**
**A PRELIMINARY INJUNCTION**

Defendants, by their undersigned attorneys and pursuant to LCvR 7(b) and the

Minute Order entered by the Court on August 26, 2005, hereby respectfully submit the

following memorandum of points and authorities in opposition to plaintiff's motion for a

preliminary injunction in the above-captioned civil action.

**<u>Background</u>**

Plaintiff is a corporation owned by United States citizens which owns and operates

Guam Shipyard, a commercial shipyard located in the Territory of Guam.  *See* Plaintiff's

Complaint filed August 10, 2005 (hereafter cited as "Compl."), ¶¶ 1-2 at p. 2.  Plaintiff

has moved that the Court issue a preliminary injunction enjoining defendants

-1-

from having any non-emergency, non-voyage repairs, overhauls or maintenance to the SS Petersburg, or to any other vessel under the jurisdiction of the Secretary of the Navy, including vessels in the United States Ready Reserve Force, and subject to 10 U.S.C. § 7310, performed in a foreign shipyard; [and]

from soliciting bids from, or awarding contracts to, foreign shipyards for any non-voyage repairs, overhauls or maintenance of vessels in the Ready Reserve Force, in violation of 10 U.S. [sic] § 7310.

*See* Plaintiff's Motion for Preliminary Injunction.  *See also* Plaintiff's Memorandum in Support of its Motion for a Preliminary Injunction (hereafter cited as "Pl. Mem.") at pp. 1-2.

The Ready Reserve Force is a component of the National Defense Reserve Fleet, which is maintained by the Secretary of Transportation pursuant to 50 App. U.S.C.A. § 1744.  *See* Compl., ¶ 12 at p. 4.  The SS PETERSBURG is part of the Ready Reserve Force, and has been activated for duty under the Military Sealift Command's Prepositioning Program.  *See id.*, ¶ 13 at p. 4.  *See also* http://www.msc.navy.mil/PM3/.

On June 21, 2005, Interocean American Shipping Corporation ("IASC"), a private corporation with its principal headquarters in Voorhees, New Jersey, issued a Request for Price ("RFP") in connection with drydock repairs to the SS PETERSBURG.  *See* Compl., ¶ 19 at p. 5.  IASC solicited proposals for those repairs pursuant to a Ship Manager Contract that has been entered into between IASC and the Department of Transportation's Maritime Administration ("MARAD") pursuant to 50 App. U.S.C.A. § 1744(c)(2).  *See* Compl., ¶ 20 at p. 5.  *See also* News Release MARAD 13-05, *U.S. Maritime*

*Administration Ushers in New Contracts to Run Ready Reserve Force*, July 28, 2005,

http://www.dot.gov/affairs/marad1305.htm.

Plaintiff submitted a proposal in response to IASC's RFP.  *See* Compl., ¶ 21 at p.

5.  After learning that IASC had rejected its proposal, plaintiff filed this civil action on

August 10, 2005.  *See id.*, ¶ 23 at p. 5.  In particular, plaintiff alleged in its Complaint (1)

that IASC had "awarded the drydocking repair contract for the SS Petersburg to a

shipyard [in] Singapore," *id.*, and (2) that "the SS PETERSBURG was scheduled to

depart for Singapore on or about August 7, 2005, for said repairs," *id.*, ¶ 24 at p. 5.

On August 19, 2005, plaintiff filed its motion for a preliminary injunction.  Then,

on August 23, 2005, after being advised by defendants that SS PETERSBURG had

arrived in Singapore and that repairs to the ship had begun, plaintiff moved for a

temporary restraining order.  The Court denied plaintiff's motion for a temporary

restraining order, following highly expedited briefing, on August 24, 2005.  *See*

Memorandum Opinion Denying the Plaintiff's Motion for a Temporary Restraining

Order, filed August 24, 2005 (hereafter cited as "TRO Opinion").

Because plaintiff's motion for a temporary restraining order was directed solely to

the repair work currently being performed on the SS PETERSBURG, the scope of that

motion was narrower than plaintiff's pending motion for a preliminary injunction, which

appears to extend generally to vessels under the jurisdiction of the Secretary of the Navy.

The precise dimensions of the interim injunctive relief requested by plaintiff's pending

motion, however, is somewhat unclear because, in both its Complaint and its moving papers, plaintiff seemingly makes no distinction between "naval vessels" and "other vessels under the jurisdiction of the Secretary of the Navy." By contrast, the statute plaintiff invokes, 10 U.S.C.A. § 7310(a), draws an unmistakable distinction between those two different categories of vessels. *See* Declaration of Captain James Driscoll, U.S. Navy (hereafter cited as "Driscoll Dec.") [copy attached as Exhibit 1], ¶¶ 9-10 at p. 3.

Section 7310(a) by its own terms is applicable to "[a] naval vessel (or any other vessel under the jurisdiction of the Secretary of the Navy)." If, as plaintiff apparently believes, any other vessel under the jurisdiction of the Secretary of the Navy is "a naval vessel" for purposes of the statute, the parenthetical language would be meaningless surplusage. The Court has previously rejected an approach to statutory construction that would "ignore the disjunctive 'or' and rob the term . . . of its independent and ordinary significance." *See* TRO Opinion at pp. 6-7 (quoting *Reiter v. Sonotone Corp.*, 442 U.S. 330, 338-39 (1979)). Indeed, there is simply no way to ignore the disjunctive "or" that precedes the term "any other vessel under the jurisdiction of the Secretary of the Navy" without directly contradicting *Reiter*, and such an interpretation would be nonsensical.

Except for the various scattered references to "naval vessels," nothing in plaintiff's Complaint or moving papers indicates that plaintiff is challenging, in this civil action, the use of foreign shipyards to repair "naval vessels" defined as ships that are "owned and operated by the Navy listed in U.S. Navy Regulation § 406." *See* Driscoll

Dec., ¶ 9 at p. 3. Consequently, defendants interpret plaintiff's claims as involving "vessel[s] under the jurisdiction of the Secretary of the Navy" other than "naval vessels," as those terms are used in 10 U.S.C.A. § 7310(a).[1] More particularly, because the relief sought in both the Complaint and in plaintiff's motion for a preliminary injunction appears to be focused on vessels, such as the SS PETERSBURG, that are part of the Ready Reserve Force, defendants understand the critical issue on the merits of plaintiff's claims in this case to be whether Ready Reserve Force vessels are "under the jurisdiction of the Secretary of the Navy" for purposes of Section 7310(a). *See* Pl. Mem. at pp. 12-13 ("[t]he crux of this case is that Defendants have and continue to solicit bids and/or award contracts to foreign shipyards in connection with non-voyage repairs to all RRF ships, or at a minimum, to all RRF ships activated for duty with the Navy's Prepositioning Program").

---

[1] In 2003, plaintiff brought a civil action, which has been resolved adversely to plaintiff by a final judgment, in the United States Court of Federal Claims challenging the participation of foreign shipyards in a competition for overhaul and repair services for a naval vessel. *See* Order filed June 9, 2003 in *Guam Industrial Services, Inc. v. United States*, Case No. 03-706C (Ct. Fed. Cl.) [copy attached as Exhibit 2]. Thus, to the extent plaintiff might be seeking to challenge before this Court the use of foreign shipyards to perform repairs on vessels that are owned and operated by the Navy, plaintiff's action would be barred by the doctrine of res judicata because any claims of that sort either were or could have been litigated in plaintiff's 2003 case in the Court of Federal Claims. *See Johnson v. Ashcroft*, Civil Action No. 02-1745 (RMU), 2005 WL 2064095, *3 (D.D.C. August 25, 2005) (legal standard for res judicata).

**Legal Standard for a Motion for a Preliminary Injunction**

The criteria that govern the issuance of a preliminary injunction in the District of Columbia Circuit are well-established.  In order for the Court to grant such relief, the plaintiff must demonstrate:

> (1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction is not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction.

*Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1066 (D.C. Cir. 1998) (quoting *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995)).  *See also World Duty Free Americas, Inc. v. Summers*, 94 F. Supp. 2d 61, 64 (D.D.C. 2000).  The Court should balance these four factors on a sliding scale, such that the movant can compensate for a lesser showing on one factor by making a very strong showing on another factor.  *See CSX Transp., Inc. v. Williams*, 406 F.3d 667, 670 (D.C. Cir. 2005) (citing *CityFed Fin. Corp.*, 58 F.3d at 747).  Nevertheless, it is particularly important for plaintiff to demonstrate a substantial likelihood of success on the merits.  *Cf. Benten v. Kessler*, 505 U.S. 1084, 1085 (1992) (per curiam).  Indeed, absent a "substantial indication" of likely success on the merits, "there would be no justification for the court's intrusion into the ordinary processes of administration and judicial review."  *Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 38 F. Supp. 2d 114, 140 (D.D.C. 1999) (internal quotation omitted).

Because interim injunctive relief is an extraordinary form of judicial relief, courts should grant such relief sparingly. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). As the Supreme Court has said, "[i]t frequently is observed that a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Id.* (citation omitted). Therefore, although the Court has the discretion to issue or deny a preliminary injunction, it is not a form of relief to be granted lightly. In addition, any injunction that the Court issues must be carefully circumscribed and tailored to remedy the harm shown. *See Nat'l Treasury Employees Union v. Yeutter*, 918 F.2d 968, 977 (D.C. Cir. 1990) (citation omitted).

To the extent that plaintiff is seeking to stop performance of the repair work that is currently being performed on the SS PETERSBURG in the Singapore shipyard, plaintiff's motion for a preliminary injunction "faces an additional hurdle because it seeks a mandatory as opposed to a prohibitive injunction." *Mylan Pharm., Inc. v. Shalala*, 81 F. Supp. 2d 30, 36 (D.D.C. 2000). Specifically, plaintiff is seeking to stop the performance of a contract, and thereby change the status quo, despite the Court's previous decision to deny a temporary restraining order and allow performance of the contract to proceed. The SS PETERSBURG is in the Singapore shipyard, significant repair work is underway, and the ship is now disabled and unable to move under its own power. *See* Declaration of

William H. Cahill dated September 6, 2005 (hereafter cited as "Second Cahill Dec.")

[copy attached as Exhibit 3], ¶¶ 14-15 at pp. 6-7.[2]

The usual purpose of a preliminary injunction is to "preserve the relative positions

of the parties until a trial on the merits can be held." *University of Texas v. Camenisch*,

451 U.S. 390, 395 (1981).  On the other hand, "where an injunction is mandatory -- that

is, where its terms would alter, rather than preserve, the status quo by commanding some

positive act -- the moving party must meet a higher standard than in the ordinary case by

showing 'clearly' that it is entitled to relief or that 'extreme or very serious damage' will

result from the denial of the injunction." *Phillip v. Fairfield University*, 118 F.3d 131,

133 (2d Cir. 1997); *accord, Nat'l Conference on Ministry v. James*, 278 F. Supp. 2d 37,

43 (D.D.C. 2003); *Columbia Hosp. for Women Foundation, Inc. v. Bank of Tokyo-*

*Mitsubishi, Ltd.*, 15 F. Supp. 2d 1, 4 (D.D.C. 1997), *aff'd*, 159 F.3d 636 (D.C. Cir. 1998).[3]

## Plaintiff Is Not Entitled To A Preliminary Injunction

Plaintiff is not entitled to a preliminary injunction under the foregoing legal

standards.  Not only has plaintiff failed to demonstrate a substantial likelihood of success

---

[2] Mr. Cahill's first declaration was submitted with defendants' opposition to plaintiff's motion for a temporary restraining order.

[3] Fed. R. Civ. P. 65(c) provides that "no . . . preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred by any party who is found to have been wrongfully enjoined."  If, notwithstanding defendants' arguments, the Court decides to grant a preliminary injunction, defendants request that the Court require plaintiff to post a bond in the amount of at least $500,000.  *See* Second Cahill Dec., ¶ 15 at p. 7.

on the merits, plaintiff has also failed to show the existence of any irreparable harm or that granting interim injunctive relief will serve the public interest and not harm other parties.

**1.    Plaintiff Cannot Succeed on the Merits.**

    **A.    Plaintiff has Failed to Join Indispensable Parties.**

To the extent that plaintiff is seeking to enjoin performance of the contract for the repairs to SS PETERSBURG that are currently in progress, plaintiff cannot succeed because it has failed to join indispensable parties under Fed. R. Civ. P. 19. The repair contract for SS PETERSBURG is between IASC and the shipyard in Singapore, neither of which has been made a party to this action. *See* Compl., ¶¶ 19-23 at p. 5.

Furthermore, contrary to plaintiff's claims, *see, e.g.* Pl. Mem. at p. 4, MARAD's ship managers, including IASC, acquire maintenance services through approved commercial subcontracting methods, not as "agents" of the government. *See* Second Cahill Dec., ¶ 10 at pp. 10-11. Indeed, MARAD's Ship Manager Contract expressly provides that "[t]he Ship Manager is not an agent of the United States under the Contract Disputes Act and nothing contained herein shall be deemed to extend to the Ship Manager the status of 'agent of the United States' under any laws relating to contracts." *See* Ship Manager Contract, Section G.7.1.1.1, Amendment 0013.[4] Moreover, the Comptroller

---

[4] A complete copy of MARAD's current Ship Manager Contract is available on the internet at https://voa.marad.dot.gov/programs/ship_manager/final.asp.

General of the United States has ruled that a contract for ship repair services analogous to the one at issue here involved a procurement that was not conducted "by a Federal Agency," and so was not within the Comptroller General's jurisdiction under the Competition in Contracting Act, 31 U.S.C.A. § 3551(1)(A).  *See Guam Industrial Services, Inc. d/b/a Guam Shipyard*, File No. B-281381 (Comp. Gen. November 10, 1998) [copy attached as Exhibit 4].  In short, the contract for the current repairs to SS PETERSBURG is between two private commercial entities, and cannot be deemed a "government contract."

The Court of Appeals has recognized that "[n]umerous cases hold that an action seeking rescission of a contract must be dismissed unless all parties to the contract, and others having a substantial interest in it, can be joined."  *Naartex Consulting Corp. v. Watt*, 722 F.2d 779, 788 (D.C. Cir. 1983) (internal quote omitted; citing authorities), *cert. denied*, 467 U.S. 1210 (1984); *see Kickappo Tribe v. Babbitt*, 43 F.3d 1491, 1495-96 (D.C. Cir. 1995).  In accordance with this rule, plaintiff's failure to join the parties to the repair contract precludes consideration of plaintiff's claims insofar as they relate to the SS PETERSBURG.

### B.    Ready Reserve Force Vessels are Not Subject to 10 U.S.C.A. § 7310(a).

10 U.S.C.A. § 7310(a) provides as follows:

**Vessels with homeport in the United States.** -- A naval vessel (or any other vessel under the jurisdiction of the Secretary of the Navy) the homeport of which is in the United States may not be overhauled, repaired,

-10-

or maintained in a shipyard outside the United States or Guam, other than in the case of voyage repairs.

The applicable agency interpretation of Section § 7310(a) is contained in Commander Military Sealift Command Instruction 4700.15A, *Accomplishing Ship Repair in Foreign Ship Yards* (dated 2 February 2000) (hereafter cited as "COMSCINST 4700.15A"), www.msc.navy.mil/instructions/pdf/m470015a.pdf [copy attached as Exhibit 5]. COMSCINST 4700.15A sets forth a number of definitions applicable to 10 U.S.C.A. § 7310(a) for purposes of determining compliance with the statute. These definitions include "vessel under the jurisdiction of the Secretary of the Navy," "homeport," and "voyage repairs." Most significantly for purposes of the instant case, the instruction expressly provides that "MARAD's Ready Reserve Force (RRF) vessels," such as SS PETERSBURG, "are not considered to be under the jurisdiction of the Secretary of the Navy and therefore are not required to comply with the provisions of Title 10 U.S. Code, Section 7310(a)." *See* COMSCINST 4700.15A, ¶ 4.d.[5]

---

[5] Even if the Ready Reserve Force vessels were under the jurisdiction of the Secretary of the Navy -- which they are not -- 10 U.S.C.A. 7310(a) would still be inapplicable to the current repairs to the SS PETERSBURG, for two reasons. First, the statute would not apply because the "homeport" of the SS PETERSBURG would be deemed to be outside the United States pursuant to Paragraph 4.b of COMSCINST 4700.15A. *See* TRO Opinion at pp. 5-11. Second, Paragraph 4.a of COMSCINST 4700.15A defines "voyage repairs," which are expressly excluded from the scope of Section 7310(a), to include "[c]orrective maintenance on mission or safety essential items necessary for a ship to deploy, or to continue on its deployment or comply with regulatory requirements" and "scheduled maintenance" that is "absolutely necessary to ensure machinery and equipment operational reliability." The repairs that are being performed on SS PETERSBURG in Singapore fall within this definition, and so would not be

As plaintiff recognizes, "[c]ourts review an agency's interpretation of [a] statute under the well known and established *Chevron* standard." *See* Pl. Mem. at p. 14 (citing *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837 (1984)). The first step under *Chevron* is to inquire "whether Congress has directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842.  As explained by the Court of Appeals, "if Congress has directly spoken that is the end of the matter and we must give effect to the unambiguously expressed intent of Congress." *Public Citizen v. HHS*, 332 F.3d 654, 59 (D.C. Cir. 2003) (internal quote omitted).  "If, however, the statute is silent or ambiguous with respect to the specific issue, we must move to the second step and must defer to the agency's interpretation as long as it is based on a permissible construction of the statute." *Id.* (internal quote omitted).

The Supreme Court explained In *United States v. Mead Corp.*, 533 U.S. 218 (2001), that an agency interpretation is eligible for deference

> when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority. Delegation of such authority may be shown in a variety of ways, as by an agency's power to engage in adjudication or notice-and-comment rulemaking, or by some other indication of a comparable congressional intent.

*Id.* at 226-27.  The Court, quoting *Chevron*, then reiterated that if Congress "left a gap for an agency to fill, there is an express delegation of authority to the agency to elucidate a

---

subject to Section 7310(a) in any event.  *See* Second Cahill Dec., ¶ 11, at pp. 5-6.

specific provision of the statute by regulation," and therefore, "any ensuing regulation is binding in the courts unless procedurally defective, arbitrary or capricious in substance, or manifestly contrary to the statute." *Id.* at 227 (quoting *Chevron*, 467 U.S. at 843-44).

Although most cases qualifying for *Chevron* deference have involved notice-and-comment rulemaking or formal adjudication, the absence of such procedures is not dispositive, and the Supreme Court has given *Chevron* deference to agency interpretations "even when no administrative formality was required and none was afforded." *Id.* (citing *NationsBank v. Variable Annuity Life Ins. Co.*, 513 U.S. 251, 256-57 (1995); *see Barnhardt v. Walton*, 535 U.S. 212, 221 (2002) ("the fact that the Agency previously reached its interpretation through means less formal than 'notice and comment' rulemaking . . . does not automatically deprive that interpretation of the judicial deference otherwise due"); *Edelman v. Lynchburg College*, 535 U.S. 106, 114 (2002) (same).

The statute at issue here is silent with regard to the meaning of the term "vessel under the jurisdiction of the Secretary of the Navy," thereby leaving "a gap for an agency to fill." *Mead Corp.*, 533 U.S. at 227. Therefore, the Court must look to the agency interpretation and determine whether that interpretation was duly adopted and is reasonable. *Id.* at 226-27; *see Chevron*, 467 U.S. at 845. This analysis demonstrates that the Navy's interpretation of the term is reasonable, and so is entitled to *Chevron* deference.

-13-

First, COMSCINST 4700.15A was promulgated in accordance with a number of statutes that address the authority of the Navy to prescribe its own regulations. Under 5 U.S.C.A. § 301, "the head of an Executive department or military department may prescribe regulations for the government of his department." Specific to the Navy, 10 U.S.C.A. § 5013(g) provides that the Secretary of the Navy may "prescribe regulations to carry out his functions, powers, and duties under this title." The "powers" and "duties" under 10 U.S.C.A. § 5013 include, *inter alia*, "the functioning and efficiency of the Department of the Navy," "the formulation of policies and programs by the Department of the Navy," and "the effective and timely implementation of policy, program, and budget decisions and instructions of the President of the Secretary of Defense relating to the functions of the Department of the Navy." *See* 10 U.S.C.A. § 5013(c). As the Court has previously recognized, the foregoing statutory provisions give the Secretary of the Navy "the requisite delegated authority to make rules carrying the force of law." *See* TRO Opinion at p. 9 (quoting *Mead Corp.*, 533 U.S. at 226-27; internal quotation omitted).

Second, the Navy's interpretation of the term "vessel under the jurisdiction of the Secretary of the Navy" is reasonable. In this connection, it should be noted that 10 U.S.C.A. § 7310(a) deals with the overhaul, repair, and maintenance of naval vessels and other vessels under the jurisdiction of the Secretary of the Navy. By statute, however, the maintenance of vessels in the National Defense Reserve Fleet, including vessels assigned

-14-

to the Ready Reserve Force, is the responsibility of the Secretary of Transportation.  *See*

50 App. U.S.C.A. § 1744 (a) ("[t]he Secretary of Transportation shall maintain a National

Defense Reserve Fleet, including any vessel assigned to the Ready Reserve component of

the fleet").  For purposes of a statute dealing with vessel "maintenance" such as 10

U.S.C.A. § 7310(a),  it is logical and reasonable for the Secretary of the Navy to define

his jurisdiction so as to conform to Congress's assignment of responsibility to "maintain"

the vessels in question.[6]

Plaintiff argues that 10 U.S.C.A. § 7310(a) should apply to Ready Reserve Force

vessels because "jurisdiction need not be exclusive -- i.e. DoD/naval jurisdiction does not

preclude DOT jurisdiction."  *See* Pl. Mem. at p. 13.  In other words, plaintiff contends

that if the Secretary of the Navy has jurisdiction over a vessel for any purpose, the

Secretary should then be deemed to have jurisdiction over that vessel for purposes of

_____

[6] Paragraph 4.d of COMSCINST 4700.15A defines "vessel under the jurisdiction of the Secretary of the Navy" to exclude, in addition to Ready Reserve Force vessels, "MSC time chartered ships . . . and voyage chartered ships."  As with Ready Reserve Force vessels, the Navy is not responsible for the repair and maintenance of those excluded vessels.  In 1993, the General Accounting Office determined that the Navy's position "that time-chartered ships remain under the jurisdiction of their owners, and are therefore allowed to be repaired overseas, appears reasonable."  *See* GAO Report, *Navy Contracting: Military Sealift Command's Control Over Time-Chartered Ships* (GAO/NSIAD-93-140), B-252298, at p. 4 (April 7, 1993) [copy attached as Exhibit 6].  The Navy's responsibility for voyage chartered ships is even more attenuated because, as the term implies, a "voyage charter" is a contract for the services of a vessel to carry a full cargo on a single voyage.  *See* Gilmore & Black, ADMIRALTY LAW, § 4-1 at p. 193 (2d ed. 1975); Schoenbaum, ADMIRALTY AND MARITIME LAW, § II-1 at p. 2 & § II-4 at p. 9 (4th ed. 2001).  Nothing in plaintiff's Complaint or in plaintiff's moving papers suggests that the instant case involves repairs to either time chartered or voyage chartered ships.

maintenance and repair. Neither the statute nor logic supports this expansive reading of Section 7310(a)'s scope. Moreover, once a Ready Reserve Force vessel is activated to provide service to the Department of Defense, the vessel is under the control of a Combatant Commander who does not report to and is not under the supervision of the Secretary of the Navy. *See* Driscoll Dec., ¶ 7 at pp. 2-3. Thus, contrary to plaintiff's assumption, the Secretary of the Navy has neither operational control over nor responsibility for the repair and maintenance of Ready Reserve Force vessels even after those vessels have been activated for duty. *See id.*, ¶ 9 at p. 3. For these reasons, plaintiff's contention that Ready Reserve Force vessels are "under the jurisdiction of the Secretary of the Navy" for purposes of Section 7310(a) has no merit.

In short, the agency interpretation of the statutory term "vessel under the jurisdiction of the Secretary of the Navy" is not "procedurally defective, arbitrary or capricious in substance, or manifestly contrary to statute." *See* TRO Opinion at p. 9 (quoting *Mead Corp.*, 533 U.S. at 227; internal quotation omitted). As such, that interpretation is binding in the courts. *See id*.

> ### C. Neither the MARAD Ship Manager Contract Nor the DoD/DOT Memorandum of Agreement Support Plaintiff's Claim.

Plaintiff also asserts that "it is likely to succeed on the merits because the U.S. Government and its agents have violated their own mandates and required procedures." *See* Pl. Mem. at p. 15. The so-called "mandates and required procedures" to which plaintiff refers are contained in two documents. One is a 1997 Memorandum of

Agreement between the U.S. Transportation Command, on behalf of the Department of

Defense ("DoD"), and MARAD, on behalf of the Department of Transportation ("DOT").

*See* Memorandum of Agreement between Department of Defense and Department of

Transportation (hereafter cited as "MOA"), dated 28 August 1997 [copy attached as

Exhibit 7]. The other document is the Ship Manager Contract that is entered into by

MARAD and entities such as IASC, pursuant to 50 App. U.S.C.A. § 1744(c)(2), for the

management of the vessels in the Ready Reserve Force. *See* Compl., ¶¶ 19-20 at p. 5;

Second Cahill Dec., ¶¶ 8-9 at pp. 3-4.

Plaintiff's reliance on the MOA and the MARAD Ship Manager Contract is

predicated on plaintiff's claim that "[d]efendants are bound by their own procedures and

contracts, and it [sic] is not free to disregard them." *See* Pl. Mem at p. 16. This claim,

however, does not accurately reflect applicable law. Even if one or both of those

documents could properly be construed to require all repair and maintenance work on

Ready Reserve Force vessels to be performed by domestic shipyards, the MOA and Ship

Manager Contract would still be of no help to plaintiff because neither of those

documents creates any rights that plaintiff may enforce.

Plaintiff cites two dated Supreme Court opinions and several Court of Appeals

cases from outside this Circuit to support its claim that the MOA and the Ship Manager

Contract amount to binding agency procedures or regulations. Those cases are illustrative

of the so-called *Accardi* doctrine, which "holds that government agencies are bound to

-17-

follow their own rules, even self-imposed procedural rules, that limit otherwise discretionary decisions." *Wilkinson v. Legal Services Corp.*, 27 F. Supp. 2d 32, 34 n.1 (D.D.C. 1998) (*citing United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 267-68 (1954)). As the Court of Appeals for this Circuit has recognized, however, the Supreme Court "retreated from the broadest reading" of the *Accardi* doctrine in *Schweiker v. Hansen*, 450 U.S. 785, 789-90 (1981), where the Court "refused to bind the Secretary of Health and Human Services to the internal rules set forth in a 13-volume Social Security Administration handbook." *See Jackson v. Culinary School of Washington, Ltd.*, 27 F.3d 573, 584 n.21 (D.C. Cir. 1994), *vacated on other grounds*, 515 U.S. 1139 (1995), *reinstated in pertinent part*, 59 F.3d 254, 255 (D.C. Cir. 1995).

Another judge of this Court has explained the current state of the *Accardi* doctrine as follows:

> While it can hardly be gainsaid that public officials must obey the law, in the administrative context, a more nuanced question arises as to what constitutes "law" binding on the agencies. The question is not posed in its broadest, jurisprudential sense. Rather the question is to what sources must a court look to determine whether a government actor is prohibited from taking the action (or inaction) alleged to have been wrongfully done (or not done).

*Wilkinson*, 27 F. Supp. 2d at p. 34 (footnotes omitted); *see, e.g., BP Exploration & Oil, Inc. v. Dep't of Transportation*, 44 F. Supp. 2d 34, 37-38 (D.D.C. 1999). *See also, e.g., In re Grand Jury Subpoena, Judith Miller*, 397 F.3d 964, 974-76 (D.C. Cir.) (Department of Justice guidelines for issuing subpoenas to news media not binding), *cert. denied*, 125

S. Ct. 2977 (2005); *Nat'l Small Shipments Traffic Conference, Inc. v. ICC*, 725 F.2d 1442, 1449 (D.C. Cir. 1984) (rejecting application of *Accardi* doctrine where rule at issue "was not designed to protect either individual rights or wards of the federal government"); *Doe v. Hampton*, 566 F.2d 265, 280-81 (D.C. Cir. 1977) ("not every piece of paper emanating from a Department or Independent Agency is a regulation").

In this Circuit, "with regard to rules that have not been formally promulgated, the 'law' to which an agency will be bound are those rules to which it intended to be bound." *Wilkinson*, 27 F. Supp. 2d at 35 (footnote omitted); *accord, e.g., Jackson*, 27 F.3d at 584 ("[t]he touchstone for enforceability is agency intent"). Thus, in *Nat'l Latino Media Coalition v. FCC*, 816 F.2d 785, 788 n.2 (D.C. Cir. 1987), the Court of Appeals pointed out that "the 'binding' quality of a particular rule or statement will depend on whether the agency intended to establish a 'substantive' rule, one which is not merely interpretative but which creates or modifies rights that can be enforced against the agency." And, in *Vietnam Veterans v. Sec'y of the Navy*, 843 F.2d 528 (D.C. Cir. 1988), the Court of Appeals explained that "statements whose language, context and application suggest an intent to bind agency discretion and private party conduct -- the sort of statements requiring compliance with § 553 [of the Administrative Procedure Act] -- will have that effect if valid; interpretative rules or policy statements will not, *regardless* of their validity." *Id.* at 537 (emphasis in original).

The nature and function of the MOA and the MARAD Ship Manager Contract demonstrate that those documents are not intended to provide plaintiff with any enforceable rights. The MOA and the Ship Manager Contract are not agency "procedures" or "regulations" as those terms are used for purposes of the *Accardi* doctrine. Rather, the documents are contracts: the MOA governs the relationship between DoD and DOT with respect to vessels in the National Defense Reserve Fleet, a component of which is the Ready Reserve Force; the Ship Manager Contract governs the relationship between MARAD and the entities that manage vessels in the Ready Reserve Force.

Unlike the regulations involved in cases such as *Vitarelli v. Seaton*, 359 U.S. 535 (1959), and *Morton v. Ruiz*, 415 U.S. 199 (1974), on which plaintiff relies, the MOA and the Ship Manager Contract are not intended to regulate defendants' conduct with respect to the plaintiff. Although contracts obviously create rights and responsibilities that inure to the respective contracting parties, plaintiff is not a party either to the MOA or to a Ship Manager Contract. And, as the Court has previously observed, plaintiff has cited no authority for "its standing to enforce the provisions of a contract to which it is not a party." *See* TRO Opinion at p. 12.

Therefore, plaintiff may not rely on the MOA or the MARAD Ship Manager Contract to support plaintiff's claims against defendants because plaintiff has no enforceable rights under either of those documents. Furthermore, neither the MOA nor

the Ship Manager Contract can in any event be read to require that all repair and

maintenance work on Ready Reserve Force vessels, including the specific repairs

currently being made to the SS PETERSBURG, be performed in a domestic shipyard.

> The pertinent portion of the MOA provides as follows:

> All shipyard and ship repair facility work to [Ready Reserve Force] ships
> will be accomplished by MARAD (either directly or through is ship
> operating companies) and performed in the United States (except for
> necessary voyage repairs while overseas) in accordance with statue and
> DOT regulations.

MOA, Article 5, ¶ b at p. 3.  This provision, by its own terms, does not apply to repairs

such as those currently being made to SS PETERSBURG for two reasons.

> First, the MOA requires repairs to be performed in the United States "in

accordance with statute and DOT regulations."  Plaintiff has cited no DOT regulations

that would require use of a domestic shipyard for the current repairs to SS

PETERSBURG, and, as shown above, the statute on which plaintiff relies, 10 U.S.C.A. §

7310(a), is not applicable here.  Thus, plaintiff has identified no statute or regulation that

would trigger application of the "buy America" provision of the MOA.

> Second, that provision expressly excepts "necessary voyage repairs while

overseas."  As the TRO Opinion demonstrates, it is reasonable to deem the SS

PETERSBURG to be deployed "overseas" because "the United States and Guam are

-21-

distinct entities under 10 U.S.C. § 7310(a)." *See* TRO Opinion at p. 5.[7]  Further, as noted

above, the repairs that are currently being performed on SS PETERSBURG constitute

"voyage repairs" as defined by Paragraph 4.a of COMSCINST 4700.15A.  *See* Second

Cahill Dec., ¶ 11 at pp. 5-6.  Thus, repair work of that sort is exempt from the "buy

America" provision of the MOA even if the provision were otherwise applicable.

     Section C of the current Ship Manager Contract provides as follows:

    2.4.6 Performance of Repair Work
    All repair work and/or upgrading work required in conjunction with the
    contract (including surveys and correction of sea trial deficiencies, or any
    other deficiencies that may be noted up to time of delivery and acceptance
    previously noted or not) necessary to meet all requirements of this contract
    shall be accomplished in a U.S. ship repair facility, unless the work is for
    emergency, or mission essential repairs, or **for pre-positioned ships which**
    **are deployed overseas, or for any vessel forward deployed outside of**
    **the United States**.

*See id.*, ¶ 9 at p. 4 (emphasis added to contract language).  The SS PETERSBURG is part

of the Ready Reserve Force, is currently activated for duty under the Prepositioning

Program, and is prepositioned in Guam.  *See* Compl., ¶¶ 13, 18 at pp. 4-5.  As

demonstrated in the TRO Opinion, it is reasonable to construe the exception in the Ship

Manager Contract for "pre-positioned ships which are deployed overseas" and vessels

"forward deployed outside of the United States" as being applicable to a ship, such as the

---

    [7] *See also* 10 U.S.C.A. § 101(a)(1), which defines, for purposes of Title 10 United
States Code, the term "United States" in a geographical sense, to mean only the States and
District of Columbia.  Guam, under 10 U.S.C.A. § 101(a)(2), is defined separately as a
"possession."

SS PETERSBURG, that is prepositioned in Guam.  *See* TRO Opinion at pp. 5-11.  Thus,

MARAD's Ship Manager Contract does not require that repairs to SS PETERSBURG or

any similarly-situated vessels in the Ready Reserve Force be performed in a domestic

shipyard.

     2.      **<u>Plaintiff Fails to Demonstrate Irreparable Harm.</u>**

Plaintiff likewise fails to demonstrate that it will suffer irreparable harm if an

injunction is not granted.  "[T]he basis for injunctive relief in the federal courts has

always been irreparable harm."  *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58

F.3d 738, 747 (D.C. Cir. 1995).  Thus, while the decisive factors in granting or denying a

preliminary injunction "interrelate on a sliding scale and must be balanced against each

other," *Davenport v. Int'l Bhd. of Teamsters*, 166 F.3d 356, 361 (D.C. Cir. 1999), the

failure of the movant to make any showing of irreparable harm "alone is sufficient" for

the Court to deny relief.  *CityFed.*, 58 F.3d at 747.

Moreover, the injury depicted "must be both certain and great; it must be actual

and not theoretical.  Injunctive relief 'will not be granted against something merely feared

as liable to occur at some indefinite time.'"  *Wisconsin Gas Co. v. FERC*, 758 F.2d 669,

674 (D.C. Cir. 1985) (quoting *Connecticut v. Massachusetts*, 282 U.S. 660, 674 (1931)).

"It is also well settled that economic loss does not, in and of itself, constitute

irreparable harm."  *Id*.  Indeed, "recoverable monetary loss may constitute irreparable

harm only where the loss threatens the very existence of the movant's business."  *Id.*; *see*

*Washington Metropolitan Area Transit Comm'n v. Holiday Tours, Inc.* 559 F.2d 841, 843 n. 2 (D.C. Cir. 1977). Finally, the movant must show that the injury is "certain to occur in the near future, and that this harm could be prevented by the injunction." *Leboeuf, Lamb, Greene & McCrae, LLP v. Abraham*, 180 F. Supp. 2d 65, 72 (D.D.C. 2001) (quoting *Wisconsin Gas Co.*, 758 F.2d at 674).

Plaintiff has "made allegations of irreparable injury which are speculative, unsubstantiated and of a nature which clearly does not warrant the issuance of a stay." *Wisconsin Gas Co.*, 758 F.2d at 672. Plaintiff alleges that, if the repair work on the SS PETERSBURG is accomplished at the Singapore shipyard, it will suffer $14,000,000 in lost revenue and will be forced to layoff a majority of its 250 employees "for a significant period." *See* Pl. Mem. at p. 8. Plaintiff further asserts that,

> if this Court permits Defendants to continue to solicit bids from and/or award contracts to foreign shipyards in connection with non-voyage repairs to all RRF ships, or at a minimum, to all RRF ships activated for duty with the Navy's MSC Prepositioning Program, the economic stability and viability of the United States' private shipyard industry will be severely jeopardized in the face of increased foreign competition.

*Id.* at pp. 8-9.[8]

Plaintiff cannot show that the alleged loss of revenue and forced lay-off of its employees constitute anything more than "something merely feared as liable to occur at

---

[8] Defendants agree with the Court that plaintiff's sweeping statements regarding the "United States' private shipyard industry" are confusing and unhelpful in resolving the issue in question. *See* TRO Opinion at p. 13. Defendants addresses these allegations as they apply to plaintiff's continued viability as a commercial enterprise.

some indefinite time," or that this economic harm "threatens the very existence of [its] business." *See Wisconsin Gas Co.*, 758 F.2d at 674. Moreover, it cannot show that this alleged harm will necessarily be "prevented by the injunction." *See id*. Specifically, plaintiff admits that there exist "similarly situated private shipyards." *See* Pl. Mem. at p. 8. Thus, even if the Court were to enjoin the continued repair of the SS PETERSBURG in Singapore, the award of that work to plaintiff is speculative at best.

Additionally, plaintiff has provided nothing to support a contention that it could not obtain other work for the period of time that it indicates it is available to repair the SS PETERSBURG. According to plaintiff, it is unable to commence repairs of the SS PETERSBURG until after November 15, 2005, because it is otherwise occupied with the USNS NIAGARA FALLS and USNS CONCORD prior to that date. *See* Declaration of Mathews Pothen (hereafter cited as "Pothen Dec."), ¶ 6 [submitted with Plaintiff's Motion for Preliminary Injunction]. Plaintiff also tells the Court that it must complete any awarded work on the SS PETERSBURG by early January 2006, because the USNS FLINT is scheduled for repair the last week of January. *Id*. Plaintiff's stated work schedule also militates against any allegation that its failure to obtain the contract on the SS PETERSBURG, or any other RRF vessel for that matter, "threatens [its] very existence." *See Wisconsin Gas Co.*, 758 F.2d at 674.

Plaintiff can likewise make no showing that the use of foreign shipyards to repair Ready Reserve Force vessels causes it to suffer irreparable harm. Specifically, plaintiff

-25-

asserts that this practice has been ongoing for the last seven years.  *See* Pl. Mem. at 5.

Despite this, plaintiff's business continues to exist and employ approximately 250

individuals, who are currently consumed with work and will remain so until at least

November 15, 2005, and again in January 2006.  *See* Pothen Dec., ¶ 6.  Thus, Plaintiff

makes no allegation, nor could it, of the "imminent" harm, *Wisconsin Gas Co.*, 758 F.2d

at 674, required to prompt the "extraordinary and drastic remedy" of a preliminary

injunction.  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).

     As noted by the Court in the TRO Opinion, the one case plaintiff cites in support

of its irreparable harm argument is inapposite.  In *CSX Transportation, Inc. v. Williams*,

406 F.3d 667, 673-674 (D.C. Cir. 2005), the Court found that the significant decrease in

the capacity and flexibility of the movant's rail network itself constituted irreparable harm

"given its strong likelihood of success on the merits."  *Id.* at 673.  The case at bar is

readily distinguishable from *CSX Transportation* because Plaintiff has not demonstrated a

similar likelihood of success on the merits of its claim, and because the capacity and

flexibility of the shipyard itself to repair vessels has been apparently unaffected these last

seven years that Ready Reserve Force ships have been repaired at times in foreign

shipyards.  In short, plaintiff makes no showing of a "clear and present" danger that any

irreparable injury will occur in the near future.  *See Wisconsin Gas Co.*, 758 F.2d at 674.

**3.    A Preliminary Injunction Would Cause Significant Harm to Other Parties.**

Contrary to plaintiff's assertions, other parties and the public will sustain substantial harm if the Court issues a preliminary injunction.  *See* Second Cahill Dec., ¶¶ 4, 12-13, 15 at pp. 3, 6, 7-8; Declaration of Michael F. Souza [attached as Exhibit 8]; Declaration of LCDR Tony V. Giles, USN [attached as Exhibit 9].  These substantial and concrete injuries make the balance of harms tip decidedly against the interim injunctive relief requested by plaintiff.  *See* TRO Opinion at p. 16 (citing *Gentex Corp. v. United States*, 58 Fed. Cl. 634 (2003)).

**D.    A Preliminary Injunction Would Be Contrary to the Public Interest.**

For the reasons described in the accompanying declarations of Mr. Cahill, Mr. Souza, and LCDR Giles, the strong public interest in military preparedness, especially in a time of war, weighs heavily against issuance of interim injunctive relief.  As the Court has previously pointed out:

> [w]hile the public certainly has an interest in securing the legal rights of U.S. private shipyards, that interest certainly yields to the national defense. Surely, in times of war, the public would prefer a working Navy vessel repaired in Singapore, to a lame one drydocked in Guam.

*See* TRO Opinion at pp. 16-17 (internal quotation and citation omitted).

## Conclusion

Based on the foregoing, defendants respectfully request that plaintiff's motion for a preliminary injunction be denied. A proposed Order is submitted herewith.

Respectfully submitted,

_____
KENNETH L. WAINSTEIN
D.C. Bar No. 451058
United States Attorney

_____
R. CRAIG LAWRENCE
D.C. Bar No. 171538
Assistant United States Attorney

_____
DANIEL F. VAN HORN
D.C. Bar No. 924092
Assistant United States Attorney

_____
KATHLEEN M. KONOPKA
Assistant United States Attorney

United States Attorney's Office
Civil Division, Room E-4816
555 Fourth Street, N.W.
Washington, D.C. 20530
(202) 514-7168
daniel.vanhorn@usdoj.gov

OF COUNSEL:

JANIS RODRIGUEZ, Esq.
Maritime Administration
U.S. Department of Transportation

ALAN W. MENDELSOHN, Esq.
CHARNA SWEDARSKY, Esq.
Department of the Navy