# In the United States Court of Federal Claims

Case No. 03-706C
(Filed: June 9, 2003)

```
***************************************
GUAM INDUSTRIAL SERVICES, INC.,   *
              Plaintiff,           *
                                   *
                                   *
         v.                        *
                                   *
THE UNITED STATES OF AMERICA,      *
              Defendant.           *
                                   *
***************************************
```



## ORDER

The Plaintiff, a privately owned shipyard in the United States territory of Guam, brought this pre-award bid protest pursuant to the Tucker Act, 28 U.S.C. § 1491(b)(2). In its request for a declaratory judgment, the Plaintiff challenges the participation of foreign shipyards in a competition for overhaul and repair services for a U.S. naval vessel. The Plaintiff contends that by considering the bids of these offerors, the Navy has violated 10 U.S.C. § 7310, a statute governing overhaul and repair of vessels in U.S. and foreign shipyards.

The issue has been briefed by the parties and presented to the Court in cross-motions for judgment on the Administrative Record, pursuant to RCFC 56.1. The Court finds that the Plaintiff's argument lacks merit, and that the Navy's solicitation for repair services complies with the statute. **This Order confirms the ruling issued from the Bench on June 5, 2003, GRANTING the Defendant's motion for judgment on the Administrative Record and DENYING the Plaintiff's cross-motion.**

I. <u>Jurisdiction</u>

In an Order dated April 8, 2003, the Court requested that the parties brief the issue of whether jurisdiction over the Plaintiff's claim is proper in this Court, or whether this matter is instead subject to the exclusive admiralty jurisdiction of the District Court. The question arises by virtue of the nature of the solicitation, a contract for port repairs to United States Navy Vessel (USNS) YUKON. Both the Plaintiff and the Defendant argue that jurisdiction is proper in the U.S. Court of Federal Claims. We agree.

The issue was addressed by Senior Judge Merow in an unpublished decision in *ASTA Engineering, Inc. v. United States*, No. 00-214C (May 10, 2000), a copy of which was made available for the parties. We decline to follow that case. The District Court has exclusive jurisdiction over maritime contracts. However, subsequent to the sunset date set forth in the Administrative Dispute Resolution Act of 1996, this Court has exclusive jurisdiction over all bid protests. The District Court may no longer hear bid protests, whether or not the underlying contract can be characterized as maritime in nature. There is no need to address the underlying contract here. Indeed no contract has been awarded at present. The claim concerns only the procurement scheme under which the contract will be awarded, matters solely within our purview.

In this regard we note, first, that the plain words of the 1996 statute conferring shared jurisdiction over pre- and post-award bid protests, and then sunsetting the District Court's portion, do not suggest any limitation. Moreover, the statute explicitly limits the U.S. Court of Federal Claims by excluding bid protests involving U.S. Court of International Trade jurisdiction and matters involving the Tennessee Valley Authority. And where the Congress meant to preclude U.S. Court of Federal Claims jurisdiction from maritime matters, i.e., in the Contract Disputes Act, it did so explicitly.

## II. Preliminary Matters

### A. Motion to Strike

With its Complaint, the Plaintiff included the affidavit of retired Admiral Douglas J. Katz. Defendant filed a motion to strike this piece of evidence because the document is not part of the Administrative Record. The Plaintiff has since withdrawn the affidavit, thereby rendering the Defendant's motion moot.

### B. Motion to Supplement the Administrative Record

The Defendant has moved to supplement its compilation of the Administrative Record with volume III previously filed with the Court. The supplementary material includes a number of staffing memorandums and other documents associated with the Navy's approval of overhaul, repair and maintenance of Military Sealift Command vessels in foreign shipyards. These documents reflect the Navy's policy guidance respecting homeport designations and compliance with 10 U.S.C. § 7310. Included among the supplementation is the document requested by the Court, COMSCINST 4700.15, the predecessor to COMSCINCT 4700.15A, the controlling agency instruction in this case.

The Plaintiff does not oppose the Government's motion to supplement the Administrative Record. We observe that in this case, the notion of an Administrative Record is especially anomalous. Strictly speaking, the Administrative Record consists of the RFP and little more. The other material in the Administrative Record consists of background information and legal materials such as legislative and regulatory history commonly accepted in the adjudication of ordinary motions for summary judgment. **The motion is hereby GRANTED.**

### III. Judgment on the Administrative Record

This dispute turns entirely on a legal question regarding the Navy's application of 10 U.S.C. § 7310. According to the Plaintiff, the Navy should be prevented from awarding this contract on the grounds that it solicited offers from shipyards outside the United States or Guam, in contravention of this statute.

#### A. Statutory Scheme

Section 7310(a) is a "Buy American" provision whereby the Navy must conduct routine overhaul and repair of ships in ports within the United States and its territories, namely within Guam, where the Plaintiff's operations are based. However, this provision explicitly applies only to vessels with a homeport in the United States. It does not apply to U.S. ships with foreign homeports. There is another set of restrictions contained in Section 7310(b), subparagraphs (1) and (2), for ships whose homeports change between foreign and domestic. We will return to those provisions momentarily.

The Plaintiff's Complaint centers around the argument that the USNS YUKON has a domestic homeport, or at least that it should be considered to have a domestic homeport, making it subject to the requirements of Section 7310(a). The Plaintiff asserts a direct violation of the law, and an "arbitrary and capricious" application of its regulations. The parties agree that both the ship and the contemplated maintenance contract otherwise fall within the ambit of the subsection.

#### B. Naval Policy on Designation of Homeports

This particular solicitation involves the Navy's procurement of routine maintenance known as Mid-Term Availability service for the USNS YUKON. The YUKON is a class of vessels within one of the Navy's major subordinate commands, the Military Sealift Command (MSC). The primary mission of the MSC is to provide ocean transportation, equipment, fuel, supplies and ammunition to sustain U.S. military forces in peacetime and in war. These ships resupply regular U.S. naval vessels which remain on station. The YUKON is one of fourteen Navy Underway Replenishment Oilers.

To understand the relationship between MSC ships and the statute, it is necessary to recur to history. The statutory predecessor of Section 7310(a) was Section 9101 of the DoD Appropriations Act for Fiscal Year 1987, which reads essentially the same as the later permanent provision:

> No naval vessel or any vessel owned and operated by the Department of Defense homeported in the United States may be overhauled, repaired, or maintained in a foreign owned and operated shipyard located outside of the United States except for voyage repairs.

At the time of its enactment, regular Navy ships had specific homeports, either in the United States or, occasionally, in a foreign port. But MSC ships traditionally had no specific homeport because as service ships, they tended to be "on station" for years at a time.

When the Appropriation rider was enacted, the Navy adopted a policy of attributing an "equivalent status" homeport to MSC ships for purposes of applying the statute. This policy finds its first expression in the exchange of memorandums between the Commanding Officer of the MSC (COMSC) (January 6, 1987) and the Assistant Secretary of the Navy (Shipbuilding and Logistics) (ASN (S&L))(February 12(?), 1987). Ships assigned to forward areas for two years or more without intervening stops in U.S. ports would be designated as having a generic "foreign homeport." All others would have a generic "U.S. homeport" and would therefore be governed by the rider, and later the statute. The successor official, the Assistant Secretary of the Navy (Research, Development and Acquisition) (ASN (RDA)), periodically designates those MSC ships with "foreign homeports" by approving lists submitted by the COMSC.

The statutory interpretation and the MSC's "agency practice" are now reflected in COMSCINST 4700.15A. The listed vessels are designated "forward-deployed" because of the nature of their mission and the duration of their voyage. The ships will be deployed overseas for at least two and up to five years, and are thus considered homeported overseas.

Because MSC ships regularly change homeport status, the Navy originally had a policy with respect to some kinds of servicing for ships changing status – those soon to be returning to the United States and those soon to be forward deployed. This transition policy now finds congressional expression in Section 7310(b) (1) and (2). Work on a ship scheduled to return to the

United States within 15 months of its scheduled overhaul date must be delayed and performed by a U.S. shipyard. Similarly, work on ships currently in U.S. ports but scheduled for deployment over the next 15 months must be performed in a U.S. port. These transitional rules governing "Vessel Changing Homeports" as the provisions are entitled, are subject to two important limitations: First, they apply only to regular U.S. Navy combat ships, and not MSC ships; and second, they apply only to servicing work exceeding a six-month duration. Section 7310(b) would thus have to be substantially rewritten if it were to be applied to the circumstances of this case. Neither party argues its relevance. With this procurement scheme in mind, we now review its application in the present case.

### C. Operations of USNS YUKON

The YUKON was first added to the foreign homeport list in March 19, 1999. The record indicates that the ship was based out of Singapore during this period. It was deleted from the list on July 10, 2000, upon its return to the United States. For over two years, the YUKON remained in domestic ports, traveling back and forth between Pearl Harbor, San Francisco, and San Diego. Clearly, the ship did not qualify as "forward deployed" during this period. Repairs in foreign shipyards were not permitted under statute or regulation. Nor did the Navy seek such authorization, as is evidenced by the absence of the YUKON from the Assistant Secretary's list.

It is unknown whether maintenance was scheduled during this time period. (Navy co-counsel suggested that the YUKON was likely on an 18-24 month regularly scheduled servicing. However, this representation aside, the Administrative Record does not reveal any maintenance scheduling prior to the release of the solicitation on February 23, 2003.) However, on February 4, 2003, the MSC requested that the YUKON again be classified as forward deployed. The request was granted on February 15, 2003, when the ASN(RDA) approved the list in anticipation of the deployment of the ship and its crew to the Far East and Western Pacific Ocean.

On February 23, barely a week later, The MSC issued the procurement for the YUKON's Mid-Term Availability work. Guam Industrial Services and other foreign shipyards were invited to respond to the solicitation. Although the contract had not yet been awarded at the time of Oral Argument, the parties appeared to believe that the Plaintiff's bid would not stand up to the foreign competitor's bid due to increased costs – quantified as Interport Differentials – resulting from the need to travel from Singapore to Guam in the event the Plaintiff was to perform the contract. The Navy made it clear that it would like to make an award immediately, and commence Mid-Term Availability overhaul as early as Monday, June 9, 2003.

### D. Judicial Review of the Navy's Implementation of § 7310

We review agency action in a bid protest such as this under a deferential

standard, only setting aside an agency's action or decision that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Whether agency action is arbitrary or capricious turns on whether: (1) there was subjective bad faith on the part of procurement officials; (2) there was not a reasonable basis for the procurement decision; (3) the procuring officials abused their discretion; and (4) pertinent statutes or regulations were violated. See *Keco Indus., Inc. v. United States*, 492 F.2d 1200, 1203-04 (Ct. Cl. 1974). The Plaintiff asserts each of these as grounds for reversing the Navy's decision to solicit performance from foreign shipyards, but the core of its position is that Section 7310(a) is being violated, indeed, that it is being flouted.

The Court finds that the Navy's actions here were not, as the Plaintiff argues, contrary to law. The procuring activity and the higher authorities involved in implementing Navy policy complied with the literal terms of Section 7310(a). What the Plaintiff's brief most poignantly demonstrates is that the law carries – and has always carried – a loophole. The Plaintiff may disagree with the loophole but it is, in fact, part of the law.

True, the Navy's application of this statute adheres to the letter but arguably not the spirit of the law. One can make a case that the Navy has evaded the purpose of the statute by scheduling the deployment of certain vessels around the timetables set forth in the statute. Indeed, the Plaintiff argues passionately that the Navy's originally strict adherence to the spirit of the law – called by it, the statute's and regulation's "intent" – have deteriorated over the years so as to permit more overhaul work to be performed overseas. In addition to the short eight-day difference between the "foreign homeport" redesignation and the YUKON solicitation, Plaintiff points to the number of ships on the redesignation list. Whereas previously there were about a dozen, now in 2003, there were three dozen.

We are unpersuaded that these circumstances establish bad faith. There are too many explanations for these facts – indeed, the YUKON's redesignation was officially signaled months earlier. We do not choose to adopt a negative presumption of bad motive. Indeed, to assign an improper motive to the Navy's navigation of the loopholes in this statutory scheme is to violate the most basic tenets of Administrative Record review. Such an approach flies in the face of the presumption that public officers perform their duties in good faith and according to law. See *Alaska Airlines, Inc. v. Johnson*, 8 F.3d 791, 795 (Fed. Cir. 1993).

If the Navy is exploiting this loophole, it has been doing so in a time-honored fashion. The Navy policy dates back at least to 1987. Certainly, the controversy over servicing MSC ships dates back at least that far, as clearly evident by the House Report on Section 9101. Congress has had many opportunities to remove this loophole, and while it has amended and elaborated on this Buy America provision by adding Section 7310(b)(1) and (2), it has not ventured to change or

reject the ASN designation process for MSC ships. Efforts to do so politically have not succeeded. See Letter of 20 Members of Congress to Hon. William S. Cohen (Dec. 1, 1999). The Plaintiff would like this Court to do what like-minded interests inside and outside Congress have failed to do – amend Section 7310(a). That policy issue is far beyond the capacity or authority of this body. Outside of insuring adherence to the statute's injunctions, the execution of Buy America policy belongs in the other two Branches.

### IV. Conclusion

The deployment of the YUKON complies with the literal terms of the equivalent status policy of the Navy. The Plaintiff's real complaint is with the policy itself: The Navy should not be permitted to avoid American repairs simply by designating a ship forward deployed. However, this statute does not preclude, and we have been pointed to no authority restricting the Navy from doing just this. Moreover, this Court must defer to the Navy's permissible construction of the statutory provisions that govern its conduct. See Chevron U.S.A., Inc. v. NRDC, 467 U.S. 837, 843 (1984). The MSC's interpretation of the statute as reflected in policy instructions carrying out the law is also implicitly supported by congressional amendments governing treatment of ships changing homeports.

Had Congress intended the sweeping prohibitions on foreign repairs advocated by the Plaintiff, we would expect the language of the statute to be absolute with respect to all naval vessels. But it is anything but absolute. Accordingly, the Plaintiff's lobbying efforts -- which have so far fallen on deaf ears in the Legislative and Executive Branches -- are similarly wasted upon us. Unlike Congress, we owe a certain deference to the agency practice, certainly in the context of a bid protest, which compels an exceedingly narrow judicial review.

Congress has allowed both the loophole and the Navy's longstanding exploitation of the loophole to survive for years. It is not for us to rewrite the law.

**We hereby GRANT Defendant's motion for judgment on the Administrative Record and DENY the Plaintiff's cross-motion.** The Clerk of Court is directed to dismiss the Complaint and enter judgment in favor of the Defendant. Each party to bear its own costs.

**IT IS SO ORDERED.**

LAWRENCE M. BASKIR
Judge