

Comptroller General
of the United States

Washington, D.C. 20548

# Decision

**Matter of:**  Guam Industrial Services, Inc. d/b/a Guam Shipyard

**File:**  B-281381

**Date:**  November 10, 1998

## DECISION

Guam Industrial Services, Inc. d/b/a Guam Shipyard (GIS) protests the award of a subcontract by Interocean Ugland Management Corporation (IUM) to IHI Amtec Co. Ltd. (IHI) for drydocking and painting of the S.S. GOPHER STATE under IUM's prime contract with the Maritime Administration (MARAD).

We dismiss the protest.

MARAD argues that our Office lacks jurisdiction over the protest because the award is not by a federal agency but by IUM under its prime contract with MARAD. The protester argues that our Office has jurisdiction because the agency's involvement is so pervasive that IUM is in effect merely a conduit for MARAD and therefore this procurement is "by" the government.

In support of its position, GIS points to a copy of what appears to be an electronic mail message from IUM informing various IUM personnel and others that MARAD has directed award of the subcontract to IHI. The protester also relies on an affidavit submitted by a MARAD contracting officer setting forth the facts leading up to the award in question, and in which she explains that:

> MARAD's involvement in IUM's selection of IHI consisted of reviewing and approving the need for mission essential repairs outside the United States pursuant to [IUM's prime] contract, reviewing and approving the specifications that IUM drafted for the repair work, and reviewing the proposed subcontract to verify that the prime contractor complied with its approved purchasing procedures. At no time did MARAD direct IUM to restrict award to particular companies to participate in IUM's evaluation of potential offerors and selection of IHI as the subcontractor for the repair work.

Iris B. Cooper Declaration, Oct. 29, 1998 at 2. In further support of its position, GIS points to IUM's subcontract with IHI, which identifies IUM as "the operator/manager who has been appointed to manage and conduct the business of the S.S. GOPHER STATE . . . for [MARAD]." IUM Contract for the repair of the S.S. GOPHER STATE,

Oct. 12, 1998 at 1. The protester also focuses on isolated portions of documents in the record to conclude that the procurement was essentially "by" MARAD.

Under the Competition in Contracting Act of 1984 (CICA), our Office has jurisdiction to resolve bid protests concerning solicitations and contract awards that are issued "by a Federal agency." 31 U.S.C. § 3551(1)(A) (1994). Pursuant to our authority under CICA, we initially took jurisdiction over subcontract awards by prime contractors to the federal government where, as a result of the government's involvement in the award process, or the contractual relationship between the prime contractor and the government, the subcontract in effect was awarded on behalf of–i.e., "by or for"–the government, and federal procurement laws and regulations otherwise would apply. See Compugen, Ltd., B-261769, Sept. 5, 1995, 95-2 CPD ¶ 103 at 3-4.

Our role in reviewing the award of subcontracts was called into question by U.S. West Comms. Servs., Inc. v. United States, 940 F.2d 622 (Fed.Cir. 1991), which held that under CICA the General Services Administration Board of Contract Appeals (GSBCA) did not have jurisdiction over protests of subcontract awards; the court held, construing statutory language basically identical to that applicable to our Office, that the GSBCA does not have jurisdiction over subcontract procurements that were conducted "for" a federal agency, in the absence of a showing that the prime contractor was a procurement agent, as defined by the Supreme Court in United States v. New Mexico, 455 U.S. 720 (1982), and the court of appeals in United States v. Johnson Controls, Inc., 713 F.2d 1541 (Fed.Cir. 1983).

Consistent with the holding in U.S. West Communications Servs., Inc. v. United States, supra, it now is our view that our jurisdiction generally does not extend to awards made by others but "for" the government; we therefore no longer review protests of such subcontract awards where, as here, the agency involved has not requested in writing that we do so. See 4 C.F.R. §§ 21.5(h), 21.13(a) (1998); see also Compugen, Ltd., supra, at 4-5. Further, while we still will consider protests concerning awards essentially "by" the government–that is, where the government's involvement in the procurement is so extensive that a prime contractor in effect is acting as a mere conduit for the agency–as explained below, the involvement here by the government was not so substantial that the procurement could be considered to be "by" the government. See Compugen, Ltd., supra, at 5-6.

We have considered a subcontract procurement to be "by" the government where the agency handles substantially all the substantive aspects of the procurement, leaving to the prime contractor only the procedural or ministerial aspects of the procurement, i.e., issuing the subcontract solicitation and receiving proposals. See St. Mary's Hosp. and Medical Center of San Francisco, California, B-243061, June 24, 1991, 91-1 CPD ¶ 597; University of Michigan; Indus. Training Svs. Corp., B-225756, B-225756.2, June 30, 1987, 87-1 CPD ¶ 643. On the other hand, we have found subcontractor procurements were not "by" the government, even where the agency

effectively directed the subcontractor selections, where the prime contractor handled other meaningful aspects of the procurement. See Kerr-McGee Chemical Corp., B-252979, May 3, 1993, 93-1 CPD ¶ 358, aff'd, B-252979.2, Aug. 25, 1993, 93-2 CPD ¶ 120; ToxCo, Inc., B-235562, Aug. 23, 1989, 89-2 CPD ¶ 170. Here, contrary to the protester's argument, the record establishes that IUM retained substantial responsibility for the conduct of the subcontract procurement, such that it did not act as a mere conduit for the government.

The agency's contracting officer states that MARAD awarded the prime contract to IUM on June 30, 1993, for the operation and maintenance of certain vessels of the Ready Reserve Force, including the S.S. GOPHER STATE.[1] In August 1998, following work by another firm on the S.S. GOPHER STATE to remove barnacles from the hull of the vessel, IUM recommended to MARAD that the vessel be drydocked and the hull cleaned and painted.[2] MARAD issued IUM a work order to implement that recommendation. Subsequently, IUM personnel prepared a solicitation package for the repairs, which included developing a statement of work (SOW), writing contractual terms and conditions, preparing a bidder's list, and developing a cost estimate. IUM's engineering department also conducted a survey of shipyards in Guam, Japan and South Korea to determine availability and capability to perform the work. Pursuant to its prime contract, IUM submitted the solicitation package to the agency for approval, and MARAD approved it on September 1.

IUM's contracting officer initially issued the solicitation to several firms. At that time, GIS had indicated that due to previous commitments, it was unavailable to perform work. In response to that initial solicitation, IUM received proposals from two firms—IHI and Daewoo Shipbuilding. Subsequently, Daewoo informed IUM that it could not accommodate the vessel, leaving only IHI for consideration.

IUM did not award a subcontract to IHI, however, because MARAD requested that the repairs be deferred until after the vessel completed a military exercise scheduled to begin on October 11, and requiring the vessel to sail to Korea. Subsequently, on September 22, IUM's engineering department contacted GIS, IHI

---

[1] IUM's prime contract, in conjunction with Federal Acquisition Regulation (FAR) Part 44, Subcontracting Policies and Procedures, prescribes policies and procedures for consent to subcontracts or advance notifications of subcontracts, and for review, evaluation, and approval of contractors' purchasing systems. See FAR § 44.00. "Consent to subcontract" means the contracting officer's written consent for the prime contractor to enter into a particular subcontract. See FAR § 44.101.

[2] Under the terms of its prime contract, IUM is required to notify MARAD of vessel deficiencies and develop required repair specifications.

and a third shipyard to determine drydock availability and their interest in the procurement.

In response to IUM's subsequent inquiry, only GIS and IHI indicated interest in performing the work and submitted proposals to IUM. IUM then held discussions with both companies; evaluated the companies' proposals, including delivery schedules; and on October 6, recommended to MARAD that the agency approve the subcontract to IHI. MARAD concurred with that recommendation and IUM awarded the subcontract to IHI on October 12.

Contrary to the protester's arguments, the evidence in the record, including the affidavits provided by the IUM and MARAD contracting officers, establishes that IUM acted in more than a ministerial way in awarding the subcontract to IHI and that, consistent with IUM's contract, the agency was not actively involved in the evaluation of proposals, discussions, or source selection. Specifically, it was IUM, and not MARAD, which prepared the solicitation package, including writing the SOW and contractual terms and conditions; IUM prepared the bidder's list; and IUM developed a cost estimate. In addition, IUM, not MARAD, surveyed shipyards to determine availability and capability to perform the work, and it was IUM which issued the solicitation to GIS and IHI. Further, IUM, not MARAD, held discussions with the firms and evaluated IHI's and GIS's proposals. Finally, it was IUM, not MARAD, which determined that award should be made to IHI. Except for approving the need for the work and reviewing the subcontract to verify that IUM complied with its approved purchasing procedures in accordance with FAR Part 44, MARAD had virtually no role in the award.[3] In sum, the record indicates that IUM's involvement in the procurement was more than that of a mere conduit for the government, and we therefore find that this procurement is not, in effect, "by the government." See ToxCo, Inc., supra.

The protest is dismissed.

Comptroller General
of the United States

---

[3] The protester also argues that MARAD is ultimately responsible for payment if IUM defaults in its obligation to pay IHI for the work, and points out that the prime contract between IUM and MARAD is a cost-reimbursement type, requiring that MARAD approve subcontracts over $50,000. The fact that MARAD is ultimately responsible for payment or that IUM's prime contract is of a cost-reimbursement type, however, does not establish that IUM is a mere conduit. See, e.g., Edison Chouest Offshore, Inc.; Polar Marine Partners, B-230121.2, B-230121.3, May 19, 1988, 88-1 CPD ¶ 477 at 3-4.