United States General Accounting Office



# GAO

Report to Congressional Requesters

April 1993

# NAVY CONTRACTING

# Military Sealift Command's Control Over Time-Chartered Ships





148831

GAO/NSIAD-93-140

Case 1:05-cv-01599-RMU    Document 17-7    Filed 09/07/2005    Page 2 of 12



United States
General Accounting Office
Washington, D.C. 20548

**National Security and
International Affairs Division**

B-252298

April 7, 1993

The Honorable Owen Pickett
The Honorable Herbert H. Bateman
The Honorable G.V. Montgomery
The Honorable Gene Taylor
The Honorable Frank Pallone, Jr.
The Honorable Benjamin L. Cardin
The Honorable Helen Delich Bentley
The Honorable James H. Bilbray
The Honorable Thomas J. Manton
The Honorable Robert A. Borski
The Honorable Randy Cunningham
The Honorable Duncan Hunter
House of Representatives

This report responds to your request that we examine whether the Military Sealift Command (MSC) complied with applicable laws in allowing the Atlantic Forest to have reflagging work[1] and the Green Wave and Green Ridge to have repair work done in foreign shipyards or repair facilities.

## Background

MSC is responsible for providing ocean transportation for the Department of Defense. MSC fulfills this mission by moving cargo on regularly scheduled commercial ships, government-owned ships, and chartered ships that have been offered by private shipping companies in response to requests for proposals. One of the two types of contracts MSC uses to charter ships is a time-charter contract. Under this contract, MSC pays a daily fee for the use of a ship during a specific period of time, but the owner retains all responsibilities, such as crewing, operating, supplying, and servicing the ship. Time-chartered ships remain under the jurisdiction of their owners during the time that MSC is using them. MSC charters about 30 ships each year under time-charter contracts. MSC also charters ships under bareboat contracts. MSC assumes all ownership responsibilities for ships chartered under this type of contract and considers these ships to be under the jurisdiction of the Secretary of the Navy.

The Atlantic Forest, Green Wave, and Green Ridge are three time-chartered ships. The Atlantic Forest is a lighter-aboard-ship vessel, which carries its cargo in barges that can be floated ashore. It has been in

---

[1] This work is required to meet U.S. Coast Guard or American Bureau of Shipping standards for reflagging foreign ships to U.S. registry (i.e., for becoming a U.S.-flagged ship).

B-252298

service to MSC since November 1992. The Green Wave and Green Ridge are ice-strengthened general cargo vessels, which are able to sail in Arctic regions. They have been chartered by MSC since 1984 and 1988, respectively.

## Results in Brief

MSC believes it has conformed with applicable laws in allowing the Atlantic Forest to have reflagging work and the Green Wave and Green Ridge to have repair work done in foreign shipyards or repair facilities. Our review of the laws cited in your request letter and by MSC indicates that (1) MSC's decision to allow the Atlantic Forest to be reflagged overseas appears to have been within its discretion and (2) MSC's position that time-chartered ships remain under the jurisdiction of their owners, and are therefore allowed to be repaired overseas, appears reasonable.

## Reflagging the Atlantic Forest

MSC issued a request for proposals in March 1992 for the time charter of 1 lighter-aboard-ship vessel and as many as 12 other dry cargo ships. In compliance with 10 U.S.C. 2631, MSC requires that all of the ships it charters be U.S.-flagged. Although not required by this law, MSC normally requires that work necessary to reflag a foreign ship offered in response to a time-charter request for proposals must be performed in a U.S. shipyard.

While the request for proposals was being prepared, MSC and some shipyard officials believed that U.S. shipyards would be heavily involved in deactivating Ready Reserve Force ships that had been activated for the Gulf War. As a result, MSC officials thought that the shipyards would be too busy to reflag foreign ships offered in response to the request for proposals. MSC officials also believed that requiring reflagging work to be done in U.S. shipyards would have reduced or eliminated competition for lighter-aboard-ship vessels, since a previous competition to charter these vessels had shown their availability to be limited. Therefore, when MSC issued the request for proposals, it deleted its normal requirement that work to reflag a foreign ship must be done in a U.S. shipyard.

Three lighter-aboard-ship vessels and other types of ships were offered in response to the request for proposals. After analyzing the offers, MSC decided to enter into a time charter for the least costly lighter-aboard-ship vessel, the foreign-flagged Atlantic Forest. The ship was owned by International Shipholding Corporation and was offered to MSC through a U.S.-owned subsidiary, Waterman Steamship Lines. The other lighter-aboard-ship vessels were the U.S.-flagged LASH Atlantico and

American Veteran, which were owned by Coastal Barge Corporation. The contract to charter the Atlantic Forest was awarded on July 2, 1992, and the actual daily charter was to commence in mid-November. In the interim, the ship entered a shipyard in Singapore for the necessary reflagging work and was renamed the Jeb Stuart.

Section 8117 of the Department of Defense Appropriations Act of 1992 (P.L. 102-172)[2] limits the charter of foreign-flagged ships to those necessary to satisfy the shortfalls identified in the Mobility Requirements Study, which was conducted by the Department of Defense to examine total U.S. mobility assets projected to 1999. The act also states that any work required to reflag ships chartered to satisfy these shortfalls must be accomplished in U.S. shipyards.

The Mobility Requirements Study assumed the continuation of shipping capabilities that existed before the Persian Gulf War and identified shortfalls above that level. MSC's contract files showed that the Atlantic Forest was chartered to return shipping capabilities to the level that existed before the war and not to satisfy a shortfall identified in the study. Therefore, MSC was not required by the act to have the Atlantic Forest reflagged in a U.S. shipyard, so its decision to delete the normal U.S. shipyard requirement from the request for proposals appears to have been within its discretion.

After the offers were received and the request for proposals was closed, correspondence from Members of Congress and U.S. shipyards indicated that shipyard space would most likely be available to accomplish future reflagging work. MSC later determined that space would probably be available and amended the request for proposals on July 13, 1992, to reinstate the requirement for reflagging work to be done in U.S. shipyards. On July 24, 1992, another eight ships were chartered to fulfill other requirements in the request for proposals, three of which needed to be reflagged. The work to reflag these ships was done in U.S. shipyards in accordance with the amended request for proposals.

MSC officials told us that their initial decision to delete the normal requirement for reflagging work from the request for proposals was based on an informal telephone survey about shipyard capacity conducted by MSC's engineering department in early 1992. This survey was not documented in MSC contract files. In November 1992, we conducted our own telephone survey of representatives at several shipyards on MSC's

---

[2]This is one of the specific laws you cited in your letter requesting this review.

telephone list. The representatives told us that they also had expected that the shipyards would be busy deactivating ships after the Gulf War cargo was returned to the United States, but only one representative we spoke with remembered being called by MSC. MSC officials said that the other shipyard officials might not have remembered being called because the survey was informal and occurred several months before our survey.

## Repairing the Green Wave and Green Ridge

The Green Wave and Green Ridge have had some repairs made at overseas shipyards or facilities. MSC does not require that time-chartered ships be repaired in the United States. MSC also does not approve the work required or the shipyard chosen for the repairs. The owner notifies MSC and the ship is placed "off hire" while under repair, during which time MSC does not pay the daily fee. MSC believes that there are no legal restrictions on where time-chartered ships are repaired, since they remain under the jurisdiction of their owners and are therefore not required under 10 U.S.C. 7309(c)[3] to be repaired in U.S. shipyards (as are ships under the Secretary of the Navy's jurisdiction). Therefore, MSC's position that time-chartered ships can be repaired overseas appears reasonable.

Data were not available at MSC on the frequency or extent of repairs for the Green Wave and Green Ridge. The ships' owner, International Shipholding Corporation, indicated that most repairs had been performed in the United States, except for emergency repairs and those necessary to meet scheduling requirements for the Persian Gulf War. Data provided by the owner showed that from 1988 to 1991 about 80 percent of repairs on the Green Wave and about 60 percent of repairs on the Green Ridge were done in the United States. Appendix I shows domestic and foreign repair costs for these ships from 1988 to 1991.

## Scope and Methodology

We obtained information from officials at the Military Sealift Command and the Departments of Defense and the Navy, Washington, D.C. We examined the pertinent MSC request for proposals and contract files for the Atlantic Forest, Green Wave, and Green Ridge. We used the same list of contacts that MSC uses in its informal shipyard surveys to contact various U.S. shipyards to determine their availability during the time that the Atlantic Forest had to be reflagged. We also examined applicable legislation to determine what legal restrictions apply to MSC-chartered ships being reflagged or repaired overseas.

---

[3]This is the codification of section 1224 of Public Law 100-456, which was cited in your request letter.

B-252298

We conducted our review from September to December 1992 in accordance with generally accepted government auditing standards. The Department of Defense provided written comments on a draft of this report (see app. II). The Department agreed with the report's findings and conclusions.

We are sending copies of this report to the Chairmen, Senate and House Committees on Appropriations and Armed Services; the Chairman, Senate Committee on Governmental Affairs; the Secretaries of Defense and the Navy; the Commanders, Transportation Command and Military Sealift Command; and the Director, Office of Management and Budget. We will also make copies available to others on request.

Please contact me at (202) 512-5140 if you or your staff have any questions concerning this report. Major contributors to this report are Norm Rabkin, Associate Director; Robert Eurich, Assistant Director; Robert Wright, Evaluator-in-Charge; and Judy Lasley, Evaluator.

Mark E. Gebicke
Director, Military Operations
  and Capabilities Issues

# Appendix I
# Repair Costs for the Green Wave and Green Ridge

| Dollars in thousands | | | | |
|---|---|---|---|---|
| **Green Wave** | **1988** | **1989** | **1990** | **1991** |
| Domestic | $1,077 | $328 | $380 | $298 |
| Foreign | 7 | 54[a] | 38[a] | 451[b] |
| **Total**[c] | **$1,083** | **$382** | **$418** | **$748** |
| **Green Ridge** | | | | |
| Domestic | 0 | $364 | $453 | $56 |
| Foreign | 0 | 15 | 19 | 507[b] |
| **Total** | **0** | **$379** | **$472** | **$563** |

[a]These costs were for emergency engine repairs.

[b]These repairs were necessary to meet MSC scheduling changes as a result of the Persian Gulf War.

[c]Totals may not add due to rounding.

# Comments From the Department of Defense



OFFICE OF THE ASSISTANT SECRETARY OF DEFENSE

WASHINGTON, DC 20301-8000

PRODUCTION AND
LOGISTICS

5 MAR 1993

Mr. Frank C. Conahan
Assistant Comptroller General
National Security and International Affairs Division
U.S. General Accounting Office
Washington, DC 20548

Dear Mr. Conahan:

   This is the Department of Defense (DoD) response to the General Accounting Office (GAO) draft report entitled, "NAVY CONTRACTING: Military Sealift Command's Control Over Time-Chartered Ships," dated February 17, 1993, (GAO Code 394497)/OSD Case 9327).

   The Department has reviewed the draft report and agrees with the draft report findings and conclusions. The Department appreciates the opportunity to comment on the draft report.

Sincerely,

Walter B. Bergmann, II
Acting Deputy Assistant Secretary
(Production Resources)

Ordering Information

The first copy of each GAO report and testimony is free. Additional copies are $2 each. Orders should be sent to the following address, accompanied by a check or money order made out to the Superintendent of Documents, when necessary. Orders for 100 or more copies to be mailed to a single address are discounted 25 percent.

Orders by mail:

U.S. General Accounting Office
P.O. Box 6015
Gaithersburg, MD 20884-6015

or visit:

Room 1000
700 4th St. NW (corner of 4th and G Sts. NW)
U.S. General Accounting Office
Washington, DC

Orders may also be placed by calling (202) 512-6000
or by using fax number (301) 258-4066.

PRINTED ON RECYCLED PAPER

United States
General Accounting Office
Washington, D.C. 20548

Official Business
Penalty for Private Use $300

First-Class Mail
Postage & Fees Paid
GAO
Permit No. G100