UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

GUAM INDUSTRIAL SERVICES, INC.    )
                                  )
              Plaintiff,          )
                                  )
       v.                         )          Civil Action 05-01599 (RMU)
                                  )
                                  )
RUMSFELD ET. AL.                  )
                                  )
              Defendants.         )
_____)

DECLARATION OF WILLIAM H. CAHILL

I, William H. Cahill, hereby declare the following in response to Guam Industrial

Services, Inc.'s (GIS) suit for a preliminary injunction and declaratory relief.

1. I am the Acting Director of the Office of Ship Operations for the Maritime

   Administration ("MARAD"), Department of Transportation.  Prior to becoming

   Acting Director in January 2005 when the Director retired, I was the Deputy

   Director for two years.  I have worked for the Maritime Administration in the

   Office of Ship Operations since October 1993, almost 12 years.  In my capacity as

   Acting Director of the Office of Ship Operations, under the Maritime

   Administration's Associate Administrator for National Security, I am responsible

   for ensuring the Ready Reserve Force (RRF) is maintained to meet the

   Department of Transportation's statutory responsibilities.

2. The Secretary of Transportation is responsible for maintaining the National

   Defense Reserve Fleet (NDRF), including the Ready Reserve Force, pursuant to

50 App. U.S.C. § 1744.  The Ready Reserve Force (RRF) is the high readiness subset of the NDRF established to support rapid deployment of U.S. military forces.  The RRF is used for defense sealift functions and in support of military contingency operations.

3.  The Secretary of Transportation's authority over the NDRF has been delegated via a general delegation which makes the Maritime Administration responsible for "[m]aintaining custody of, and preserving, ships in the National Defense Reserve Fleet."  49 C.F.R. ' 1.4(i)(10).

4.  The SS PETERSBURG is a tanker which has been specially outfitted with an Offshore Petroleum Discharge System (OPDS).  This system permits the discharge of fuel from up to four miles offshore to locations where a port is unavailable.  The PETERSBURG has been placed in the Ready Reserve Force (RRF) component of the NDRF by the Maritime Administration.  It is one of three tankers of this kind in the world, all in MARAD's RRF.  Two of the tankers are pre-positioned overseas for rapid deployment in support of the national defense.  The PETERSBURG is ordinarily pre-positioned in Guam and its sister ship the CHEASAPEAKE is pre-positioned in Diego Garcia nearer the Middle East.  The third vessel, the POTOMAC, is normally located in MARAD's Beaumont Reserve Fleet in Texas but it is being activated to disperse diesel oil to locations on shore in the wake of Hurricane Katrina.

5.  Vessels in the RRF are owned by the United States Department of Transportation, acting by and through the Maritime Administration.  They are public vessels. The PETERSBURG is owned by the United States Department of Transportation

and is a public vessel; it carries a Public Vessel Certification.  Exhibit A,

Certificate of Public Vessel.

6.   Although most public vessels, including those under the jurisdiction of the

Secretary of the Navy, are exempt from the inspection requirements of Chapter 21

of Title 46 of the United States Code, vessels owned or operated by the United

States Department of Transportation, Maritime Administration, including those in

the RRF, are not exempt and must be inspected by the United States Coast Guard.

7.   The Coast Guard issues Certificate of Inspection (COI) for all RRF vessels.  The

PETERSBURG carries a COI from the Coast Guard.  Exhibit B, Certificate of

Inspection for the PETERBURG, indicating vessel is owned and operated by the

U.S. Department of Transportation, Maritime Administration.

8.   The Secretary of Transportation is authorized to enter into contracts to maintain

and operate vessels in the Ready Reserve Force.  Pursuant to this delegated

authority, the Maritime Administration recently awarded new ship manager

contracts for vessels in the RRF at the end of July 2005.  (Exhibit C, 2005 Ship

Manager contract, Section C, p. 1)[1]  Vessels are kept in either maintenance phase

(Phase M) or operational phase (Phase O).  When vessels are in Phase O, they

remain under the administrative control of MARAD even though they are under

the operational control of the Military Sealift Command (MSC).  (C.3.3.2 and

C.2.2.3.2 in Section C of the 2005 Ship Manager Contract, Exhibit C, pp 5 and

16-17; Exhibit E; Ship Manager Contract, Attachment TE-1, section 7.1.5, pp. 7-2

and 7-3).  Under the contract, pre-positioned vessels are in Phase O.

---

[1]   The 2005 Ship Manager contract is at https://voa.marad.dot.gov/programs/ship_manager/final.asp

9.  MARAD has entered into a ship manager services contract with Interocean

American Shipping (IAS) for the PETERSBURG and the CHESAPEAKE.

Interocean Ugland Management (IUM), IAS's predecessor, has operated these

vessels under contract with MARAD for many years.  The 1993 contract cited by

GIS was modified and then replaced with a ship manager services contract in

2000.  MARAD recently awarded new ship manager contracts at the end of

July 2005.  The language in both those contracts differs significantly from the

contract language attached to GIS's filing.  The current ship manager contract,

awarded July 27, 2005, under which these repairs are being made provides the

following in Section C:

> 2.4.6 Performance of Repair Work
> All repair and/or up-grading work required in conjunction with the contract
> (including all surveys and correction of sea trial deficiencies, or any other
> deficiencies that may be noted up to time of delivery and acceptance previously
> noted or not) necessary to meet all requirements of this contract shall be
> accomplished in a U.S. ship repair facility, unless the work is for emergency, or
> mission essential repairs, *or for pre-positioned ships which are deployed*
> *overseas, or for any vessel forward deployed outside of the United States.*

*Emphasis added.* (Exhibit C, p. 8) [2]

10.  MARAD's Ship Managers, including IAS, acquire maintenance and repair

through approved commercial purchasing methods, not as agents of the

---

[2] When IAS issued the original solicitation in June 2005, the current ship manager contract had not
been awarded.  However, that same language permitting repairs in foreign shipyards was included in
Clause H.1 of the 2000 contract:

**H.1 PERFORMANCE OF REPAIR WORK**
All repair and or upgrading work required in conjunction with the contract (including all
surveys and correction of sea trial deficiencies, or any other deficiencies that may be
noted up to time of delivery and acceptance previously noted or not) necessary to meet all
requirements of this contract shall be accomplished in a U.S. ship repair facility, unless the
work is for emergency, or mission essential repairs, or for pre-positioned ships which are
deployed overseas, or for any vessel forward deployed outside of the United States.

government.  (Exhibit D; Attachment J-2 Ship Manager (SM) Subcontract

Policies, of the 2005 Ship Manager contract, p. 10)  Under the approved

procedures, the ship manager prepares the solicitation package, statement of

work, terms and conditions, bidder's lists, develops cost estimates, awards the

contracts and oversees performance.  MARAD does approve award

recommendations for procurements of this size.

11. The repairs covered by the IAS solicitation are a required drydocking survey, a

special survey and a tailshaft survey as well as other necessary repairs.  The

repairs required by the solicitation are necessary to comply with regulatory

requirements and to ensure the readiness of the vessel.  The Certificate of

Inspection (COI) for the PETERBURG expired on August 5, 2005.  In addition,

the American Bureau of Shipping (ABS) drydocking survey and special survey

requirements for the vessel are due on September 30, 2005 and the ABS tailshaft

survey is due on August 31, 2005.  By regulation, all of these repairs and surveys

must be satisfactorily completed before the ship is available to perform its

mission.  In addition to the repairs originally contemplated by the solicitation,

additional emergency repairs are required due to deficiencies found in a Coast

Guard inspection performed August 8-10, 2005, before the ship departed for the

shipyard in Singapore.  Due to the deficiencies, the Coast Guard only authorized

the ship to sail via a one-way waiver and a planned Shipyard Availability exercise

(i.e., conducted to test readiness even during shipyard repairs) had to be cancelled.

The repairs must be completed before the ship can be available to perform its

mission.  Documented public vessels, like the PETERSBURG and other RRF

vessels cannot operate without a valid COI.

12. IAS's solicitation included a requirement for the repairs to occur on or about the

first week in August 2005.  The procurement schedule attached to the solicitation

shows a performance period of 35 calendar days beginning August 3rd.

(Exhibit F)  The performance schedule was necessitated by the expiration of the

COI and the rapidly approaching due dates for completion of the regulatory

surveys, and an "out of service" period for the vessel agreed upon with the

Department of Defense.  Given the strategic importance of this unique asset, the

repairs must be completed with all speed to return the ship to readiness.

13. GIS submitted a bid on the IAS procurement, but eventually indicated that their

dry dock was not available for performance until November 15th.  (Exhibit G)  In

addition, GIS indicated the repairs would take 82 days when program estimates

and other offerors indicated the work could be performed in 35-45 days.  This

schedule means that the PETERSBURG would be unavailable to perform its

critical mission from now until February 2006, at the earliest, assuming the work

was completed on time by GIS.

14. The PETERSBURG left for Singapore August 12, 2005.  I am informed by IAS

that while an award decision had been made at that time, additional funding was

required before the contract could be awarded so the contract was awarded

August 16th.  The vessel arrived at Keppel Shipyard in Singapore on

August 22nd.  Significant work was accomplished pier-side and then the ship

moved into the dry dock on August 28, 2005.  Until the dry dock work is

completed, the ship cannot even be returned to water. The vessel is scheduled to be fully operational by October 1, 2005.

15. An injunction on performing further repairs to the PETERSBURG at the Keppel shipyard would have a significant impact on the readiness of the vessel to perform its mission since the ship is unusable in its current state. It would also be extremely costly. The PETERSBURG is unable to sail under its own power and would have to be towed back to Guam. Before such a tow could be attempted, given the significant amount of work already performed, the ship will require significant preparation for the tow including, at a minimum, completion of the dry dock. In addition, if repairs were stopped and the vessel prepared for tow, the tow alone, not to mention the preparations, would take 22 days and cost approximately $350,000-400,000. Then, after the tow, the United States would not have the use of this asset, critical to the national defense, until the vessel repairs were completed. Even if repairs were ultimately performed at the GIS facility when it becomes available in November, another tow would be required, and the ship would not be operational until sometime in February 2006, over four months after the repairs are scheduled to be completed in Singapore. When the cost of the terminating the $2,985,020 contract with the Keppel shipyard is added to all of the above, the cost in readiness, time and money, of halting repairs now and returning the vessel to Guam for possible repair by GIS is prohibitive. MARAD would be required to pay any additional monetary costs because the MARAD's

ship manager contract with IAS clearly permits repairs in foreign shipyards for

vessels pre-positioned overseas. (See Section C.4.2.6, Exhibit C, p. 8)


I hereby declare, pursuant to 28 U.S.C.A. § 1746 under penalty of perjury, that the

above declaration is true and correct to the best of my knowledge.


William H Cahill
Acting Director
Office of Ship Operations

9/6/05
Date

## EXHIBITS

Exhibit A    Certificate of Public Vessel.

Exhibit B    Certificate of Inspection for the PETERBURG

Exhibit C    2005 Ship Manager contract, Section C, pp 1, 5, 8, 15-17

Exhibit D    Attachment J-2 Ship Manager (SM) Subcontract Policies, of the 2005 Ship
Manager contract, p. 10

Exhibit E    Technical Exhibit (TE-1), Section 7.1.5, pp 7-2 & 7-3 2005 Ship Manager
Contract

Exhibit F    Performance Schedule form IAS solicitation

Exhibit G    GIS email regarding schedule.



# United States of America

## Department of 🌀 Transportation

### Maritime Administration
# Certificate of Public Vessel Status

*This certifies that the*

## Petersburg    Official Number    291990

## is a PUBLIC VESSEL OF THE UNITED STATES OF AMERICA AND IS ENTITLED TO ALL THE IMMUNITIES AND PRIVILEGES OF SUCH A PUBLIC VESSEL.

*This vessel is a public vessel, owned (or demise chartered) and operated by the United States of America, as represented by the Department of Transportation, acting by and through the Maritime Administration (MARAD). This vessel is either a part of the National Defense Reserve Fleet or in service in accordance with the Defense Production Act. It is engaged solely in noncommercial public service, for the account of and at the expense of, and for the carriage of cargo for the United States of America, in accordance with the statutory requirements and restrictions of 50 U.S.C. App. §744 or 50 U.S.C. App. §2158, as applicable. As such, neither the master nor any third party has any right, power, or authority to create, incur, or pledge the credit of the vessel, or permit to be imposed upon the vessel any liens whatsoever. Any claims must be filed against MARAD, in accordance with its administrative claims procedure, the Public Vessels Act (46 U.S.C. §§ 781-790) or the Suits in Admiralty Act (46 U.S.C. §§741-752), as applicable*

MARITIME ADMINISTRATOR
DATED 6 DAY OF 12 1991

**Cahill Declaration (PI)**
**Exhibit A**



| | Certification Date: | 05 Aug 2000 |
|---|---|---|
| | Expiration Date: | 05 Aug 2005 |
| | IMO Number: | 6329044 |

**United States of America**
Department of Homeland Security
**United States Coast Guard**

# Certificate of Inspection

| Vessel Name | Official Number | Call Sign | Service |
|---|---|---|---|
| PETERSBURG | 291990 | WJDC | Tank Ship |

| Hailing Port | Hull Material | Horsepower | Propulsion |
|---|---|---|---|
| NORFOLK, VA | Steel | 15000 | Steam Turbine |

| Place Built | Delivery Date | Date Keel Laid | Gross Tons | Net Tons | DWT | Length |
|---|---|---|---|---|---|---|
| SPARROWS POINT, MARYLAND, UNITED STATES | 15Dec1963 | | R-27469 | R-18685 | 48992 | R-708.2 |
| | | | I- | I- | | I- |

| Owner | Operator |
|---|---|
| US DEPT TRANSPORTATION (MARAD) | US DEPT OF TRANSPORTATION |
| NASSIF BLDG    ROOM 2117 | MARAD SHIP OPERATIONS OFC |
| 400 7TH STREET SW | 2875 J JOHNSON BLVD |
| WASHINGTON, DC 20590 | PORT ARTHUR, TX 77640 |
| UNITED STATES | UNITED STATES |

**This vessel must be manned with the following licensed and unlicensed personnel. Included in which there must be 5 certified lifeboatmen, 0 certified tankermen, 0 HSC type rating, and 2 GMDSS Operators.**

| | | |
|---|---|---|
| 1 Master | 0 Master & 1st Class pilot | 0 Radio Officer(s) | 1 Chief Engineer | 0 QMED/Rating |
| 1 Chief Mate | 0 Mate & 1st Class Pilot | 6 Able Seamen/ROANW | 1 1st Asst. Engr/2nd Engr. | 3 Oilers |
| 1 2nd Mate/OICNW | 0 Lic. Mate/OICNW | 3 Ordinary Seamen | 1 2nd Asst. Engr/3rd Engr. | |
| 1 3rd Mate/OICNW | 0 1st Class Pilot | 0 Deckhands | 1 3rd Asst. Engr. | |
| | | | 0 Lic. Engr. | |

In addition, this vessel may carry 0 passengers, 21 other persons in crew, 12 persons in addition to crew, and no others.
Total persons allowed: 53

**Route Permitted and Conditions of Operation:**

**---Oceans---**

THIS TANK VESSEL IS EQUIPPED WITH AN INERT GAS SYSTEM AND COMPLIES WITH THE REQUIREMENTS OF 46 CFR 32.53 AND REGULATION 62 OF THE SOLAS PROTOCOL.

THE ELIMINATION OF FIREMEN/WATERTENDERS IS CONTINGENT UPON THE PROPER AUTOMATED OPERATION OF THE BOILER MANAGEMENT SYSTEM. ANY ALTERATIONS TO OR FAILURE OF THIS SYSTEM MUST BE REPORTED TO THE NEAREST OFFICER IN CHARGE, MARINE INSPECTION.

JUNIOR ENGINEERS, DECK ENGINE MECHANICS, OR ENGINEMEN MAY BE SUBSTITUTED FOR ONE OR MORE OILERS.

**\*\*\*SEE NEXT PAGE FOR ADDITIONAL CERTIFICATE INFORMATION\*\*\***

With this Inspection for Certification having been completed at KEPPEL TUAS SHIPYARD, SINGAPOR, the Officer in Charge, Marine Inspection, FEAMI certified the vessel, in all respects, is in conformity with the applicable vessel inspection laws and the rules and regulations prescribed thereunder.

| Annual/Periodic/Quarterly Reinspections | | | | This Amended certificate issued by: |
|---|---|---|---|---|
| Date | Zone | A/P/Q | Signature | |
| 11Jul2003 | SIND | A | Martineau, Gle | JAMES M. GARRETT, CAPT |
| 14Aug2002 | GUAMS | P | Gaugler, Gary | Officer in Charge, Marine Inspection |
| - | | | | ACTIVITIES FAR EAST |
| - | | | | Inspection Zone |



Department of Homeland Security
United States Coast Guard

# Certificate of Inspection

Page 2 of 4

Certification Date:
05Aug2000

PETERSBURG

LOOKOUT TOWER LOCATED ON FLYING BRIDGE TO BE MANNED WHEN ENTERING OR
LEAVING PORT TO MEET THE REQUIREMENTS OF 33 CFR 164.15.

### ---Hull Exams---

| Exam Type | Next Exam | Last Exam | Prior Exam |
|---|---|---|---|
| Drydock | 05Aug2005 | 11Jul2003 | 05Aug2000 |
| Internal structure | 05Aug2005 | 11Jul2003 | 05Aug2000 |

### ---Liquid/Gas/Solid Cargo Authority/Conditions---

Authorization/ FLAMMABLE & COMBUSTIBLE LIQUIDS
46CFR Subchapter D Authority: Highest Grade/B  Capacity/333254  Units/Barrels
46CFR Subchapter O Authority: Part 151/No  Part 153/No  Part 154/No

### ---Inspection Status---

*Boilers/Steam Piping*
Maximum Steam Pressure Allowed/680

| Boiler/Piping ID | Hydro/Previous | Hydro/Last | Hydro/Next | Mounts Opened | Mounts Removed |
|---|---|---|---|---|---|
| 13403 | 21Jan1998 | 05Aug2000 | 05Aug2005 | 05Aug2000 | 05Aug2000 |
| 13404 | 21Jan1998 | 05Aug2000 | 05Aug2005 | 05Aug2000 | 05Aug2000 |

| Boiler/Piping ID | Fireside Previous | Last | Next | Waterside Previous | Last | Next |
|---|---|---|---|---|---|---|
| 13403 | 05Aug2000 | 10Jul2003 | 10Jul2006 | 05Aug2000 | 10Jul2003 | 10Jul2006 |
| 13404 | 05Aug2000 | 10Jul2003 | 10Jul2006 | 05Aug2000 | 10Jul2003 | 10Jul2006 |

*Pressure Vessels*

| Type | Location | Previous | Last | Next |
|---|---|---|---|---|
| Air Receiver | OPDS HOUSE | - | 05Aug2000 | 05Aug2005 |
| Air Receiver | AUX. DIESEL ENCL. | - | 05Aug2000 | 05Aug2005 |
| Air Receiver | OPDS HOUSE | - | 05Aug2000 | 05Aug2005 |
| Air Receiver | BLR ROOM | - | 05Aug2000 | 05Aug2005 |
| Air Receiver | BLR ROOM | - | 05Aug2000 | 05Aug2005 |
| DC Heater | UPPER ENG. ROOM | - | 05Aug2000 | 05Aug2005 |
| Steam Generator | BLR ROOM SWP | - | 05Aug2000 | 05Aug2005 |

*Tailshafts*

| Tailshaft ID | Date Drawn | Next Due Date |
|---|---|---|
| NDT | 05Aug2000 | 05Aug2005 |
| MAIN (WATER) | 05Aug2000 | 05Aug2005 |

*Lifesaving*
Number of Davits/2

| Lifeboat/Raft ID | Full Wgt Test | Light Wgt Test | Falls Rnwd | Falls End/End |
|---|---|---|---|---|
| 2 | 11Jul2003 | - | 11Jul2003 | - |
| 1 | 11Jul2003 | 11Jul2003 | 11Jul2003 | - |

### ---Lifesaving Equipment---

| | Number Persons | | Required |
|---|---|---|---|



Department of Homeland Security
United States Coast Guard

# *Certificate of Inspection*

PETERSBURG

Page 3 of 4

Certification Date:
05Aug2000

| Total Equipment for | | 53 | Life Preservers(Adult) | 58 |
|---|---|---|---|---|
| Lifeboats(Total) | 2 | 106 | Life Preservers(Child) | 0 |
| Lifeboats(Port)* | 1 | 53 | Ring Buoys(Total) | 24 |
| Lifeboats(Starbd)* | 1 | 53 | With Lights* | 12 |
| Motor Lifeboats* | 2 | 106 | With Line Attached* | 2 |
| Lifeboats W/Radio* | 2 | 0 | Other* | 10 |
| Rescue Boats/Platforms | 0 | 0 | Immersion Suits | 58 |
| Inflatable Rafts | 4 | 66 | Portable Lifeboat Radios | 3 |
| Life Floats/Buoyant App | 0 | 0 | Equipped with EPIRB? | Yes |
| | | | (* included in totals) | |

## ---Fire Fighting Equipment---

Number of Fireman Outfits/ 4                    Number of Fire Pumps/ 2

*Hose information*

| Qty | Diameter | Length |
|---|---|---|
| 34 | 1.5 | 75 |
| 6 | 2.5 | 75 |
| 11 | 1.5 | Other |
| 7 | 1.5 | 75 |
| 18 | 1.5 | Other |

*Fixed Extinguishing Systems*

| Capacity | Agent | Space Protected |
|---|---|---|
| | Other | PUMP ROOM |
| 100 | Carbon Dioxide | PAINT LOCKER |
| 660 | Foam | ENGINE ROOM/CARGO DECK/PUMP RM |
| 700 | Carbon Dioxide | OPDS HOUSE |
| 200 | Carbon Dioxide | AUXILARY DIESEL ENCLOSURE |
| 150 | Carbon Dioxide | PAINT LOCKER |

*Fire Extinguishers - Hand portable and semi-portable*

| Qty | Class Type |
|---|---|
| 26 | B-II |
| 12 | B-III |
| 1 | B-V |

## ---Certificate Amendments---

*Current Amendment*
Port Amending/ ACTIVITIES FAR EAST          Date Amended/ 12Dec2003
-Remarks-
UPDATED FIRE FIGHTING EQUIPMENT AND INSPECTION STATUS DETAILS.

1.  Port Amending/ SIND              Date Amended/ 11Jul2003
-Remarks-
Completed credit drydock, ISE and 3rd annual exam.  Updated lifesaving details.

2.  Port Amending/ GUAMS             Date Amended/ 14Aug2002
-Remarks-
COMPLETED SECOND RE-INSPECTION



Department of Homeland Security
United States Coast Guard

# *Certificate of Inspection*

Page 4 of 4

Certification Date:
05Aug2000

PETERSBURG

\* \* \*END\* \* \*

SECTION C -- DESCRIPTIONS AND SPECIFICATIONS

C.1      INTRODUCTION

PERFORMANCE WORK STATEMENT (PWS) FOR READY RESERVE FORCE (RRF) SHIP
MANAGER SERVICES

1.1 Mission

The Ready Reserve Force (RRF) is the high readiness subset of the Maritime Administration's
(MARAD), Department of Transportation (DOT), National Defense Reserve Fleet (NDRF) established
to support the rapid deployment of U.S. military forces. As a key element of strategic sealift, the RRF
is specifically structured to transport military unit equipment during initial surge for U.S. forces
deploying anywhere in the world.

1.2 Background

This is a performance based service contract (PBSC) issued by MARAD for maintenance and
operational services for the RRF. Previous fixed price contracts for these services were awarded in
1988, 1993, and 2000 to U.S. commercial ship operating firms. MARAD expects that this PBSC will
improve quality of service, productivity, and maximize cost savings during performance. It is the
policy of the Federal Government that agencies use PBSC methods to the maximum extent practicable
when acquiring services.

1.3 General Scope

Ship Managers shall maintain assigned RRF ship(s) in Fully Mission Capable Readiness Status and
efficiently activate and operate these vessels in support of national emergencies and defense objectives.
Services required include labor and supervision to equip, provision, supply, replace, upgrade, maintain
or repair structures, equipment, machinery, outfitting, spare parts or supplies. The Ship Manager shall
provide administrative support to ensure that all requirements of this contract are accomplished in a
timely and efficient manner. Administrative support includes: management personnel, technical
support, supplies, materials and services necessary to maintain and operate assigned ships, to the extent
that such materials, reporting, and services are not specified as being provided by the Government.

1.3.1 Reimbursables: The omission of any particular item required for the performance of this
performance work statement (PWS) does not make the item Government furnished or reimbursable
unless expressly provided for in Attachment J-9. All work to be reimbursed shall be authorized by
Task Order (TO) prior to commencement of work. All work is to be carried out under competent
supervision and completed in a timely and lawful manner.

1.4 Definitions and Abbreviations

Definitions and abbreviations used throughout the contract, Technical Exhibits (TEs) and attachments
are contained in TE-1 Section 2.

**Cahill Declaration (PI)**
**Exhibt C**

of readiness.  A retention crew is not an ROS crew, although they may be given the option of becoming a nucleus crewmember. They are not required to obtain the same level of training (Attachment J-13) as an ROS crew would have, nor do they have the same benefits (permanent billets) as ROS crewmembers.  If joining the Phase O crew, they must meet standard FOS requirements (see Sections C.5.10 and C.5.4.1).  They are not required to maintain internal vessel security.

The Ship Manager is not required to obtain a layberth for the RRF-10 vessels as part of its proposal, however, during the course of the contract, MARAD may request its assistance at obtaining layberth services as a Prime.  RRF-10 vessels with outport locations are listed in TE-4.

2.2.3.2 Phase O - Operation: This Phase involves the operation of the vessel for a specific mission or exercise. The vessel is to be operated in accordance with standard commercial practice and the RRF Operations Management Manual (TE-1). In Phase O the ship is normally under Military Sealift Command's (MSC) operational control.

2.2.4 While in Phase M and Phase O, maintain the vessel in a C-1 or C-2 status.

2.2.5 MARAD recognizes that events will occur which will result in a C-3 or C-4 status.

2.2.5.1 Notify the COTR within 24 hours of discovery whenever an event occurs which would place the vessel in a C-3 or C-4 status.

2.2.5.2 Initiate planning and as directed by TO take necessary action to correct promptly a C-3 or C-4 deficiency and return the vessel to the required readiness level. Submit a change to the current year Business Plan to reflect corrective actions.

2.2.6 MARAD recognizes that the vessel will have to be scheduled for C-5 status periods due to regulatory inspections, upgrades, and major maintenance periods.

2.2.6.1 Identify these periods within the vessel's business plan. (CDRL M-0005) The Ship Manager may be expected to adjust its proposed C-5 periods per the direction of the COTR when fleet-wide readiness is evaluated.

2.2.6.2 While the C-5 period must be kept to a minimum, evaluate cost against premium time and work acceleration expenditures in returning the ship to its required C-rating status.

2.3 Preventative Maintenance Plan Development

2.3.1 Develop two (2) preventative maintenance plans for each vessel one (1) for Phase M and one (1) for Phase O. Compliance with these Plans, and any of their modifications, is considered a performance measurement under the QASP. The preventative maintenance plans shall take into consideration all facets of inspection, testing, and conditioning the vessel's machinery, equipment, outfitting, and spaces (including structure, habitability areas, cargo areas, etc). The preventative maintenance plans shall include all regulatory body inspections and tests, as required.

2.3.1.1 A ship-specific Phase M Preventative Maintenance Plan, which incorporates both regulatory and preventative maintenance actions, shall be developed when the vessel is inactive. It shall reflect the assigned ROS-4; ROS-5 or deep lay up status (RRF-10). This plan shall be developed so as to

5

Cahill Declaration (PI)
Exhibt C

will place the vessel in a C-3 or C-4 status and enter the deficiency into MARAD's RMS at the next opportunity.  All other repair items, upgrades, and enhancements shall be entered into MARAD's RMS at the discretion of the Ship Manager for funding consideration

2.4.5.1 In the event that a situation or condition develops that poses a threat to life, limb, property or the environment, take immediate action to protect or preserve the same.

2.4.6 Performance of Repair Work

All repair and/or up-grading work required in conjunction with the contract (including all surveys and correction of sea trial deficiencies, or any other deficiencies that may be noted up to time of delivery and acceptance previously noted or not) necessary to meet all requirements of this contract shall be accomplished in a U.S. ship repair facility, unless the work is for emergency, or mission essential repairs, or for pre-positioned ships which are deployed overseas, or for any vessel forward deployed outside of the United States.

2.5 Business Plan Development (Maintenance and Repair)

2.5.1 The Business Plans shall encompass all known facets of the budget, scheduling, maintenance, repair, manning, training, regulatory compliance, and operation (if planned) of the vessel. The Business Plans shall identify all estimated resources and scheduling for successful execution.

2.5.1.1 Submit initial detailed estimates of activation, operation, and deactivation costs for each vessel by item.

2.5.2 Submit with the Business Plans an estimate, by category (ship work breakdown structure), for emergent work which may arise during the year. Base these estimates on their experience as a ship operator and on historical data.

2.5.3 Identify the required work; estimate the cost and schedule for projected actions, i.e., preventative maintenance, corrective maintenance, and regulatory surveys and inspections; define the necessary resources; and schedule the execution of these actions to sustain the vessel in its required readiness. Documentation of these proposed actions and scheduling is part of the vessel's Business Plan. (CDRL M-0012)

2.6 Business Plan Execution (Maintenance and Repair)

Execute the Current Year Business Plan for each assigned vessel in accordance with the respective Plan's scope and schedule, subject to the obligation of funds. This shall be applicable regardless if vessel is in Phase O or M. Report status of individual tasks within the plan utilizing RMS. Maintain all data in RMS reflecting start and completion dates (planned and actual); work items (planned, in progress, and completed); method to complete; obligated and actual costs; and other supporting data elements as required by the system. (CDRL M-0013)

2.6.1 Maintain a historical database of work and repairs accomplished, to include associated costs accurately categorized by equipment, system or space. Use RMS database to refine and justify outyear business plans.

**Cahill Declaration (PI)**
**Exhibt C**

And an (optional) submission of Photographs (digital, if possible,) for use by MARAD in briefings or public affairs articles.

3.2.7.2 Maintain throughout both Phases the onboard property, inventory and currency of MSC, USCG, and other nautical publications and instructions.

3.2.7.3 Report any discrepancies (inventory and/or currency) to the COTR (for items, which MARAD furnishes,) and undertake necessary efforts to replace or update the deficient items.

3.2.7.4 Ensure missing documents or publications are obtained prior to the completion of load-out or departure from CONUS, whichever occurs first. Items in the Standard Administrative Yellow Filing cabinet onboard each vessel are found in CDRL BUS-0004.

3.2.7.5 Embarkation of military personnel. Ship Managers and Masters may be required to support the embarkation of Government personnel including military as passengers, supercargo personnel, and/or observers as directed by MARAD. This includes military stationed as a temporary security force, for example Guardian Mariners.

3.2.7.5.1 The Ship Manager shall provide berthing, food, medical, laundry, and cleaning services comparable to the equivalent shipboard rating. These services shall be provided on a cost reimbursable basis. Entertainment for embarked military is not required and it is not a reimbursable nor an allowable expense. No additional exercise facilities beyond what is available for the crew shall be provided.

3.2.7.5.2 COMSC has instructions which address Master's responsibility and relationship with military personnel, allocation of space, shipboard safety, behavior and discipline, weapons security and other related subjects. (See MSC SOM Chapter 2 Section 7)

If issues arise regarding weapons/ammunition, advise MAR-613 by the fastest means possible.

3.2.8 Chart Ordering and Nautical Publications. Ship Managers will gain access to nautical publications and charts (paper copies) ordering service by having a representative attend the MSC provided course (see J-13). Upon authorization which is provided in writing after completion of the course, Ship Managers shall obtain nautical publications and charts for vessels prior to operation and dispose of them during deactivation in accordance with direction from the COTR.

3.2.9 Slop Chest. Ship Managers will obtain all slop chest items at their own expense, operate the slop chest, and dispose of all materials in accordance with their own corporate procedures. MARAD will no longer reimburse slop chest materials.

3.3 Operations

3.3.1 General. Provide all resources and support equipment required to accomplish continuous ship operations for at least 180 consecutive days in accordance with good commercial practice and the laws and regulations of the United States. Ships are required to maintain operational sea speed listed in TE-7 or notify COTR immediately.

3.3.2 Arrange for port services when in port including anchorages and alongside facilities. Ship Managers must expect and be ready for simultaneous operations of vessels. Although most RRF

Cahill Declaration (PI)
Exhibt C

operations are point-to-point service, Ship Managers must remain flexible to changing operational requirements because there are a variety of worldwide missions for RRF ships. Generally, but not always, RRF ships are under the OPCON of MSC. RRF ships are owned by MARAD and the Ship Manager is contractually obligated to MARAD. Administrative control of the RRF remains with MARAD despite mission or operation assigned. See TE-1, Section 2 for Naval operational terminology.

3.3.3 Maintain vessels such that they achieve the minimum operational speed designated in TE-7. Failure to routinely meet operational speed requirements will result in an investigation to determine root causes, such as, but not limited to, severe weather, improper loading, operational or mission considerations, or failure to perform preventative or routine maintenance.

3.3.3.1 If an RRF ship is unable to comply with naval sailing orders during Operations, because the Master determines compliance is not feasible or it jeopardizes the safety of the ship, the Master, as Ship Manager's representative, must advise the naval operational commander and MARAD (COTR, MAR 611 and MAR-613 and if activated, the Crisis Management Team) within one (1) hour by immediate precedence message, unless message traffic is restricted by the naval commander. The message must include intended actions and reasons for not accepting naval operational direction.

3.3.3.2 Keep the naval operational command and MARAD (see Section 3.3.3.1) fully informed of the ship's status until it is capable of complying.

3.3.4 Operations Plan. Develop, implement, manage and maintain the Ship Manager developed ship-specific Operations Plan. Compliance with the Operations Plan, and any of its modifications, is considered a performance measurement under the QASP.

3.3.5 Bunkering

Provide general policy and ship specific plan for bunkering the ship in accordance with Federal, State, and local environmental regulations.

3.3.5.1 Ensure crew members are familiar with the ship's bunkering plan and conduct bunkering operations with the utmost care for environment in strict compliance with the bunkering plan.

3.3.5.2 Bunkering is normally performed after the vessel is reported RFS and accepted by MSC.

3.3.5.3 Bunkering instructions can either be provided in the MSC activation message or by the COTR.

3.3.5.4 Vessels under MSC OPCON must request bunkering instruction from the MSC area commander. The MSC area commander will instruct the vessel to use bunkers or procure bunkers commercially as a reimbursable. Bunkers are GFP or reimbursable (at the discretion of the Government). During operations, request information on availability of bunkers from the local MSC area commander before arriving in port.

3.3.5.4.1 Maintain list of crewmembers to have viewed bunkering video.

3.3.5.4.2 Inventory of oil spill response kit - semi-annually. Coordinate with COTR.

Cahill Declaration (PI)
Exhibt C

Solicitation DTMA8R04004 – RRF Ship Manager Services                    Amendment 0009

3.7.2.2 <u>Non Commercial Items</u> - Purchases for supplies and services that do not qualify as commercial items (as determined by the MARAD ACO) shall include all appropriate clauses that flow-down from the SM Contract.

3.7.3 <u>Subcontract terms</u> - The subcontract shall not include any language implying or stating that it is an agent of the Federal Government, and the SM shall not sign as "agent" or 'SM for MARAD." The subcontract shall not include terms that bind the Government to the results of arbitration, judicial determination, or voluntary settlement between the prime contractor and subcontractor.

3.7.4 <u>Insurance</u> - The SM shall require insurance from subcontractors to protect Government property in an amount appropriate to the subcontract, which shall be determined on a case-by-case basis. Typically, when a vessel is transported to a shipyard facility for a repair availability, MARAD requires the following types of insurance and minimum coverage during the entire performance of the subcontract:

(1) Workmen's Compensation, including Longshoremen & Harbor Worker's Act coverage - no minimum.

(2) Employers Liability - $5 million bodily injury by accident, each accident - $5 million bodily injury by disease each accident - $5 million bodily injury by disease in the aggregate.

(3) Maritime Employers Liability (Jones Act) - $5 million for each person per occurrence and $5 million in the aggregate.

(4) Comprehensive General Liability - $5 million combined single per occurrence limit for bodily injury and property damage and $5 million in the aggregate.

(5) Ship Repairers Legal Liability - $5 million per vessel, per occurrence.

(6) Pollution Liability - $5 Million per occurrence.

The SM shall ensure that indemnification extends to MARAD, and the insurance certificate shall name the United States of America as a secondary source certificate holder as owner, along with the SM as vessel operator. Such policies shall contain a statement that there is no recourse against the USA for payment of premium. The SM shall stipulate that upon request the subcontractor shall provide a copy of all original insurance policies within 5 calendar days. The SM shall ensure that the coverage does not contain exclusions that would effectively negate coverage for all but third party liabilities. All such insurance will contain 30 calendar days advance notice of cancellation or of any non-renewal which is the option of the insurer be provided in writing to the U.S. Department of Transportation, Division of Marine Insurance , MAR-575, Room 8117, 400 Seventh Street, SW, Washington, DC  20590.

The SM shall obtain and review proof of insurance coverage (i.e., certificate of insurance, policy). The ACO may request that the SM send the subcontractor insurance to the MARAD Division of Marine Insurance for review.

Cahill Declaration (PI)
Exhibit D

Sighting Reports, Prearrival Reports (PREREPs), Communications Guard (COMGUARD) Shift Reports, Position (POSIT) Reports (if required by the OPCON authority), and Mail Routing Information Reports (when applicable).

Voyage sailing orders are usually issued by message, but may be issued by letter.  Sailing orders may be issued verbally and subsequently confirmed by message.  As a minimum, COMSC requires that sailing orders include: task organization, any CHOP provisions, specific speed of advance (SOA) instructions, reporting requirements, and bunkering instructions.  Movements of MSC point-to-point cargo ships shall be kept unclassified, except when a ship's mission and/or cargo necessitate classification.  Classification will be determined by the Military Service shipping the cargo, the Navy Fleet Commander-in-Chief, COMSC, or the Naval Control of Shipping Authority.  MARAD Headquarters and Regions have the capacity to receive/send classified traffic.  RRF ships are not normally supplied with secure communications.

### 7.1.3  Deviation

MARAD vessels follow the operational commander's prescribed course until in the Master's judgment they must deviate to respond to life-saving or other common marine practices regarding aid and assistance to vessels in distress.  If a vessel diverts from the operational commander's directions, full particulars shall be entered into the vessel's log including a statement as to the amount of fuel onboard at the time of diversion.  When the vessel resumes her intended voyage, a second entry shall be made in the vessel's log stating full particulars, including fuel onboard and fuel consumed.

### 7.1.4  Inability to Perform

If a ship is unable to comply with immediate sailing orders because the Master determines compliance is not feasible or it jeopardizes the safety of the ship, he must advise the operational commander and MARAD within one hour, by immediate precedence message.  The message must include intended actions and reasons for not accepting the direction. The Ship Manager shall keep the Operational Commander and MARAD fully informed of the ship(s) status until it is capable of complying with sail orders.

### 7.1.5  Navy Recommendations During OPCON.

As the Ship Manager reads the MSC SOM, he shall notice that COMSC frequently addresses reimbursable actions, for example the bunkering of a vessel.  Please note, that although COMSC can provide endorsement for a reimbursable action, under the terms and conditions of this Ship Manager's contract, COMSC cannot direct or ensure the authorization of a reimbursable action, only the designated MARAD ACO can do this.  Administrative control of the Ship Manager contract is retained by MARAD at all times. The Ship Manager must use his judgment during an operational period with respect to Naval recommendations.  For example,  the Ship Manager may choose to follow orders

to bunker the vessel because of mission dictates.  The Ship Manager should notify the MARAD COTR as soon as possible and provide a copy of MSC's written direction or endorsement for reimbursement which ordered the bunkering. As a rule in a contingency, MARAD will not take exception to any directive issued by COMSC.  In a peacetime exercise, MARAD may wish to ensure the availability of funding before concurring with the recommendation.  If the Ship Manager has any questions with respect to a COMSC directed action/and whether he will be reimbursed for it, he should advise the MARAD COTR and/or the ACO and request clarification BEFORE committing himself.

Similarly, COMSC may recommend a vessel be placed "off-hire," however, COMSC cannot place a vessel off-hire, only the MARAD ACO can authorize a penalty for failure of performance.

### 7.1.6  Deck Operations.

The Ship Manager shall operate and navigate the ship safely in support of naval operations and arrange for services when in port (including anchorages and alongside facilities.)

**General**

**Navigation and Seamanship Policies**

Masters shall be on the bridge when: a vessel must pass in the vicinity of shoals, outlying rocks or other hazards to navigation; when making landfall; while maneuvering in ice or restricted visibility; during heavy traffic or near other ships; while steaming in restricted waters; docking and undocking; upon entering and leaving port; shifting berths; embarking/disembarking a pilot; when anchoring or weighing anchor; or at any time when the condition is such that the possibility of danger warrants the Master's presence on the bridge.

Masters shall observe weather conditions closely at all times and not hesitate to alter course or speed, or put into port or go to sea to avoid heavy weather.  When varying from voyage sailing orders and resulting MOVREPs, Masters must keep operational commanders advised of all such changes and file MOVREP revisions.  In addition to keeping the operational commander informed, this advisement will assist the Navy OTSR routing facility to adjust support accordingly.

Masters shall ensure that:

1. A bridge organization is established and all watch officers and unlicensed personnel are thoroughly familiar with and capable of performing their duties in accordance with the Master's Standing Orders.

**Cahill Declaration (PI)**
**Exhibit F**

Date: 06/10/05 Rev 1 -KS

# S.S. PETERBURG
### Drydock / Repair Availability  RFP # <u>05-G-207-077</u>
## <u>PROCUREMENT SCHEDULE</u>

| EVENT | ACTION | <u>WORKING DAYS</u> | START | FINISH |
|---|---|---|---|---|
| **MARAD Region Review - Technical** <br> *(Review/Acceptance of Specification – Prior to submittal of entire RFP package to  MARAD Region ACO)* | CR | 10 | April 2005 | 5/16/05 |
| IAS Received MARAD Regional – Technical Review <br> *R. Boldt went over final comments w/IAS G.H while at IAS office on 5/16/05. | CR | 1 | 5/16/05 | 5/16/05 |
| (*1)RFP to Region for Review (Electronic) then to Headquarters (5 days review per each) | IAS | 5 | 06/02/05 | ~~06/09/05~~ 06/17/05 |
| Authorize RFP Issuance <br> (Note:  IAS will only issue upon review/acceptance of specification and or entire RFP pkg – based on estimated amount) | CR | 1 | 6/17/05 | 6/17/05 |
| Issue RFP | IAS | 1 | 06/17/05 | 06/17/05 |
| Solicitation Time *(calendar days)* | | **22 (Calendar Days)** | 06/17/05 | 07/08/05 |
| Vessel Site Inspection / Bidder Conference | IAS | 2 | 06/27/05 | 06/28/05 |
| Open | IAS | 1 | 07/08/05 | 07/08/05 |
| Initial Evaluation | IAS | 1 | 07/08/05 | 07/08/05 |
| Negotiation / BAFOs w/Competitive Yards | IAS | 5 | 07/11/05 | 07/15/05 |
| Prepare Award Recommendation | IAS | 2 | 07/18/05 | 07/19/05 |
| (*1)MARAD Region Review *(working days)* | CR | 5 | 07/19/05 | 07/25/05 |
| (*1)MARAD Headquarter Review  *(working days)* | HDQR | 5 | 07/25/05 | 07/19/05 |
| Authorize Contract Award | CR | 1 | 07/29/05 | 07/29/05 |
| Award to Vendor | IAS | 1 | 07/29/05 | 07/29/05 |
| **NTP** | IAS | 1 | 08/03/05 | 08/03/05 |
| Performance Period - *(Calendar Days)* | IAS | **35** | 08/03/05 | 09/06/05 |

(*1)IAW:  SM Contract Section J-2, Section 11.0 SUBCONTRACT REVIEW AND APPROVAL:
Review and Consent Requirements for Ship Manager w/ Approved Commercial Purchasing Systems.

Subcontracts between $100K - $2M (Fixed Price Contracts) only a copy of subcontract to ACO and SOMO upon award. For subcontract higher than $2m, consent to subcontract is required <u>prior</u> to purchase for all.

**Cahill Declaration (PI)**
**Exhibit G**

## Rodriguez, Janis <MARAD>

| | |
|---|---|
| **From:** | Suarez, Karen [karen.suarez@ium.com] |
| **Sent:** | Friday, July 29, 2005 12:12 PM |
| **To:** | Gilmour, Paul <MARAD>; Nancarrow, Trevor |
| **Subject:** | SS PETERSBURG RFP # 05-G-207-077 DRY DOCK |

Paul,

Karen is out today, but here is the information you requested.

Evelyn Maldonado
Contracts Secretary

---

**From:** Herman Agustin [mailto:HAgustin@guamshipyard.net]
**Sent:** Wednesday, July 27, 2005 2:56 AM
**To:** Suarez, Karen
**Cc:** Mathews Pothen
**Subject:** RE: SS PETERSBURG RFP # 05-G-207-077 DRY DOCK CERTIFICATION LTR

Karen,

Our present schedule is as fols:

NIAGARA FALLS Regular Overhaul (ROH) 25 Jul ~ 22 Sep 2005 – negotiated and in progress
CONCORD Regular Overhaul (ROH) 03 Oct ~ 16 Nov 2005 – present schedule (negotiations O/A 11 ~ 16 Aug 2005)

Petersburg (Proposed 82 days) 15 Nov 2005 ~ 05 Feb 2006

San Jose Mid-Term Availability (MTA) 20 Feb ~ 21 Mar 2006 – projected

V/R
Herman

---

**From:** Suarez, Karen [mailto:karen.suarez@ium.com]
**Sent:** Wednesday, July 27, 2005 12:57 AM
**To:** Herman Agustin
**Cc:** Mathews Pothen
**Subject:** RE: SS PETERSBURG RFP # 05-G-207-077 DRY DOCK CERTIFICATION LTR
**Importance:** High

Mr. Agustin,

If you are reading emails, right now can you please contact IAS as soon as possible.
I have questions in regards to your submitted schedule for the PETERSBURG. In particular,
what actual date are you referencing as your start date?.

Please respond.

Regards,
Karen Suarez

8/23/2005

**Cahill Declaration (PI)**
**Exhibit G**

IAS Contracting Officer
856-770-5620

**From:** Herman Agustin [mailto:HAgustin@guamshipyard.net]
**Sent:** Tuesday, July 26, 2005 12:40 AM
**To:** Suarez, Karen
**Cc:** Mathews Pothen
**Subject:** SS PETERSBURG RFP # 05-G-207-077 DRY DOCK CERTIFICATION LTR

Please find attached.

This message was scanned by ATX
12:39:25 AM ET - 7/26/2005

This message was scanned by ATX
2:54:44 AM ET - 7/27/2005

8/23/2005