IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| GUAM INDUSTRIAL SERVICES, INC.         )<br>                                                                 )<br>               Plaintiff,                            )<br>                                                                 )<br>vs.                                                            )     Cause No. 05-CV01599<br>                                                                 )<br>DONALD H. RUMSFELD, Secretary of  )     Division No. 1<br>Defense, et al.                                       )<br>                                                                 )<br>               Defendants.                        )<br>                                                                 ) | |

**PLAINTIFF'S REPLY MEMORANDUM IN SUPPORT OF ITS
MOTION FOR PRELIMINARY INJUNCTION**

**Preliminary Statement**

Plaintiff Guam Industrial Services, Inc., d/b/a Guam Shipyard ("GIS" or "Guam Shipyard"), respectfully submits this reply memorandum of points and authorities in further support of its Motion for a Preliminary Injunction.

GIS continues to seek injunctive relief from the Court, pursuant to the Administrative Procedures Act, 5 U.S.C. §§ 702-706, to prevent the Government[1] from unlawfully continuing to solicit bids from and/or award contracts to foreign shipyards in connection with non-voyage repairs of United States Ready Reserve Force ("RRF") vessels that are homeported in the United States in violation of 10 U.S.C. § 7310(a) ("Section 7310(a)").

However, in light of the Court's August 24, 2005 Memorandum Opinion (hereinafter, "TRO Opinion"), GIS, for present threshold purposes, seeks to narrow its request for relief, asking the Court, pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, declare that, in accordance with the plain and unambiguous language of Section 7310(a), vessels in the

---

[1] Donald H. Rumsfeld, Secretary of the U.S. Department of Defense ("DoD"), Gordon R. England, Secretary of the Department of Navy ("Navy"), Norman Y. Mineta, Secretary of the Department of Transportation ("DOT"), and John Jamian, Acting Administrator, Maritime Administration ("MARAD"), collectively, "Defendants."

RRF and those within the United States Navy's Military Sealift Command Prepositioning Program ("MSC Prepositioning Program"), an activated component of the RRF, are under the Navy's jurisdiction and control and thus subject to the statute. Astonishingly, Defendants would have this Court believe that all RRF and MSC Prepositioning vessels are outside the scope of Title 10. In the Government's view, no vessels other than commissioned "naval" vessels would ever be subject to the statutory requirements, thus rendering the statute's protections for vessels under the jurisdiction of the Secretary of the Navy a complete nullity. The Court cannot endorse such a position.

Additionally, GIS respectfully submits that it is entitled to further discovery in order to develop the relevant administrative record about the Defendants' own policies and practices and specifically on the issues of how these internal policies and practices define and interpret "homeport" and "voyage repairs" per the language of the statute. At this time, there is simply not enough of a record before the Court to make these important determinations. The only information before the Court is the selective record presented by the Defendants, as they have not produced the entire administrative record.

## Factual Background

GIS, a corporation organized and existing under the laws of the U.S. Territory of Guam, owns and operates Guam Shipyard, which repairs and otherwise services maritime vessels. TRO Opinion at 1; Compl. ¶ 2. Guam Shipyard remains the only U.S. owned and operated private shipyard located west of the International Dateline. *Id.* As such, it is the only shipyard of its kind that can service Navy, Military Sealift Command ("MSC"), and MARAD vessels that are under the jurisdiction of the Secretary of the Navy in the Pacific and Indian Oceans. Pothen Decl. ¶ 2.

The RRF is a select group of ships within the National Defense Reserve Fleet, which are

maintained by DOT's MARAD and funded from the Navy-controlled National Defense Sealift Fund. Cahill Decl. ¶ 4; Pothen Decl. ¶ 4; Naval Vessel Register, www.nvr.navy.mil/stat_12.htm.

Certain vessels that are part of the RRF are also currently activated for duty with the Prepositioning Program, a program funded and administered by the Navy and under the direction of the MSC. Pothen Decl. ¶ 4; *Inventory of Ships in the MSC Prepositioning Program*, MSC website, www.msc.navy.mil/inventory. MSC is a military command within the Department of Navy and subject to the authority of the head of the Department, the Secretary of the Navy.

MARAD contracts with commercial ship operators to maintain and operate the RRF. These vessels are kept in either maintenance phase (Phase M) or operational phase (Phase O). Cahill Decl. ¶ 4. When vessels are in Phase O they are under the operational control of the MSC. *Id.*

The ships in the MSC Prepositioning Program are strategically positioned in key ocean areas, making it possible to deploy equipment, fuel, and supplies to support U.S. military forces on short notice during times of war or as a result of other contingencies. Pothen Decl. ¶ 4; MSC website, www.msc.navy.mil/PM3. Prepositioning ships are subdivided into three separate elements: Combat Prepositioning Force Ships; Maritime Prepositioning Force Ships; and Logistics Prepositioning Ships. *Id.* All prepositioning ships are under the operational control and jurisdiction of the U.S. Navy's MSC area commands, providing direct support for the Navy's fleet commanders. *Id.* Day-to-day control of these ships is exercised by one of three Maritime Prepositioning Ship squadrons ("MPSRONs"). *Id.* Each MPSRON is under the command of a Navy Captain. *Id.* In addition to being principal components of the U.S. Navy's MSC Prepositioning Program, and administratively reporting to the Prepositioning Program Manager at MSC Headquarters in Washington, D.C., the ships in the various MPSRONs are operational assets of the Navy's Seventh Fleet. *Id.*

## Legal Background

This action, filed on August 10, 2005, seeks injunctive relief to prevent the Government from continuing its practice of repairing and maintaining RRF vessels in foreign shipyards in violation of Section § 7310(a). However, for present purposes, GIS seeks threshold declaratory relief that the vessels in the RRF and its component part, the MSC Prepositioning Program, are under the Navy's jurisdiction and control and thus manifestly within the scope of the statute.

The statute, itself, and a formal inter-agency agreement between DoD and DOT reflecting their joint understanding of the Congressional intent of the statute provide the legal backdrop for this threshold analysis. The plain and unambiguous language of Section 7310(a) certainly encompasses RRF vessels when it explicitly refers to "vessel[s] under the jurisdiction of the Secretary of the Navy." The relevant statutory language reads:

> **Vessels with homeport in United States.** - A naval vessel (or any other *vessel under the jurisdiction of the Secretary of the Navy*) the homeport of which is in the United States may not be overhauled repaired, or maintained in a shipyard outside the United States or Guam, other than in the case of voyage repairs. (emphasis added)

10 U.S.C. § 7310(a). Furthermore, pursuant to paragraph 5(b) of a Memorandum of Agreement between DoD and DOT ("MOA"), both agencies expressly recognize this logical interpretation of the Congressional intent of Title 10 when they specify that "[a]ll shipyard and ship repair facility work to RRF ships will be accomplished by MARAD (either directly or through its ship operating companies) and performed in the United States (except for necessary voyage repairs while overseas), *in accordance with the statute* and DOT regulations." (emphasis added) As such, it is hard to avoid the legal conclusion that Congress intended for, and DoD and DOT initially recognized that, all RRF (and MSC Prepositioning) vessels would be under the jurisdiction and control of the Navy, and thus within the scope of Title 10. And yet, in the face of this manifest construction, Defendants would have this Court believe that an after-the-fact and

self-serving internal agency "instruction" trumps both Congressional intent and a clear inter-agency expression of this intent. *See* Defendants' Opposition to Plaintiff's Motion for a Preliminary Injunction (hereinafter, "Def. Opp.") at pp. 10-16.

### Applicable Legal Standards

*Washington Metropolitan Area Transit Commission v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977) continues to be the standard by which district courts in this Circuit consider requests for preliminary injunctive relief:

> In considering whether to grant preliminary injunctive relief, the court must consider whether: (1) the party seeking the injunction has a substantial likelihood of success on the merits; (2) the party seeking the injunction will be irreparably injured if relief is withheld; (3) an injunction will not substantially harm other parties; and (4) an injunction would further the public interest.

*CSX Transportation, Inc. v. Williams*, 406 F.3d 667, 670 (D.C. Cir. 2005), citing *Holiday Tours*, 559 F.2d at 843 (D.C. Cir.1977).

Application of the *Holiday Tours* standard is to be approached with flexibility, such that the particular circumstances of each case are considered. GIS is thus not required to prevail on every factor. *International Long Term Care, Inc. v. Shalala*, 947 F. Supp. 15, 17 (D.C. Cir. 1996). More of one factor may compensate for less of another factor. *Id.* "If the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak." *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995). Furthermore, "when the other three factors strongly favor interim relief, a court may grant injunctive relief when the moving party has merely made out a 'substantial' case on the merits." *International Long Term Care*, 947 F. Supp. at 17.

This Court also is entitled to grant relief in this matter pursuant to its general equitable powers as well as pursuant to 5 U.S.C. § 705 (Administrative Procedure Act), which provides:

> When an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review. On

>such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court, including the court to which a case may be taken on appeal from or on application for certiorari or other writ to a reviewing court, may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings.

Defendants would have this Court believe that the bar for relief is even higher in the instant case by characterizing GIS' request as mandatory rather than prohibitive. Def. Opp. at p. 7. This is simply no longer the case, as GIS is not interested in a specific mandatory contract award. At this juncture, GIS merely seeks declaratory relief from the Court with respect to Section 7310(a)'s scope and *future prohibitory* relief with respect to Defendants' continued practice of repairing and maintaining RRF vessels in foreign shipyards in violation of the statute. Although a party must demonstrate irreparable injury before obtaining injunctive relief, such a showing is not necessary for the issuance of a declaratory judgment. *Tierney v. Schweiker*, 718 F.2d 449, 457 (D.C. Cir. 1983)

Therefore, pursuant to *CSX Transportation, Inc.* and *Holiday Tours, supra*, the Administrative Procedure Act, and its general equitable powers, this Court possesses the authority to declare that RRF vessels plainly fall within the scope of Section 7310(a) and to prohibit Defendants from continuing to solicit bids from and/or award contracts to foreign shipyards in connection with non-voyage repairs of RRF vessels that are homeported in the United States in violation of the statute.

### GIS Is Entitled to Injunctive and Declaratory Relief

Contrary to Defendants' assertions, GIS is entitled to injunctive and declaratory relief. If this Court does not act to provide the relief requested, Guam Shipyard and other similarly situated private U.S. shipyards will suffer irreparable injury. Furthermore, if this Court finds that all RRF ships (and those activated for duty with the Navy's MSC Prepositioning Program) are outside of the scope of Section 7310(a) and thus permits Defendants to continue to solicit bids

from and/or award contracts to foreign shipyards in connection with non-voyage repairs to these vessels, the economic stability and viability of the United States' private shipyard industry - a vital element of our country's defense industrial base - will continue to deteriorate. In contrast to the irreparable harm that would clearly be suffered by the U.S. defense industrial base and shipyard industry and its U.S. citizen employees, Defendants will not suffer from the injunctive and declaratory relief requested. In fact, the Government cannot demonstrate any injury that would arise from the proper enforcement of Section 7310(a). Moreover, the public interest certainly lies in ensuring that DoD and DOT (and their respective divisions) fully comply with Title 10, the language of which unmistakably encompasses all RRF and MSC Prepositioning vessels.

    1.    **GIS Has a Strong Likelihood of Success on the Merits**

Defendants have articulated three primary grounds for why GIS cannot succeed on the merits: a failure to join indispensable parties, the scope of Section 7310(a), and the apparent insignificance of the 1996 MARAD Ship Manager Contract and the MOA to GIS' claim. Def. Opp. at pp. 9-23. All three grounds asserted by the Government are either misplaced or no longer applicable to the relief currently sought.

    A.    **Plaintiff Has Not Failed to Join Indispensable Parties.**

GIS is not interested in disrupting the current contract between IASC and Keppel Shipyard in Singapore. Again, GIS merely seeks declaratory relief with respect to Section 7310(a)'s scope and future prohibitory relief with respect to Defendants' continued practice of repairing and maintaining RRF vessels in foreign shipyards in violation of the statute. As such, IASC and Keppel Shipyard are not indispensable parties to this action. They are merely the parties to one in a series of repair contracts for RRF vessels that have been awarded by Defendants over the past seven years to various foreign shipyards, to the detriment of Guam

Shipyard and other similarly situated private shipyards. Unfortunately, Defendants persistently refuse to properly apply Section 7310(a). This Court can certainly fashion the relief requested without the need for joining these parties.

Nor is GIS seeking in any way to affect or limit the operating agreement between MARAD and the private operator. Defendants are wholly incorrect in claiming that GIS seeks "rescission" of a private contract. Finally, as noted in our private brief, the remedy for any failure to join a party that should be joined is not dismissal but an order joining that party.

### B. Ready Reserve Force Vessels Are Plainly Within the Scope of Section 7310(a).

Defendants correctly suggest that the "critical issue" with respect to the merits of this case is "whether Ready Reserve Force Vessels are under the jurisdiction of the Secretary of the Navy." Def. Opp. at p. 5. Answering this question in the negative, Defendants ask this Court to ignore the plain meaning of Section 7310(a) and a formal interagency agreement signed by representatives of two cabinet-level departments in 1997 in favor of an after-the-fact internal agency instruction given in 2000.[2] In effect, Defendants are asking this Court to believe that COMSCINST 4700.15A trumps both Congressional intent and a clear DoD-DOT recognition and interpretive expression of this intent.

Defendants liberally cite the *Chevron* standard in their reply brief. Def. Opp. at pp. 12-13. Under the *Chevron* standard, if the "intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984). "Under settled principles of statutory and rule construction, a court may defer to administrative interpretations of a statute or regulation only when the plain meaning of the rule

---

[2] The instruction at issue is Commander Military Sealift Command Instruction 4700.15A, *Accomplishing Ship Repair in Foreign Ship Yards* (hereinafter, "COMSCINST 4700.15A").

itself is doubtful or ambiguous." *Secretary of Labor, Mine Safety and Health Administration v. Western Fuels-Utah, Inc.*, 900 F.2d 318, 325-26 (D.C. Cir. 1990). A court should be guided by an administrative construction of a regulation only "if the meaning of the words used is in doubt." *Udall v. Tallman*, 380 U.S. 1, 16 (1965). "Deference to agency interpretations is not in order if the rule's meaning is clear on its face." *Western Fuels-Utah*, 900 F.2d at 326.

In the instant case, there is little doubt about the intention of Congress as expressed in Section 7310(a) – "vessel[s] under the jurisdiction of the Secretary of the Navy…may not be overhauled repaired, or maintained in a shipyard outside the United States or Guam…". RRF vessels are drawn from the National Defense Reserve Fleet, which is funded from the Navy-controlled National Defense Sealift Fund. Cahill Decl. ¶ 4; Pothen Decl. ¶ 4; Naval Vessel Register, www.nvr.navy.mil/stat_12.htm. Vessels in the MSC Prepositioning Program are strategically positioned to support U.S. military forces on short notice during times of war or as a result of other contingencies. Pothen Decl. ¶ 4; MSC website, www.msc.navy.mil/PM3. They are under the operational control and jurisdiction of the United States Navy's MSC area commands, providing direct support for the Navy's fleet commanders. *Id.* Day-to-day control of these vessels is exercised by one of three MPSRONs. *Id.* Each MPSRON is under the command of a Navy Captain. *Id.* These vessels are operational assets of the Navy's Seventh Fleet. *Id.*

Nonetheless, Defendants continue to maintain that these vessels are not under the DoD's jurisdiction, calling GIS' reading of Section 7310(a) "expansive." Def. Opp. at p. 16. Yet there is nothing particularly "expansive" about the concept of concurrent jurisdiction. Jurisdiction need not be exclusive – i.e. DOT/MARAD jurisdiction does not preclude DoD/naval jurisdiction. *See United States v. Corey*, 232 F.3d 1166, (9th Cir. 2000) ("there is no question that domestic lands may fall under the concurrent jurisdiction of the state and federal governments"). It is not uncommon for branches of government or departments thereof to share jurisdiction. In fact, it is

Defendants' reading of the statute's scope that requires convoluted reasoning, as Defendants wish to make a distinction between vessels "being under the command of a U.S. Navy captain" and those "under the control of a Combatant Commander who does not report to…the Secretary of the Navy." Def. Opp. at p. 16; MSC website, www.msc.navy.mil/mpsthree/. This attempted functional distinction strains credulity and cannot be reconciled with the plain meaning of the statute.[3]

If, however, this Court should determine that there is some ambiguity in Section 7310(a), it must find that the MOA is the more binding expression of interagency interpretation of what vessels Congress intended to fall within the scope of Title 10. "[I]t is elementary that an agency must adhere to its own rules and regulations. Ad hoc departures from those rules, even to achieve laudable aims, cannot be sanctioned,…for therein lie the seeds of destruction of the orderliness and predictability which are the hallmarks of lawful administrative action." *Reuters Ltd. v. Federal Communications Comm'n*, 781 F.2d 946, 950-51 (D.C. Cir. 1986); *see also Brock v. Cathedral Bluffs Shale Oil Co.*, 796 F.2d 533, 536 (D.C. Cir. 1986) (Scalia, J.) ("It is axiomatic that an agency must adhere to its own regulations…").

As Defendants aptly identify, "with regard to rules that have not been formally promulgated, the 'law' to which an agency will be bound are those rules to which it intended to be bound." *Wilkinson v. Legal Services Corp.*, 27 F. Supp. 2d 32, 35 (D.D.C. 1998). "[S]tatements whose language, context, and application suggest an intent to bind agency discretion and private party conduct-the sort of statements requiring compliance with § 553-will have that effect if valid; interpretive rules or policy statements will not, regardless of their validity." *Vietnam Veterans of America v. Secretary of the Navy*, 843 F.2d 528, 537 (D.C. Cir.

---

[3] For example, the Commander of MPSRON Three is Captain Ronald W. Kennedy of the U.S. Navy. He is part of the Navy's chain of command. Indeed, actions that take place on RRF and MSC Prepositioning vessels "under [his] control" are under the Navy's jurisdiction.

1988). As previously noted, paragraph 5(b) of the MOA between DoD and DOT expresses a clear interagency recognition of their obligations under Section 7310(a) and a clear and binding expression of their intent to be bound by those obligations. Had this not been the intent of DoD and DOT, they would have left this language out of their formal agreement. An internal instruction, even if valid, cannot negate this broad, formal expression of interagency intent.

### The Public Interest is Served by the Relief Requested

1. **The Public Interest Lies in the Proper Enforcement of the Law.**

Furthermore, the public interest lies in the proper enforcement of Title 10. *Whitaker v. Thompson*, 248 F.Supp.2d 1, 16 (D.D.C. 2002) ("it is clearly in the public interest to ensure that governmental agencies…fully comply with the law"). In fact, in this case, the public interest plainly is identical to the interest of Guam Shipyard and other like situated shipyards, since the United States Government cannot demonstrate any injury that would arise from the proper enforcement of Title 10 or a clear and binding expression of interagency intent to be bound by the obligations contained in its' provisions.

2. **The Public Interest Lies in the Continued Viability of the U.S. Defense Industrial Base and its Shipyard Industry.**

If this Court does not act to provide the relief requested, the economic stability and viability of the United States' private ship repair industry will be severely jeopardized in the face of devastating foreign competition. This is not just a threat to private interests, however. It is a threat to an important component of America's industrial base that supports our national defense. It is quite obvious, as Congress recognized, that America's defense interests are not served by reliance on foreign shipyards in times of conflict.

In a recent case from this Circuit, the D.C. Court of Appeals reversed the district court's denial of a preliminary injunction and remanded the case with the direction to enter a preliminary injunction. *CSX Transportation, Inc. v. Williams*, 406 F.3d 667, 670 (D.C. Cir. 2005). In *CSX*

*Transportation*, an exclusive rail carrier of hazardous materials sufficiently demonstrated that it would suffer irreparable injury absent such an injunction to enjoin the enforcement of the D.C. law, which would prohibit rail or truck transport of certain hazardous materials within a 2.2 mile zone around the United States Capitol Building. The Court of Appeals appears to have been primarily persuaded by the fact that rerouting the trains transporting the banned materials around D.C., as the D.C. law would require, would significantly decrease the capacity and flexibility of carrier's rail network, thereby causing irreparable injury to the carrier. In concluding that the carrier's injury was "properly considered irreparable," the Court of Appeals appeared to have been influenced by the anticipated decrease in efficiency of the carrier's rail system, and *Long Island R.R. Co. v. Int'l Association of Machinists*, 874 F.2d 901, 911 (2d Cir. 1989), which it cited for the proposition that "'a general cessation of rail service' constituted irreparable harm." *CSX Transportation*, 406 F.3d at 674. Ironically, the United States Government, arguing as a friend of the court, asserted that the rerouting required under the D.C. law "create[d] security risks because it [would] increase the length of time hazardous materials [were] in transit." *Id.* at 674, citing the Memorandum of the United States Government. The United States Government further asserted that the D.C. law "would disrupt 'the national system of hazardous materials shipment.'" *Id.* at 674, citing the Memorandum of the United States Government.

    The public interest is served by the continued survival of the United States' private shipyard industry and the protection of the public from a potential national security risk. Like the plaintiff in *CSX Transportation*, Guam Shipyard and other similarly situated private U.S. shipyards will suffer irreparable injury in the absence of the requested relief. If Defendants are permitted to continue to flout the plain language of Section 7310(a) and solicit bids from and/or award contracts to foreign shipyards in connection with non-voyage repairs of RRF and MSC Prepositioning vessels homeported in the United States, the country's private ship repair industry

faces economic hardship and even possible extinction. At this time, such harm is difficult, if not impossible, to ascertain. Furthermore, this harm cannot be redressed by a later suit for damages, because the Government is probably not answerable in monetary damages for such harm under the doctrine of sovereign immunity. Moreover, this practice quite possibly presents a significant national security risk, opening the door to even further, perhaps "calamitous," injury to the United States Government and the public it protects. *See CSX Transportation*, 406 F.3d at 674 ("this court does not minimize the calamitous consequences of a terrorist attack on a rail car transporting Banned Materials through the District").

### Opportunity to Develop a Record

At this time there is an insufficient record to enable this Court to determine whether Defendant's assertions about the critical concepts of "homeport" and "voyage repairs" are valid and accurate. *See, e.g., Association of American Physicians and Surgeons, Inc. v. Clinton*, 997 F.2d 898, 915 (D.C. Cir. 1993) (finding that there was insufficient record evidence with respect to a "key issue" in an action for injunctive relief); *Protestants and Other Americans United for Separation of Church and State v. Watson*, 407 F.2d 1264, 1266 (D.C. Cir. 1968).(finding "an insufficient record to render a comprehensive decision" in an action for declaratory and injunctive relief). Now, particularly in light of Defendants' most recent filing,[4] GIS should be allowed to conduct further discovery and motion practice on the issues of how Defendants' internal practices and procedures define and interpret "homeport" and "voyage repairs" per the language of the statute. *Riggs v. Home Builders Institute*, 203 F.Supp.2d 1, 17 (D.D.C. 2002) (finding plaintiff had "not yet had an opportunity to develop a record to flush out the necessary factual support for his allegations"). At this time, there is simply not enough of a record before

---

[4] During the preparation of this memorandum, Defendants filed a Motion for Summary Judgment on September 8, 2005. Counsel for Defendants subsequently consented to an extension of time to answer the motion to September 26, 2005.

the Court to make these important determinations.

## Conclusion

Defendants' interpretation of the scope of Section 7310 cannot be gleaned from the language of the statute or the MOA. The construction offered is nothing more than a self-serving ad hoc attempt to justify a failure to properly apply Title 10's provisions. Unless and until such time as this Court grants declaratory and injunctive relief, future non-voyage repair contracts for RRF and MSC Prepositioning vessels homeported in the United States' and under the Navy's jurisdiction and control will continue to be awarded to foreign shipyards to the detriment of Guam Shipyard and other similarly situated private United States shipyards in clear violation of the statute. For the reasons set forth above, this Court should grant GIS' request for declaratory and injunctive relief, pending a decision on the underlying merits of this case.

Respectfully submitted,

By: /s/ Thomas Earl Patton
Thomas Earl Patton (D.C. No. 009761)
John B. Montgomery (D.C. No. 460221)
David Taylor (D.C. No. 91280)
*Attorneys for Plaintiff*
TIGHE PATTON ARMSTRONG
TEASDALE, PLLC
1747 Pennsuylvania Ave. N.W. Suite 300
Washington, D.C. 20006-4604
Tel. (202) 454 2800
Fax (202) 454- 2805

OF COUNSEL:

ARMSTRONG TEASDALE LLP
Edwin L. Noel (Mo. No. 24184)
F. Scott Galt (Mo. No. 56548)
One Metropolitan Square, Suite 2600
St. Louis, MO. 63102-2740
TEL: (314) 621-5070
FAX: (314) 621- 5065

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 13th day of September, 2005, a true and correct copy of the foregoing document was filed electronically with the Clerk of Court to be served by operation of the Court's electronic filing system or was served via electronic mail and via U.S. Mail, postage prepaid, upon the following non-participants in Electronic Case Filing: upon the following:

/s/ Thomas Earl Patton