UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

GUAM INDUSTRIAL SERVICES INC.,

Plaintiff,

v.                              05-CV01599

DONALD H. RUMSFELD, et. al.,

Defendants

---

## DECLARATION OF MATHEWS POTHEN

1.     I make this declaration in support of the motion of Plaintiff Guam Shipyard for a preliminary injunction. Since October 1, 1997, I have been the President and Chief Executive Officer of Guam Industrial Services Inc., doing business as Guam Shipyard (the "Guam Shipyard"), the operator of the former Ship Repair Facility, in Santa Rita, Guam. I have over 30 years of experience in the Naval Engineering field as a Naval Architect, Shipboard Engineer, and Ship Repair Engineer. Extensive work in support of the US Navy has provided me with a sound working knowledge of the Navy command structure, its operational capabilities and requirements, and the maintenance requirements of the Navy's combat vessels and combat support vessels, including the role of Military Sealift Command ("MSC") and Maritime Administration (MARAD) vessels in complementing the requirements of the U.S. Navy.

2.   In my capacity as President & Chief Executive Officer of the Guam Shipyard, I have first hand knowledge of the shipyard's operations and activities. The Guam Shipyard is owned and operated by United States citizens. It is the only United States shipyard west of the International Dateline. Guam Shipyard is also the only United States citizen owned and controlled shipyard facility which can service United States Navy, Military Sealift Command (MSC), and Maritime Administration (MARAD) ships that are under the jurisdiction of the Secretary of the Navy, in the Pacific and Indian Oceans, I am also familiar with activities of these ships including the SS PETERSBURG, a Government owned vessel operated by InterOcean American Shipping Corporation, under contract to MARAD.

3.   Naval Ship Repair Facility Guam ("SRF-Guam") was closed as an active military installation on September 1, 1997. The closure was under the Defense Base Closure and Realignment Act of 1990, P.L. 101-510 ("BRAC"). At that time, the Navy leased substantially all of the property to an autonomous agency of the Government of Guam and Guam Shipyard. Guam Shipyard now operates this facility, which is located in Santa Rita, Guam, as a private sector, commercial shipyard. It has a surge work force of approximately three hundred and fifty employees (350), all of whom are United States citizens. Guam Shipyard has extensive experience in ship repairs and remains the only US owned and operated shipyard located west of the International Dateline.

4.   The SS PETERSBURG is a government owned tanker under the Ready Reserve Force (RRF) for MARAD and is currently activated for duty as part

of the United States Navy's Prepositioning Program. When activated as part of the Prepositioning Force, RRF ships come under the operational and administrative control of the Navy's MSC. SS Petersburg is assigned to Maritime Prepositioning Ship Squadron Three (MPSRON Three), under command of a Navy Captain. MPSRON Three is an operational asset of the U.S. Navy's Seventh Fleet. The SS PETERSBURG has been pre-positioned for the past three years in Guam at the Delta-Echo Pier in Apra Harbor.

5.    I am aware that the SS PETERSBURG has been scheduled for dry-docking repair and maintenance services since June, 2004. This maintenance work is planned and scheduled well ahead of the time when it is to be done, to normally coincide with vessel inspection requirements by American Bureau of Shipping (ABS). In my professional judgment this major overhaul of the Petersburg is normally performed to maintain classification certification from ABS. This certification inspection is normally performed during the ships maintenance cycle, and in many cases ABS normally extends the certification period to coincide with the maintenance cycle of the vessel when the vessel is taken out of operation.

6.    Current work at Guam Shipyard includes the USNS NIAGARA FALLS repair and dry-docking. USNS NIAGARA FALLS is scheduled to be undocked by September 9, 2005 and the overhaul completed by September 22nd. USNS CONCORD is scheduled to be dry-docked on the 8th of October through 15th of November of this year. After the 15th of November, Guam Shipyard can dry-dock SS PETERSBURG to complete all of the repair work by the first

week of January 2006. USNS FLINT is scheduled to be dry-docked the last week of January. Guam Shipyard will have no work at all at its yard from November 15th to the third week of January 2006 if MARAD allows Interocean American Shipping Corporation to accomplish the Petersburg repair work in Sembawang Shipyard in Singapore. This will result in the loss of $14,000,000.00 in revenues to Guam Shipyard, as well as a the forced lay off during this period of the majority of our work force of 250 United States citizens.

7.  I am informed that the American Bureau of Shipping (the ABS") conducts vessel classification and safety inspections of the SS PETERSBURG. As part of its classification process, ABS designates homeports for each vessel it surveys. Norfolk,Virginia is designated as the homeport for the SS PETERSBURG, because ABS conducted its vessel surveys and inspections of the ship in Norfolk prior to its activation from the Ready Reserve Fleet (RRF) maintained by MARAD.

8.  MARAD, in a recent press release announcing new ship manager contracts for Ready Reserve Force ships, listed Guam as the homeport of Petersburg. Guam is the port from which Petersburg operates as a unit of MPSRON Three.

9.  On June 21, 2005, Interocean American Shipping Corporation, the agent that operates SS Petersburg for the Maritime Administration, issued a solicitation to bidders for repair and drydock work for the SS Petersburg, which was docked in Guam. I am informed that this solicitation was issued to both

United States shipyards and to foreign shipyards. Guam Shipyard submitted a responsive proposal for the award of this work. I have been informed that a foreign shipyard in Singapore has been awarded this contract.  SS Petersburg set sail from Apra Harbor, Guam, on August 16, 2005.  On information and belief, the ship is headed to Singapore to begin her dry-docking and repair.

10.    In support of this Declaration and of the motion,  I attach hereto the following exhibits and state that they are to my knowledge true and correct copies:

Exhibit 1:   Solicitation of bids for drydock work for the SS Petersburg.

Exhibit 2: Memorandum of Agreement between DOD and Marad for operation of vessels in the Ready Reserve that requires repairs to be in U.S. shipyards;

Exhibit 3:   The government's inventory of ships in the MSC Pre Positioning Program showing that the SS Petersburg is in this program and under the operational control of the U.S. Navy.

I declare under penalty of perjury, pursuant to 28 U.S.C. subsection 1746, that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed on this _Ay - 16  2005_

Mathews Pothen
President & CEO
Guam Industrial Services Inc.
dba Guam Shipyard

## INTEROCEAN AMERICAN SHIPPING

**Page - 3**
**S.S. PETERSBURG  – DRYDOCK / REPAIR AVAILABILITY**
**RFP # 05-G-207-077**

Further, if the Owner determines that the number of proposals received that would otherwise be in the competitive range exceeds the number at which an efficient competition can be conducted, the Owner reserves the right to limit the number of proposals in the competitive range to the greatest number that will permit efficient competition and evaluation among the most highly rated proposals.

### 7.    SITE INSPECTION INFORMATION:

Bidders are advised that a site inspection will be held onboard the vessel, currently located at Wharf Echo Pier in Piti, Guam on **Monday, June 27th, at 0800 hrs (local time) to 1530 hrs . Bidders conference is scheduled for Tuesday, June 28nd at 1000 hours (local time).** Bidders are urged to attend and are cautioned to satisfy themselves concerning the nature of the work and requirements of the RFP, and all attachments thereto, prior to the survey. *Those bidders wishing to attend the survey must inform (in writing) the undersigned by **06/30/05, COB, EDT**. **Questions regarding this RFP and all attachments thereto must be presented in writing to the Owner's Representative in attendance at the time of the survey.***

For bidders who will have already advised IAS of their shipyard personnel who will attend the site inspection, listed below for your reference is  a point of contact for our Agent in Guam.

Agent:               Ambyth Shipping
Point of Contact:    Kelly Apiag Administrative Assistant
Phone:               (671)477-7250/8000  /  Fax:(671)472-1264 /477-0094
E-mail:              ops@ambyth.guam.net

Bidders are advised that our agent will assist bidders in obtaining hotel accommodations and will assist in pick-up and transport all bidders to the Naval Office to obtain all security passes. **Bidders are responsible for all costs associated with hotel accommodations**

8.      Article 17 of the Contract specifies the required insurance coverage; Contractor's Certificate of Insurance must be submitted **prior to award** of any contract resulting from this Request for Price.

### 9.    VESSEL AVAILABILTY

IAS anticipates the vessel arriving within the awarded shipyard on or about the **first week in August, 2005.**

We look forward to your response.



PLAINTIFF'S
EXHIBIT
*1*

## INTEROCEAN AMERICAN SHIPPING

Sincerely,

**INTEROCEAN AMERICAN SHIPPING CORP.**

*(document transmitted via email)*

KAREN SUAREZ
IAS Contracting Officer


Documents sent via email
cc:     MARAD CR: D. Robicheaux, R. Boldt, B. Greer
        IAS: Gary Hunsburger, P/E

INTEROCEAN AMERICAN SHIPPING

## FORM OF BID

(BIDDER'S NAME) _____ hereby offers and agrees to perform and complete the work on the **S.S. PETERSBURG**, in accordance with RFP # **05-G-207-077** dated **06/21/05 DRYDOCK / TOPSIDE REPAIRS,** including all attachments and amendments **(SPECIFY # OF AMDTS RECEIVED)**.

This agreement is with the stipulation that IAS will accept this bid within _____calendar days from the time of the bid opening date *thirty (30)* **calendar days will be used if no shorter period is specified)**.

All work shall be completed within **(SPECIFY # OF DAYS),** _____ continuous running days from the date of Contractor's acceptance of the vessel, until the final inspection, acceptance and redelivery of the vessel to the Owner, for the following sum as the total price of work: **$**

The Contractor, in any contract resulting from this Request for Price, intends to perform the contract work at the following location **(SPECIFY LOCATION OF REPAIR FACILITY):**
**Place of Performance (Street Address, City, State, Zip Code)**

_____          _____

**NAME (PLEASE PRINT)**                                          **TITLE**

_____          _____

**SIGNATURE**                                                        **DATE**

IAS-O-CON-001  05/05

## INTEROCEAN AMERICAN SHIPPING

### BIDDERS ACCEPTANCE OF CONTRACT TERMS AND CONDITIONS

(BIDDERS NAME) _____, has reviewed INTEROCEN AMERICAN SHIPPING CORPORATION'S, Contract Terms and Conditions as submitted on <u>06/21/05</u>, under <u>RFP # 05-G-207-077</u> for the <u>S.S. PETERSBURG - DRYDOCK / REPAIR AVAILABILITY</u> and hereby: *(Bidders, please check (**X**) one of the following boxes listed below)*

| | |
|---|---|
| | Agree with all Contract Terms and Conditions as written and submitted. |

| | |
|---|---|
| | Disagree with all Contract Terms and Conditions as written and submitted. |

| | |
|---|---|
| | Bidder would like to propose the following comments for consideration of incorporation into the Contract Terms and Conditions. *(Bidder to list their comments on page 2.)* |

**Place of Performance (Street Address, City, State, Zip Code)**
*(Bidder enter information within table box below)*

| |
|---|
| |

_____          _____
NAME (PLEASE PRINT)                      TITLE

_____          _____
SIGNATURE                                     DATE

INTEROCEAN AMERICAN SHIPPING

**BIDDERS ACCEPTANCE OF CONTRACT TERMS AND CONDITIONS**   (Page 2 of 2)

RFP# 05-G-207-077, S.S. PETERSBURG - DRYDOCK / REPAIR AVAILABILITY

**BIDDERS NAME:**

This page to be used only if Bidder has selected to propose additional comments for consideration of incorporation into the Contract Terms and Conditions.
*(Bidders,  type all comments below).*

# MEMORANDUM OF AGREEMENT
## BETWEEN
## DEPARTMENT OF DEFENSE AND DEPARTMENT OF TRANSPORTATION

### 1. GENERAL

The Commander in Chief, U.S. Transportation Command(USCINCTRANS),
on behalf of the Department of Defense (DoD), and the Maritime
Administrator (Administrator), Maritime Administration (MARAD),
on behalf of the Department of Transportation (DOT), agree that
they have a mutual interest in the National Defense Reserve Fleet
(NDRF), particularly the Ready Reserve Force (RRF) component of
the fleet.

### 2. PURPOSE

To identify the relationship and responsibilities of the DoD and
the DOT in the administration of the NDRF program, including: the
acquisition, lay-up, berthing and maintenance of ships in the
RRF; the conditions under which ships of the RRF will be
activated for DoD operational control, operated, and subsequently
deactivated; funding; and other aspects of the RRF program,
including the NDRF sites.  This Memorandum of Agreement (MOA) is
consistent with the President's  determination that commencing in
Fiscal Year 1996, funding for the NDRF, including the RRF, will
be provided through DoD appropriations, while management and
control of the NDRF, including vessels of the RRF prior to and
through their activation, rests with MARAD.  Contract
administration and contract control of vessels of the RRF remain
a MARAD responsibility at all times, while operational control
(OPCON) of activated vessels tendered to DoD will be exercised by
the Commander, Military Sealift Command (COMSC).

### 3. COMPOSITION AND REQUIREMENTS OF THE RRF

   a.  USCINCTRANS is responsible for developing the DoD's
sealift requirements (except for Service-unique or theater-
assigned requirements)annually and coordinating the overall DoD
RRF requirements. These requirements will be based upon sealift
requirements submitted to USCINCTRANS by the Combatant Commanders
and Service Secretaries, and will include any special capability
requirements.  When sealift capability objectives are approved by
the Secretary of Defense (SECDEF), USCINCTRANS will provide
sealift requirements to the Administrator.  MARAD will report on
actions taken to meet those sealift requirements.



PLAINTIFF'S
EXHIBIT
2

b.  The following sources of vessels will be used to meet the requirements identified for the RRF:  upgrades from the NDRF; turnovers of excess military auxiliaries; direct purchases from private owners; authorized construction and conversion programs; and sources otherwise authorized by law.  Other RRF requirements such as specific vessel features, modifications, required outporting, readiness and timing for future changes in the RRF composition will be defined and coordinated by U.S. Transportation Command (USTRANSCOM) as described in the above paragraph in coordination with MARAD.

c.  MARAD will effect installation of unique features and modifications to RRF ships, upon concurrence of such work by USTRANSCOM and funding by the sponsoring defense agency or Service.

d.  RRF vessels are public vessels, and are documented as owned and operated by the United States of America, as represented by the Secretary of Transportation (SECTRANS), acting by and through the Administrator.


4.  **ACQUISITION**

a.  USTRANSCOM, in coordination with the Office of the Chief of Naval Operations (OPNAV), will provide MARAD specific guidance on the types and numbers of vessels essential for RRF sealift requirements, including desired features and priority of each.

(1)  The above guidance will provide the basis for MARAD's development of the Source Selection Plan (Plan).  The Administrator shall serve as the Source Selection Authority (SSA).  MARAD shall obtain concurrence for the Plan from USCINCTRANS, acting on behalf of the DoD, prior to receiving approval of the Plan from the SSA. The Plan will provide the basic guidance to the Source Selection Evaluation Board (SSEB) in preparing solicitations and conducting acquisitions.

(2)  The SSEB will be chaired by MARAD with additional representation from MARAD, the Office of the Secretary of Transportation, USTRANSCOM, the Military Sealift Command (MSC) and OPNAV, as well as any other special members the SSA agrees to as appropriate.

b.  MARAD will execute the acquisition of ships in accordance with DOT/MARAD acquisition authorities and procedures.

c.  MARAD will pursue all opportunities to obtain ships for the RRF by means of program authority conferred by statute, e.g., Section 510, Merchant Marine Act, 1936, as amended (46 U.S.C.

App. 1160). Exercise of such authority in the context of the RRF shall include close consultation with USTRANSCOM, acting on behalf of DoD, in coordination with OPNAV will take into account the availability of funds needed to place ships into the RRF.

## 5. PREPARATION AND MAINTENANCE

a. Ships in the RRF will be prepared and maintained in accordance with standards set forth in the RRF Operations Management Manual; RRF Operations Management Guidelines, Volumes 1 and 2; and RRF Logistics Management Manual.

b. All shipyard and ship repair facility work to RRF ships will be accomplished by MARAD (either directly or through its ship operating companies) and performed in the United States (except for necessary voyage repairs while overseas), in accordance with statute and DOT regulations.

c. Subject to the availability of funds, and with regard to the aforementioned standards, the RRF ships will be outfitted and maintained on the basis of priorities agreed upon by the Points of Contact (POC) designated in Article 11 hereof. At any time the standards cannot be met, MARAD will so advise the POCs designated in Article 11, and provide a time estimate for correction.

## 6. MANNING AND OPERATION OF RRF SHIPS

a. RRF ships will be manned and operated under Ship Manager Contracts (SMC) or General Agency Agreements (GAA) (until SMCs are executed) awarded in accordance with statute or regulation between MARAD and individual companies. At all times such contracts will be capable of being implemented immediately upon vessel activation.

b. RRF vessels may become the subject of third party claims against the government for personal injury, property damage, or other liability. MARAD does not require operators of RRF vessels under Ship Manager Contracts or other agreements to obtain commercial Protection and Indemnity (P&I) marine insurance to cover such third party claims, except in those instances when MARAD and MSC agree that it is in the best interest of the government. MARAD will receive, investigate and resolve such claims. MARAD will notify MSC promptly upon the receipt of major claims (seaman's claim over $1,000,000 or property claim over $500,000), claims which MARAD determines may have unusual or precedent setting issues, and claims of high interest within DOD. MSC will identify funding for the payment of claims to the extent the government's liability has been established by MARAD and

**Ship Manager Contract**

## C-1 OVERVIEW

The following paragraphs describe the general scope of the contract which includes Section C and the Technical Exhibits.

1.1  Operating Requirement.  The Maritime Administration (MARAD) has determined that a Ship Manager must possess experience and resources, and be a current operating company; that is, an operator or owner-operator of vessel(s) of at least 2,000 tons. The operating company must be functional at the time the proposal is submitted.  Vessels operated may be Government vessels, or vessels belonging to the offeror, or other commercial interests.

1.2  Federal Statutes.  The Ship Manager as an Agent of the U.S. Government will abide by and conform to all Federal statutes during ALL PHASES of this contract.

1.3  Synopsis of Scope of Work.  The Ship Manager shall provide management, personnel, operational support, technical support, and supplies to maintain ships of the Ready Reserve Force (RRF) and to operate same when tasked.  The ships concerned are either steam or diesel propelled and of various ship types.  TE-4* is a list of the ships by groups, RRF status, vessel operating histories, and physical characteristics.  The Ship Manager will maintain these ships and/or enhance their state of readiness to ensure their activation within the assigned readiness period of ROS-4, ROS-5, RRF -5 (five), RRF -10 (ten), RRF -20 (twenty), or RRF -30 (thirty) days and be responsible for their follow on operation.

> \*     There are seven (7) **Technical Exhibits (TE)**
>       at the end of Section C. A list of technical
>       exhibits and attachments is provided in
>       Section J.

1.4  Responsibility.  The responsibility of a Ship Manager is to maintain the vessels in a condition which provides the highest

Effective 30 July 1996                          Spec Mod 003

probability of success in activation and subsequent operation in support of national defense objectives.

1.4.1  <u>Mission of RRF ships</u>.  The primary mission of RRF ships is to support Navy strategic sealift requirements in support of the Department of Defense.

1.4.1.1  MARAD is assigned responsibility for the acquisition, upgrade, deactivation, maintenance, exercise/operation, and installation of sealift enhancement features on the ships assigned to the RRF.  The RRF is a sub-set of the National Defense Reserve Fleet (NDRF).

1.4.1.2  The RRF portion of the NDRF is maintained in a high state of readiness to meet requirements of the military services in any contingency.

1.4.1.3  The RRF is composed of ships selected from the NDRF and other sources.  The buildup of the RRF, the number of ships, the mix of specific ship types, and positioning of ships is carried out by MARAD at the direction of the Department of Defense (DOD).

1.4.1.4  Ships selected for the RRF are prepared and maintained in accordance with standards set forth by MARAD and the DOD. Ships enter the RRF in a state of good repair and preservation, fully classed by the ABS, possessing a current U.S. Coast Guard Certificate of Inspection and are generally in compliance with other regulatory requirements (e.g. FCC, IMO, SOLAS). Ships may have some outstanding ABS or USCG requirements and known deficiencies at the time of Notice to Proceed.  The MARAD COTR will provide the Ship Manager with a list of such known deficiencies.

1.4.1.5  RRF ships are maintained in a state of readiness that enables them to be activated and Ready For Sea (RFS) (sea trial completed) within a mandated time frame, i.e., either five (ROS-5), ten (10), twenty (20) and thirty (30) days (or without sea trial (ROS-4)) or any other designated readiness timeframe as determined by the Chief of Naval Operations (CNO).  The present readiness status or "RRF Status" for each vessel is shown in TE-

DTMA91-93-C-00034 THRU 00073                          Page C3-35

RRF-MARTS in the Description memo field of the Deficiency
immediately below the description of the deficiency.
Alternatively, the Ship Manager may utilize another means for
preparing deficiency correction specifications and cost estimate;
however, the fact that a specification and cost estimate has been
prepared and submitted to the MARAD Marine Surveyor (COTR/ACOTR)
shall be documented in the deficiency Description memo field.

3.14  Obtaining Supplies and Services.  The Ship Manager shall
exercise due diligence in the selection of subcontractors,
contractors, and vendors.  Vendor source repair work includes all
levels of industrial assistance.  The fees and expenses of
contractors utilized in supplying materials or in the performance
of services and tasks authorized by the Government on such terms
and for such periods of time as the Ship Manager determines are
necessary, shall be included in the costs to be reimbursed by
MARAD.  The Ship Manager shall promptly suspend work on any
contract not satisfactory to the Government and await written
instructions from the ACO. In the case of subcontracts, the Ship
Manager has the right to terminate the contract at his own
discretion.

3.14.1  Guidance for Services/Supplies.  The Ship Manager will
obtain supplies and services as authorized by MARAD issued work
orders.  These work orders will specify whether the
supply/service should be obtained via a "subcontract" or through
the issuance of a contract "for and by the Government," or by the
Ship Manager's own personnel. MARAD provides guidance on
procurement procedures in Section G and J2 of the Ship Manager
contract.

3.14.2  Conflict of Interest.  IAW the clause in Section I,
Organizational Conflicts of Interest, Government procurement
regulations on conflict of interest shall not permit a Ship
Manager and/or the Ship Manager's subcontractors, consultants,
partners, or employees to bid on competitive acquisitions for
which he developed the specification and provided recommendations
for the Government cost estimate.

Effective 30 July 1996                          Spec Mod 003

Page C3-36                              DTMA91-93-C-00034 THRU 00073

3.15  Contracting for Repair Work.  The Ship Manager will procure
repair services/supplies (over $50,000) IAW direction of the ACO
and J2.  The Ship Manager's personnel (i.e. Port Engineer) may be
appointed as COTR.

3.15.1  Purchase Orders.  The Ship Manager will procure services
and supplies (under $50,000) via their MARAD-approved purchasing
method. See J-2.

3.15.2  Contract Administration of contracts "For and By the
Government".  Once a contract has been issued for and by the
Government to provide industrial assistance, the Ship Manager's
CO is responsible for contract administration, i.e., payment of
invoices, quality assurance, inspection and acceptance,
resolution of disputes, and contract close out.  The Ship Manager
shall provide prompt report of any proposed modifications to the
MARAD COTR in order to ensure the availability of funds and to
expedite the approval process. The Ship Manager cannot issue a
Contract Modification without the approval of the MARAD ACO.  The
Ship Manager's Port Engineer, assigned as COTR, shall carefully
control, track, or monitor the use of the labor and material
growth items of the contract during the entire course of the
repair period; prepare Delivery Orders, and closely coordinate
the utilization of the growth items with the MARAD COTR. As part
of the Ship Manager contract fixed price per diem, the Ship
Manager's Port Engineer will prepare weekly Ship Alteration &
Repair Reports, maintain close communication with the MARAD COTR
concerning the status of vessel repairs, and submit all Delivery
Orders and Ship Alteration reports to the MARAD ACO and COTR on a
weekly basis.  ACOs must receive copies of Delivery Orders before
they sign off on invoices.

3.15.3  Contract Administration of subcontracts.  Once a
subcontract has been awarded by the Ship Manager to provide
industrial assistance, the Ship Manager's CO is responsible for
contract administration, i.e., payment of invoices, quality
assurance, inspection and acceptance, resolution of disputes, and
contract close out in accordance with the Ship Managers approved
commercial procedures and J2.  The Ship Manager shall provide
prompt report of any proposed modifications to the MARAD COTR in
order to ensure the availability of funds. The Ship Manager

DTMA91-93-C-00046                    SECTION H

## SECTION H - SPECIAL CONTRACT REQUIREMENTS

### H.1 PERFORMANCE OF REPAIR WORK (MARAD) (MAR 1987)

All repair and or upgrading work required in conjunction with the contract (including all survey and sea trial deficiencies or any other deficiencies that may be noted up to time of delivery and acceptance previously noted or not) necessary to meet all requirements of this contract shall be accomplished in a U.S. shipyard or U.S. ship repair facility, unless the work is an emergency.

(End of Clause)

### H.2 DUPLICATION OF EFFORT (MARAD) (MAR 1987)

The Contractor hereby certifies that costs for work to be performed under this contract and any subcontract hereunder are not duplicative of any costs charged against any other Government contract, subcontract, or other Government source.  The contractor will include the provisions of this paragraph in every subcontract issued hereunder which exceeds $2,500.00.  The Contractor agrees to advise the Administrative Contracting Officer, in writing, of any other Government contract or subcontract it has performed or is performing which involves work directly related to the purpose of this contract.

(End of Clause)

### H.3 ORGANIZATIONAL CONFLICTS OF INTEREST (MARAD) (MAR 1987)

(a) The Contractor warrants that, to the best of the Contractor's knowledge and belief, there are no relevant facts or circumstances which could give rise to an organizational conflict of interest, as defined in FAR Subpart 9.5, or that the Contractor has disclosed all such relevant information.

209

DTMA91-93-C-00046                        SECTION H

    (b) The Contractor agrees that if an actual or potential organizational conflict of interest is discovered after award, the Contractor will make a full disclosure in writing to the Administrative Contracting Officer (ACO).  This disclosure shall include a description of actions which the Contractor has taken or proposes to take, after consultation with the ACO, to avoid, mitigate, or neutralize the actual or potential conflict.

    (c) Remedies - The Government may terminate this contract for convenience, in whole or in part, if it deems such termination necessary to avoid an organization conflict of interest.  If the Contractor was aware of a potential organizational conflict of interest prior to award or discovered an actual or potential conflict after award and did not disclose or misrepresented relevant information to the ACO, the Government may terminate the contract for default, debar the Contractor from Government contracting, or pursue such other remedies as may be permitted by law or this contract.

    Ship Managers are required to ensure adherence to this clause in their capacity as a Government Contracting Officer.  Ship Managers, their parent companies or subsidiaries are prohibited from bidding on Invitations for Bid issued for the Maritime Administration (MARAD) unless specifically authorized by MARAD.

    (d) The Contractor further agrees to insert provisions which shall conform substantially to the language of this clause, including this paragraph (d), in any subcontract or consultant agreement hereunder.

(End of Clause)

## H.4 SAFETY (MARAD) (MAR 1989)

All contract or subcontractor personnel working at MARAD's National Defense Reserve Fleet (NDRF) work sites and onboard MARAD's outported ships shall follow safe work practices and abide by the NDRF's safety and health rules, as applicable, in the performance of their duties.   The rules are contained in TE-1 Appendix M, Safety Rules for Contractor Personnel.

**Prepositioning Program**

PLAINTIFF'S
EXHIBIT
_3_
tabbies


**Prepositioning**

| MSC Overview | Commander | Media Center |
| Organization | Contracts | Employment & HI |
| Ship Inventory | Publications | CIVMAR |

Home    Privacy Policy    Accessibility    Search    Help    FOIA

Military Sealift Command's Prepositioning Program is an essential element in the nation's triad of power projection into the 21st century - sea shield, sea strike and sea basing. As a key element of sea basing, afloat prepositioning provides the military equipment and supplies for a contingency forward deployed in key ocean areas before it is needed. The MSC Prepositioning Program supports the U.S. Army, Navy, Air Force and Marine Corps and the Defense Logistics Agency. Prepositioning ships remain at sea, ready to deploy on short-notice the vital equipment, fuel and supplies to initially support our military forces in the event of a contingency. The Prepositioning Program consists of 34 at-sea ships plus 2 aviation support ships kep reduced operating status.



Afloat prepositioning began in the early 1980s to improve the response time for the delivery of urgen needed equipment and supplies to a theater of operation. MSC prepositioning ships are located all ov world, in areas such as the Mediterranean Sea, the Indian Ocean and Guam. The aviation logistics shi are berthed on the East and West Coasts of the United States.

Prepositioning Program ships include long-term chartered commercial vessels, activated Ready Reser Force ships, and U.S. government-owned ships. All are crewed by mariners provided by companies u contract to MSC.

The Prepositioning Program is divided into three separate elements: the Combat Prepositioning Force Maritime Prepositioning Force and the Logistics Prepositioning ships serving the U.S. Navy, Air For and Marine Corps and the Defense Logistics Agency.

In our worldwide Prepositioning service, our ships are traveling on a continual basis and require from logistics support from our MSC Area Commands.

## Prepositioning Elements:

- Combat Prepositioning Force
  - Afloat Prepositioning Ships Squadron Four
- Maritime Prepositioning Force
  - Maritime Prepositioning Ship Squadron One
  - Maritime Prepositioning Ship Squadron Two
  - Maritime Prepositioning Ship Squadron Three
- Logistics Prepositioning Force
- Afloat Prepositioning Force Fact Sheet

 **Go to the Prepositioning Program ship inventory**

Prepositioning Program (PM3) Page 2 of 2

Military Sealift Command, ATTN: Public Affairs, 914 Charles Morris Ct. SE, Washington Navy Yard, DC, 20398-5540
General Information: 1-888-SEALIFT • Marine Employment Opportunities: 1-877-JOBS-MSC • Email: webmaster@msc.navy.mil



# Ship Inventory

MSC Overview    Commander    Media Center

Organization    Contracts    Employment & HI

Ship Inventory    Publications    CIVMAR

Home    Privacy Policy    Accessibility    Search    Help    FOIA

**Search ship inventory by:**

► **Program**
► **Name**
► **Hull Number**
► **Type**
► **Advanced Search**

## Prepositioning Ships

Military Sealift Command operates 36 ships in its Prepositioning Prog to support the U.S. military's triad of power projection into the 21st centu sea shield, sea strike and sea basing. These ships are pre-loaded with mil: equipment and supplies needed for a war or other contingency. The ships strategically positioned in key ocean areas, making it possible to deploy short-notice the vital equipment, fuel, and supplies to initially support ou military forces when ever needed.

Prepositioning ships are sub-divided into three separate categories, bas on the U.S. military customers they support. The ships include: the ten Combat Prepositioning Force ships supporting the Army; the sixteen Maritin Prepositioning Force ships supporting the Marine Corps; and the ten Logist Prepositioning Ships ships supporting the Navy, Defense Logistics Agency and Air Force.

All prepositioning ships are under the operational control of MSC area commands, directly supporting the Navy's fleet commanders in chief. Th actual day-to-day control of the ships is carried out by one of three MPS squadrons. Those squadrons, each commanded by a Navy captain, includ MPS Squadron One, usually located in the Mediterranean Sea and eastern Atlantic Ocean; MPS Squadron Two, usually located at Diego Garcia; MP Squadron Three, normally in the Guam/Saipan area; and Afloat Prepositioni Squadron Four which supports Army prepositioning requirements in sever regions of the world.

Below is an alphabetical listing of ships in the Prepositioning Program Click on the name of any ship to get more detailed information.

- PFC JAMES ANDERSON JR., MV
- PFC WILLIAM B. BAUGH, MV
- CAPT STEVEN L. BENNETT, MV
- 2ND LT JOHN P. BOBO, MV
- 1ST LT ALEX BONNYMAN, MV
- SGT WILLIAM R. BUTTON, MV
- CAPE JACOB, SS -- *Cape Jacob is part of the RRF, but is activated for duty with the Prepositioning Program.*
- SSG EDWARD A. CARTER, JR. , MV
- TSGT JOHN A. CHAPMAN, MV -- *NOTE: This ship was named MV T Sgt. John A. Chapmar April 8, 2005.*
- CHARLTON, USNS
- CHESAPEAKE, SS -- *Chesapeake is part of the RRF, but is currently activated for duty with the Prepositioning Program.*

- **CURTISS, SS** -- *SS Curtiss is part of the RRF, but is dedicated to USMC aviation logistics support unit Prepositioning Program.*
- **DAHL, USNS**
- **MAJ BERNARD F FISHER, MV**
- **CPL LOUIS J. HAUGE JR., MV**
- **SGT MATEJ KOCAK, SS**
- **1ST LT BALDOMERO LOPEZ, MV**
- **1ST LT JACK LUMMUS, MV**
- **1ST LT HARRY L. MARTIN, USNS**
- **PFC EUGENE A. OBREGON, SS**
- **LTC JOHN U. D. PAGE, MV**
- **PETERSBURG, SS** -- *Petersburg is part of the RRF, but is currently activated for duty with the Prepositioning Program*
- **PVT FRANKLIN J. PHILLIPS, MV**
- **A1C WILLIAM H PITSENBARGER, MV**
- **MAJ STEPHEN W. PLESS, SS**
- **POMEROY, USNS**
- **RED CLOUD, USNS**
- **SISLER, USNS**
- **SODERMAN, USNS**
- **GYSGT FRED W. STOCKHAM, USNS**
- **WATKINS, USNS**
- **WATSON, USNS**
- **WESTPAC EXPRESS, MV** -- *Chartered for III Marine Expeditionary Force*
- **LCPL ROY M. WHEAT, USNS**
- **PFC DEWAYNE T. WILLIAMS, MV**
- **WRIGHT, SS** -- *SS Wright is part of the RRF, but is dedicated to USMC aviation logistics support.*

**Military Sealift Command**, ATTN: Public Affairs, 914 Charles Morris Ct. SE, Washington Navy Yard, DC, 20398-5540
General Information: 1-888-SEALIFT • Marine Employment Opportunities: 1-877-JOBS-MSC • Email: webmaster@msc.navy.mil



**Ship Inventory**

# SS PETERSBURG  (T-AOT 9101)
## Government-owned Tanker



SS Petersburg is one of 36 Military Sealift Command ships in the Prepositioning Program.

- **Length:**        736 feet
- **Beam:**          102 feet
- **Draft:**         36 feet, 1 inch
- **Displacement:**  48,993 long tons
- **Speed:**         14.5 knots
- **Organization:**  Logistics Prepositioning Ship
- **Squadron:**      Maritime Prepositioning Ship Squadron Three
- **Civilian:**      38
- **Military:**      0

*Petersburg is part of the RRF, but is currently activated for duty with the Prepositioning Program*

Click on image at left for larger picture.

***Return to ship inventory main page***                    ***Glossary of Terms***

**Military Sealift Command**, ATTN: Public Affairs, 914 Charles Morris Ct. SE, Washington Navy Yard, DC, 20398-5540
General Information: 1-888-SEALIFT • Marine Employment Opportunities: 1-877-JOBS-MSC • Email: webmaster@msc.navy.mil