UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| GUAM INDUSTRIAL SERVICES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No.  05-CV01599 |
| | ) | |
| DONALD H. RUMSFELD, Secretary of Defense, et al., | ) | Judge Ricardo M. Urbino |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

### SUPPLEMENTAL MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS OR FOR SUMMARY JUDGMENT

**Preliminary Statement**

Plaintiff Guam Industrial Services, Inc., d/b/a Guam Shipyard ("GIS" or "Guam Shipyard"), hereby respectfully submits this supplemental memorandum, pursuant to the Court's December 19, 2005 Memorandum Opinion, and in further opposition to Defendants' motion to dismiss or for summary judgment.  In its opinion, the Court directed the parties to brief the issue of the legal status of the Defendants' Memorandum of Agreement (hereafter cited as the "MOA"), with particular reference to certain cases noted by the Court.

GIS again urges the Court to deny the Government's[1] motion, as Defendants have failed to carry the heavy burden required to prevail.  In their Memorandum of Points and Authorities in support of their motion to dismiss GIS' complaint or, in the alternative, for summary judgment (hereafter cited as "Mem. in Sup."), Defendants have asserted three primary grounds in an effort to meet their burden:  an alleged failure to join indispensable parties, a suggested narrow scope

---

[1] Donald H. Rumsfeld, Secretary of the U.S. Department of Defense ("DoD"), Gordon R. England, Secretary of the Department of Navy ("Navy"), Norman Y. Mineta, Secretary of the Department of Transportation ("DOT"), and John Jamian, Acting Administrator, Maritime Administration ("MARAD"), collectively, "Defendants."

of 10 U.S.C. Section 7310(a) (hereafter cited as "Section 7310(a)"), and an alleged inconsequentiality of the 1997 MOA between DoD and DOT to GIS' principal claim. Mem. in Sup. at pp. 16-22. While the first two grounds are no longer strictly applicable,[2] the position taken in the third ground speaks to Defendants' intent to be bound by a clearly articulated policy as to what vessels Congress intended to fall within the scope of Section 7310(a). GIS submits that the MOA is a formal, binding agreement that shows an intent to be bound, but that at least raises a fact question that requires further discovery in order to locate the internal documentation to demonstrate just how these executive agencies operated the MOA in practice. The Court should reject the illogical and unreasonable position taken in Defendants' third ground, afford GIS the opportunity to conduct additional discovery to develop the relevant administrative record, and deny the remaining portion of Defendants' alternative motion to dismiss or for summary judgment.

## Factual Background

GIS owns and operates Guam Shipyard, which repairs and otherwise services maritime vessels and remains the only U.S. citizen owned and operated private shipyard located west of the International Dateline. Compl. ¶ 2. As such, it is the only shipyard of its kind that can service Navy, MSC, and MARAD vessels that are under the control of the Secretary of the Navy in the Pacific and Indian Oceans. Pothen Decl. ¶ 2.

The RRF is a select group of ships within the National Defense Reserve Fleet, which are maintained by DOT's MARAD and funded from the Navy-controlled National Defense Sealift

---

[2] GIS continues to seek injunctive relief from the Court, pursuant to the Administrative Procedures Act, 5 U.S.C. §§ 702-706, to prevent Defendants from continuing to solicit bids from and/or award contracts to foreign shipyards in connection with non-voyage repairs of United States Ready Reserve Force ("RRF") ships that are homeported in the United States in contradiction to a clearly articulated interagency policy as to what vessels Congress intended to fall within the scope of Section 7310(a). However, in light of the Court's August 24, 2005 and December 19, 2005 Memorandum Opinions, GIS has narrowed its request for relief.

Fund.  Cahill Decl. ¶ 4; Pothen Decl. ¶ 4; Naval Vessel Register, www.nvr.navy.mil/stat_12.htm.

Certain vessels that are part of the RRF are also currently activated for duty with the Prepositioning Program, a program funded and administered by the Navy and under the direction of the MSC.  Pothen Decl. ¶ 4; *Inventory of Ships in the MSC Prepositioning Program*, MSC website, www.msc.navy.mil/inventory.  MSC is a military command within the Department of Navy and subject to the authority of the head of the Department, the Secretary of the Navy.  *Id*.

MARAD contracts with commercial ship operators to maintain and operate the RRF.  These vessels are kept in either maintenance phase (Phase M) or operational phase (Phase O).  Cahill Decl. ¶ 4.  When vessels are in Phase O they are under the operational control of the MSC.  *Id*.  The MSC is under the jurisdiction of the Secretary of the Navy within the meaning of the statute.

The ships in the MSC Prepositioning Program are strategically positioned in key ocean areas, making it possible to deploy equipment, fuel, and supplies to support U.S. military forces on short notice during times of war or as a result of other contingencies.  Pothen Decl. ¶ 4; MSC website, www.msc.navy.mil/PM3.  Prepositioning ships are subdivided into three separate elements: Combat Prepositioning Force Ships; Maritime Prepositioning Force Ships; and Logistics Prepositioning Ships.  *Id*.  All prepositioning ships are under the operational control of the U.S. Navy's MSC area commands, providing direct support for the Navy's fleet commanders.  *Id*.  Day-to-day control of these ships is exercised by one of three Maritime Prepositioning Ship squadrons ("MPSRONs").  *Id*.  Each MPSRON is under the command of a Navy Captain.  *Id*.  In addition to being principal components of the U.S. Navy's MSC Prepositioning Program, and administratively reporting to the Prepositioning Program Manager at MSC Headquarters in Washington, D.C., the ships in the various MPSRONs are operational

assets of the Navy's Seventh Fleet. *Id*.

## Legal Background

This action, filed on August 10, 2005, seeks both injunctive relief to prevent Defendants from continuing their practice of repairing and maintaining RRF ships in foreign shipyards in contradiction to a clearly articulated interagency policy as to what vessels Congress intended to fall within the scope of Section 7310(a), and declaratory relief that the contents of the MOA are a clear expression of an interagency intent to be bound by this policy, and therefore illustrative of GIS' enforceable rights.

A formal interagency contract between DoD and DOT reflecting their joint understanding of this policy provides the legal backdrop for the remaining claims in this action. In paragraph 5(b) of the MOA, both agencies explicitly recognize the policy against repairing and maintaining RRF ships in foreign shipyards in accordance with Section 7310(a) when they specify that "[a]ll shipyard and ship repair facility work to RRF ships will be accomplished by MARAD (either directly or through its ship operating companies) and performed in the United States (except for necessary voyage repairs while overseas), in accordance with the statute and DOT regulations." Nonetheless, in the face of this obvious construction, Defendants argue that a self-serving, after-the-fact internal agency instruction[3] trumps a broader and clearer interagency expression of intent with respect to Section 7310(a). Mem. in Sup. at pp. 10-16. It is indisputable that the Defendants are violating the MOA because they continue to repair RRF ships, including prepositioning ships, in foreign shipyards.

## Applicable Legal Standards

Defendants have filed a motion to dismiss, or in the alternative, for summary judgment

---

[3] The instruction at issue is Commander Military Sealift Command Instruction 4700.15A, *Accomplishing Ship Repair in Foreign Ship Yards* (hereafter cited as "COMSCINST 4700.15A").

4

pursuant to Federal Rules of Civil Procedure Rule 12(b)(6) and Rule 56.

A Rule 12(b)(6) motion to dismiss tests whether a plaintiff has properly stated a claim upon which relief can be granted. *See Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974). The federal rules provide that the complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief…." Fed. R. Civ. P. 8(a)(2); *see also Conley v. Gibson*, 355 U.S. 41, 47 (1957); *U.S. ex. rel. Harris v. Bernad*, 275 F. Supp. 2d 1, 5 (D.D.C. 2003). Importantly, the complaint need not plead the elements of a prima facie case. *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511-14 (2002); *see also Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1114 (D.C. Cir. 2000). When deciding a Rule 12(b)(6) motion to dismiss, the Court must consider all well-pleaded facts as true, and draw all reasonable inferences in favor of the non-movant. *Scheuer*, 416 U.S. at 236; *Bernad*, 275 F. Supp. 2d at 5. Therefore, "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley*, 355 U.S. at 45-46.

Pursuant to Rule 56, summary judgment should be granted only if the moving party has shown that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); and *Waterhouse v. District of Columbia*, 298 F.3d 989, 991 (D.C. Cir. 2002). The moving party maintains the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp*, 477 U.S. at 323. If the Court concludes that a jury could find in favor of the non-moving party on an issue of material fact, then the issue is genuinely in dispute and precludes summary judgment. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

When adjudicating a Rule 56 motion for summary judgment, the Court must "assume the

truth of all statements proffered by the party opposing summary judgment" and view all evidence in favor of the non-moving party. *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999); *Anderson*, 477 U.S. at 255; *Carter v. Greenspan*, 304 F. Supp. 2d 13, 21 (D.D.C. 2004). Furthermore, the Court must "draw all reasonable inferences in favor of the non-moving party, and…may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Washington Post Co. v. United States Dep't of Health & Human Services*, 865 F.2d 320, 325 (D.C. Cir. 1989).

Summary judgment should ordinarily be entered only after a plaintiff has been given "adequate time for discovery." *Anderson*, 477 U.S. at 257; *Celotex Corp.*, 477 U.S. at 322; *Info. Handling Services, Inc. v. Def. Automated Printing Services*, 338 F.3d 1024, 1032 (D.C. Cir. 2003). "The Court must give a party opposing summary judgment an adequate opportunity to obtain discovery." *Radich v. Goode*, 886 F.2d 1391, 1391 (3d Cir. 1989) (citing *Dowling v. Philadelphia*, 855 F.2d 136, 139 (3d Cir. 1988)). Courts have consistently noted that pre-discovery summary judgment motions are premature and should only be used in exceptional circumstances. *See Patton v. Gen. Signal Corp.*, 984 F. Supp. 666, 669 (W.D.N.Y 1997).

## Argument

**(i)** **The Formal Interagency Contract Between DoD and DOT Signifies Their Intention to be Bound by Section 7310(a), and Therefore is Illustrative of GIS' Enforceable Rights.**

Guam Shipyard's position on the MOA is simple: it is a contract between two agencies, and contracts perforce create a binding agreement. Even if this self-evident principle is not accepted, at the least, the MOA is compelling evidence that these agencies intended to be bound by Section 7310(a)'s requirement that RRF ships must be repaired in the United States. An agency is required to obey its own rules in order to further the goal of consistency. "[I]t is elementary that an agency must adhere to its own rules…Ad hoc departures from those rules,

6

even to achieve laudable aims, cannot be sanctioned…for therein lie the seeds of destruction of the orderliness and predictability which are the hallmarks of lawful administrative action." *Reuters Ltd. v. Federal Communications Commission*, 781 F.2d 946, 950-51 (D.C. Cir. 1986); *see also Brock v. Cathedral Bluffs Shale Oil Co.*, 796 F.2d 533, 536 (D.C. Cir. 1986) (Scalia, J.) ("It is axiomatic that an agency must adhere to its own regulations…").

The basic federal doctrine for this requirement was first announced in one of the famous "red baiting" cases, involving the deportation efforts of the Attorney General. *See United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 265-67 (1954). The *Accardi* doctrine, since adopted into the administrative law of several states, "requires federal agencies to follow their own rules, even gratuitous procedural rules that limit otherwise discretionary actions." *Steenholdt v. FAA*, 314 F.3d 633, 639 (D.C. Cir. 2003); *Ctr. for Auto Safety v. Dole*, 828 F.2d 799, 806 (D.C. Cir. 1987) (recognizing the principle that "a court will require an agency to follow the legal standards contained in its own regulations despite the fact that a statute has granted the agency discretion in the matter"); *Padula v. Webster*, 822 F.2d 97, 100 (D.C. Cir. 1987) ("It is well settled that an agency, even one that enjoys broad discretion, must adhere to voluntarily adopted, binding policies that limit its discretion.").

Although the *Accardi* doctrine is an administrative rule, it also rests on due process principles where the rights of individuals are affected by an agency's failure to observe rules promulgated for their protection. *See Wilkinson v. Legal Servs. Corp.*, 27 F. Supp. 2d 32, 35 (D.D.C. 1998) ("[T]he Accardi doctrine derives from the Due Process Clause's obligation that government agencies follow the law."); *Doe v. United States Dep't of Justice*, 753 F.2d 1092, 1098 (D.C. Cir. 1985) ("Courts…have long required agencies to abide by internal, procedural regulations...even when those regulations provide more protection than the Constitution…").

As Defendants have identified, "with regard to rules that have not been formally promulgated, the 'law' to which an agency will be bound are those rules to which it intended to be bound." *Wilkinson*, 27 F. Supp. 2d at 35. "[A]n agency pronouncement is transformed into a binding norm if so intended by the agency." *Doe v. Hampton*, 566 F.2d 265, 281-82 (D.C. Cir. 1977). "[S]tatements whose language, context, and application suggest an intent to bind agency discretion and private party conduct – the sort of statements requiring compliance with § 553 – will have that effect if valid; interpretive rules or policy statements will not, regardless of their validity." *Vietnam Veterans of America v. Secretary of the Navy*, 843 F.2d 528, 537 (D.C. Cir. 1988); *Jackson v. Culinary Sch. Of Wash., Ltd.*, 27 F.3d 573, 584 (D.C. Cir. 1994) ("The touchstone for enforceability is agency intent."). Thus, the consistent principle in all applicable cases is that an agency is bound by its own administrative statements if it expresses an intent to be bound — even if the statement is not a formal regulation. Because intent is inherently a fact question, as the relevant cases demonstrate, in each case raising this question, the federal courts engage in a factual inquiry based on a developed record. In this case, no record has yet been developed.

There is little doubt about the Defendants' collective intent. The MOA is a formal contract signed by representatives of two cabinet-level departments. It is a legally binding, publicly available expression of interagency interpretation of what vessels Congress intended to fall within the scope of Section 7310(a) and how they envisioned that impacting private party conduct. It is as much a binding norm as a law or regulation in the sense that it was designed to articulate the agencies' perceived obligation to repair and maintain RRF ships in domestic shipyards in accordance with Section 7310(a) and to have immediate effect on private party conduct. RRF ships are drawn from the National Defense Reserve Fleet, which is funded from

the Navy-controlled National Defense Sealift Fund; ships in the MSC Prepositioning Program are strategically positioned to support United States military forces on short notice during times of war or as a result of other contingencies; these vessels are under the operational control of the United States Navy's MSC area commands, providing direct support for the Navy's fleet commanders; day-to-day control of these vessels is exercised by one of three MPSRONs; each MPSRON is under the command of a Navy Captain; and these vessels are operational assets of the Navy's Seventh Fleet.  Paragraph 5(b) of this binding contract expresses a clear interagency recognition of the obligation to repair and maintain RRF ships in domestic shipyards in accordance with Section 7310(a) and is a binding expression of their intent to be bound by this obligation.  Had this not been the agencies' collective intent, they would have left this language out of the contract, rather than allow private parties to rely upon it.  This language is not mere surplusage, nor is it merely precatory, but rather is intended to have binding legal force.

The situations detailed in *Schweiker v. Hansen*, 450 U.S. 785 (1981) and in *Vietnam Veterans*, 843 F.2d 528 (D.C. Cir. 1988) are inapposite to the instant situation.  In *Schweiker*, the Supreme Court determined that the failure to follow a Social Security Administration (SSA) Claims Manual did not create a basis for relief.  In reaching this decision, the Court held that the Claims Manual at issue was not a binding agency rule because it "ha[d] no legal force."  450 U.S. at 789.  Notably, the Court characterized the Claims Manual as a "13-volume handbook for internal use."  *Id*.  Unlike the agencies at issue here, the SSA never intended the Claims Manual's language to be mandatory, but rather intended it as guidance and advice.  Moreover, unlike the binding contract at issue here, an internal handbook designed for internal use only by SSA employees quite obviously does not have binding legal force that impacts private party conduct.

The same can be said for the language found in the Packard and Laird Memoranda in *Vietnam Veterans*, 843 F.2d 528 (D.C. Cir. 1988). In *Vietnam Veterans*, the Court of Appeals determined that two related memoranda written by the Secretary of Defense and his deputy addressing the upgrading of less than honorable discharges for drug use did not create a basis for relief. In reaching its decision, the Court of Appeals held that the language at issue in the memoranda was "not specific or prescriptive enough to create rights or bind agency discretion." 843 F.2d at 530. The Court of Appeals characterized the language contained therein as "murky" and "lend[ing] itself to a broad range of interpretations." *Id*. at 535-536. In fact, the Court noted that the only provision found in the Laird Memorandum that could possibly be considered mandatory, was a provision "requiring each Secretary *to consider* applications for recharacterization," at most mandating nothing more than "the process of review." 843 F.2d at 538-539. Furthermore, the Court determined that the purpose of the Laird Memorandum, unlike the purpose of the MOA at issue here, was to "exhort" and "encourage" administrative agencies, not to bind their discretion. *Id*.; *see also Jackson*, 27 F.3d at 585 (where the Court of Appeals, in determining that language found in the Secretary of Education's letters did not create a basis for relief, held that "this sort of murky, precatory language, like that at issue in *Vietnam Veterans*, militates against the conclusion that the letters were intended to confer a new, automatic defense or to recognize a longstanding, binding federal defense…"). In the instant case, the DoD-DOT contract uses prescriptive language regarding the repair and maintenance of RRF ships in domestic shipyards in accordance with Section 7310(a). There is nothing murky or precatory about it.

Nonetheless, Defendants ask this Court to ignore the plain language of a legally binding, publicly available interagency contract signed in 1997 in favor of an after-the-fact internal

10

agency instruction given in 2000.  In effect, Defendants are asking this Court to believe that COMSCINST 4700.15A trumps a clear DoD-DOT recognition and interpretive expression of their intent.  An internal instruction, even if valid, cannot negate this broad, formal expression of interagency intent.  Accordingly, it is undeniable that in the MOA, DoD and DOT formally and officially recognized that Congress intended for all RRF and MSC Prepositioning ships to be under the operational control of the Navy, and thus to fall within the scope of Title 10.

> **(ii)     GIS Needs an Opportunity to Develop the Relevant Record.**

At this time there is an insufficient record to enable this Court to fully determine if Defendants' assertions about their intent with respect to the repair and maintenance of RRF and MSC Prepositioning ships in foreign shipyards in accordance with Section 7310(a) are valid and accurate.  *See*, *e.g.*, *Association of American Physicians and Surgeons, Inc. v. Clinton*, 997 F.2d 898, 915 (D.C. Cir. 1993) (finding that there was insufficient record evidence with respect to a "key issue" in an action for injunctive relief); *Protestants and Other Americans United for Separation of Church and State v. Watson*, 407 F.2d 1264, 1266 (D.C. Cir. 1968) (finding "an insufficient record to render a comprehensive decision" in an action for declaratory and injunctive relief).  GIS should be allowed to conduct further discovery in order to locate the internal documentation that demonstrates just how these executive agencies operated the MOA in practice.  *See Riggs v. Home Builders Institute*, 203 F.Supp.2d 1, 17 (D.D.C. 2002) (finding a plaintiff had "not yet had an opportunity to develop a record to flush out the necessary factual support for his allegations").  This is particularly necessary where the determinative principle is the intent of the agency to be bound, because intent is inherently a fact question that can only be decided upon the entire agency record.  At this time, there is simply not enough of a record before the Court to make this important determination.

**Conclusion**

Defendants' present post-hoc interpretation of the scope of Section 7310(a) is inconsistent with the contractual language of the MOA.  Their construction is nothing more than a self-serving attempt to justify a failure to properly apply a clear interagency directive to repair and maintain RRF ships in domestic shipyards in accordance with Section 7310(a).  Unless and until such time as this Court grants declaratory and injunctive relief, future non-voyage repair contracts for RRF and MSC Prepositioning vessels homeported in the United States and under the Navy's control will continue to be awarded to foreign shipyards to the detriment of Guam Shipyard and other similarly situated private United States shipyards in contravention to this clearly articulated interagency policy.  For the reasons set forth above, this Court should reject Defendants' illogical and unreasonable position, afford GIS the opportunity to conduct additional discovery to develop the relevant administrative record, and deny Defendants' premature motion to dismiss, or in the alternative, for summary judgment, pending a decision on the underlying merits of this case.

Respectfully submitted,

By: /s/Thomas Earl Patton
Thomas Earl Patton (D.C. No. 009761)
John B. Montgomery (D.C. No. 460221)
David  Taylor (D.C. No. 91280)
*Attorneys for Plaintiff*
TIGHE PATTON ARMSTRONG
TEASDALE, PLLC
1747 Pennsuylvania Ave. N.W. Suite 300
Washington, D.C. 20006-4604
Tel. (202) 454 2800
Fax (202) 454- 2805

OF COUNSEL:

ARMSTRONG TEASDALE LLP
Edwin L. Noel (Mo. No. 24184)
F. Scott Galt (Mo. No. 56548)
One Metropolitan Square, Suite 2600
St. Louis, MO. 63102-2740
TEL:  (314) 621-5070
FAX:  (314) 621- 5065

## CERTIFICATE OF SERVICE

      The undersigned hereby certifies that on this 18th day of January, 2006, a true and correct copy of the foregoing document was filed electronically with the Clerk of Court to be served by operation of the Court's electronic filing system and/or was mailed by United States Postal Service to the non-participants in Electronic Case Filing.

                                                                           /s/Thomas Earl Patton