### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| GUAM INDUSTRIAL SERVICES, INC., d/b/a Guam Shipyard, ) ) ) ) Plaintiff, ) ) v. ) ) DONALD H. RUMSFELD, Secretary of Defense, et al., ) ) ) ) Defendants. ) | Civil Action No. 05-1599 (RMU) |

### SUPPLEMENTAL MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS OR FOR SUMMARY JUDGMENT

Defendants, by their undersigned attorneys and pursuant to the Court's Memorandum Opinion and Order [R. 31 & 32][1] filed December 19, 2005, hereby respectfully submit the following supplemental memorandum in support of their motion to dismiss or for summary judgment in the above-captioned civil action.

### **Background**

The Court has directed the parties to submit supplemental briefs with respect to plaintiff's claim that the defendants are acting in violation of (1) a 1997 Memorandum of

---

[1] "R. __" denotes the corresponding numbered entry in the Court's electronic civil docket for this case.

Agreement ("MOA") between the Department of Defense ("DoD") and the Department of Transportation ("DOT"), and (2) the Ship Manager Contract used by the Maritime Administration ("MARAD").[2]  Specifically, plaintiff claims that foreign shipyards are being used to repair Ready Reserve Force ("RRF") vessels in violation the MOA and the Ship Manager Contract which -- according to plaintiff -- specify that "non-voyage" (*i.e.*, non-emergency) repairs to "all RRF ships, or at a minimum, to all RRF ships activated for duty with the Navy's MSC Prepositioning Program" must be performed in shipyards located in the United States or Guam.  *See* Complaint [R. 1], Prayer for Relief ¶ 6 at pp. 8-9; *see id.*, ¶¶ 28-31 at pp. 6-7.

The Court has determined that resolution of plaintiff's claim involves the legal question whether plaintiff may enforce the MOA and the Ship Manager Contract against defendants.  The Court has ordered that the parties' supplemental briefs

> shall be limited to twenty-five double spaced pages and shall include detailed discussions (with pincites) of this circuit's law regarding the *Accardi* doctrine, *Jackson v. Culinary Sch. of Wash., Ltd.* 27 F.3d 573 (D.C. Cir. 1994), and *Vietnam Veterans of America v. Sec'y of the Navy*, 843 F.2d 528 (D.C. Cir. 1988).  Furthermore, the parties are directed to include an

---

[2] The MOA is Defendants' Exhibit 7, and was filed with defendants' Motion to Dismiss or for Summary Judgment [R. 18].  The Ship  Manager Contract is publicly available on the internet at https://voa.marad.dot.gov/programs/ship_manager/final.asp.

> analysis of the relevance of any factual similarities and differences between the Memorandum of Agreement and Contract at issue in this case with the Claims Manual at issue in *Schweiker v. Hansen*, 450 U.S. 785, 789-90 (1981), the Packard Memorandum in *Vietnam Veterans of America*, 843 F.2d at 530, as well as other cases which the parties deem relevant and instructive.

Memorandum Opinion [R. 32] at p. 2 n. 3 (filed December 19, 2005); *see* Order [R. 31] (filed December 19, 2005).

## **Argument**

The *Accardi* doctrine holds that "government agencies are bound to follow their own rules, even self-imposed procedural rules, that limit otherwise discretionary decisions." *See Wilkinson v. Legal Services Corp.*, 27 F. Supp. 2d 32, 34 n. 1 (D.D.C. 1998) (*citing United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 267-68 (1954)). Application of the *Accardi* doctrine turns on the agency's intent to be bound by its pronouncements, procedures, and policies. *See BP Exploration & Oil, Inc. v. Dep't of Transportation*, 44 F. Supp. 2d 34, 38 (D.D.C. 1999) (citing authorities). As noted by the Court, examples of *Accardi* doctrine claims can be found in *Jackson v. Culinary School of Washington, Ltd.*, 27 F.3d 573 (D.C. Cir. 1994), *vacated*, 515 U.S. 1139 (1995), *reinstated in pertinent part*, 59 F.3d 254 (D.C. Cir. 1995), and *Vietnam Veterans of America v. Sec'y of the Navy*, 843 F.2d 528 (D.C. Cir. 1988).

In *Vietnam Veterans*, former members of the United States Navy sought to have their less than honorable drug-related discharges upgraded pursuant to the "Laird Memorandum" which followed an earlier DoD pronouncement known as the "Packard Memorandum." *See* 843 F.2d at 530-32. In essence, the former service members contended that the Laird Memorandum created a binding rule that required the Navy to upgrade their discharges. *Id.* at 532. The threshold issue with respect to this contention, therefore, was "whether the Memorandum creates any binding rule at all." *Id.* at 536

In discussing the analytical framework for the resolution of that threshold issue, the Court of Appeals explained that an agency "statement" outside the context of adjudication may be binding without being a formally promulgated rule. *See id.* at 536-38. The Court quoted footnote two in *National Latino Media Coalition v. FCC*, an earlier case in which the Court of Appeals noted that "the 'binding' quality of a particular rule or statement will depend on whether the agency intended to establish a 'substantive' rule, one which creates or modifies rights that can be enforced against the agency." *Id.* at 537 (quoting *National Latino Media Coalition v. FCC*, 816 F.2d 785, 788 n. 2 (D.C. Cir. 1987)). Thus, "statements whose language, context and application suggest an intent to bind agency discretion and private party conduct -- the sort of statements requiring compliance with [5 U.S.C.] § 553 -- will have that effect if valid; interpretive rules or policy statements will not, *regardless* of their validity." *Id.* (emphasis in original).[3] The

---

[3] 5 U.S.C.A. § 553 is the section of the Administrative Procedure Act that requires

Court also pointed out that its "rule/policy exegesis is not inconsistent with the rule that agencies must follow their own procedures . . . . Internal procedures, like policy statements, are exempt from the coverage of § 553. The exemption is quite independent of whether the procedures will be binding." *Id.* at 538. Applying these principles, the Court concluded that the Laird Memorandum could not reasonably be classified as a binding statement in light of its language, context, and agency treatment. *See id.* at 538-39.

In *Jackson*, former students of a defunct and bankrupt culinary school sought to void their payment obligations to the Department of Education under their guaranteed student loans. *See* 27 F.3d at 574-75. The threshold issue considered by the Court of Appeals in that case was whether the former students had a "federally grounded right" to enforce a longstanding policy by the Department to abstain from collections where there was an "origination relationship" between a school and the lenders who provided federally guaranteed loans to the school's students. *Id.* at 583.

In this connection, the Court observed that "merely admitting the existence of a policy or its pedigree is not tantamount to conceding its enforceability by third parties." *Id.* Rather, again citing footnote two in *National Latino Media Coalition v. FCC*, the Court explained that, in determining whether an agency's "promise" is enforceable by

---

federal agencies to afford notice of a proposed rule-making and an opportunity for public comment prior to promulgating a rule.

third parties, the relevant inquiry is agency intent. *Id.* at 584. And, quoting *Vietnam Veterans*, 843 F.2d at 537, the Court reiterated that "statements whose language, context, and application suggest an intent to bind agency discretion and private party conduct -- the sort of statements requiring compliance with [APA] § 553 -- will have that effect if valid; interpretative rules or policy statements will not, *regardless* of their validity." *Jackson*, 27 F.3d at 583 (internal quotes omitted; emphasis in original). Balancing the arguments for and against creating a substantive cause of action based upon an alleged origination relationship, the Court concluded that, "under the teaching of *Vietnam Veterans*," the Department of Education had not "sufficiently communicated an intention to be bound by [its] origination policy so as to create a legally enforceable right grounded in federal law." *Id.* at 585

*Jackson* also explains why the "language, context, and application" test adopted in *Vietnam Veterans* is not contrary to *Morton v. Ruiz*, 415 U.S. 199, 231-37 (1974), the *Accardi* doctrine case in which the Supreme Court "laid down the rule that agencies must follow their own internal procedures '[w]here the rights of individuals are affected.'" *Jackson*, 27 F.3d at 584 n. 21 (quoting *Morton*, 415 U.S. at 235). In particular, the Court of Appeals noted:

> The [Supreme] Court retreated from the broadest reading of [*Morton*] in *Schweiker v. Hansen*, 450 U.S. 785, 789-90, 101 S.Ct. 1468, 1471-72, 67 L.Ed.2d 685 (1981), in which it refused to bind the Secretary of Health and

>Human Services to the internal rules set forth in a 13-volume Social Security Administration Handbook. The Court reasoned that "the Claims Manual is not a regulation. It has no legal force, and it does not bind the SSA." *Id.* at 789, 101 S.Ct.. at 1471. Although *Schweiker* is terse, the decision appears to turn on the notion that the applicant's rights were not detrimentally affected by the agency's breach of its own internal rules. We recognized that the analysis under *Morton* turned on the underlying existence on an enforceable right in *National Latino Media Coalition*, 816 F.2d at 788 n. 2. *See also National Small Shipments Traffic Conference, Inc. v. ICC*, 725 F.2d 1442, 1449 (D.C. Cir. 1984) (rejecting application of *Morton* where rule at issue "was not designed to protect either individual rights or wards of the federal government"). At issue in this case, in contrast to *Morton*, is the anterior question whether appellants have any enforceable rights in the Secretary's origination pronouncements.

*Id.*

This interpretation of *Morton* was recently confirmed by the Court of Appeals in *In re Grand Jury Subpoena, Judith Miller*, 397 F.3d 964 (D.C. Cir.), *cert. denied*, 125 S. Ct. 2977 (2005). In *Miller*, journalists who had been held in civil contempt for refusing to give evidence in response to grand jury subpoenas relied on *Morton* to argue that the contempt finding could be overturned based on the prosecutor's failure to comply with

Department of Justice guidelines for issuing subpoenas to news media. *See* 397 F.3d at 974-76. The Court, however, explained that *Morton* was distinguishable:

> Regulations considered by the [Supreme] Court in [*Morton*] required the publication of directives that "inform the public of privileges and benefits available and of eligibility requirements." [415 U.S. at 235.] The Supreme Court found that the publication requirement was intended to benefit potential beneficiaries and therefore invalidated a Bureau of Indian Affairs attempt to limit general assistance benefits to otherwise eligible beneficiaries based on an unpublished eligibility requirement. This reasoning has no applicability to the guidelines before us.

397 F.3d at 976. Instead of applying the rule in *Morton*, the Court of Appeals concluded that "[g]iven the nature of the guidelines themselves, and the function they govern, . . . the guidelines provide no enforceable rights to any individuals, but merely guide the discretion of the prosecutors." *Id.*

Similar to *Jackson*, the instant case presents "the anterior question" whether plaintiff has enforceable rights under the MOA and the Ship Manager Contract to block the use of foreign shipyards for non-emergency repairs either to all RRF vessels or to all RRF vessels activated for duty with the Prepositioning Program. The "language, context, and application" of the MOA and the Ship Manager Contract demonstrate that this question must be answered in the negative.

The MOA was entered into pursuant to 50 App. U.S.C.A. § 1744(b)(2) to govern the relationship between DoD and DOT with respect to vessels in the National Defense Reserve Fleet, a component of which is the RRF. The provision of the MOA on which plaintiff relies is as follows:

> All shipyard and ship repair facility work to RRF ships will be accomplished by MARAD (either directly or through ship operating companies) and performed in the United States (except for necessary voyage repairs while overseas) in accordance with statute and DOT regulations.

MOA, Article 5, ¶ b at p. 3; *see* Complaint [R. 1], ¶ 28 at p. 6. This provision creates no right that plaintiff can enforce to demand that non-emergency repairs to any RRF ship be performed in the United States or Guam. Indeed, this provision by itself establishes no requirement for the location of repairs at all, but instead merely incorporates other authorities by reference. In particular, the MOA specifies that repairs (except for "necessary voyage repairs while overseas") must be performed "in the United States" when otherwise required by "statute" or by "DOT regulations."

Plaintiff has not contended that any "DOT regulations" are pertinent to its claims, and the only statute on which plaintiff relies, 10 U.S.C.A. § 7310(a), does not apply to RRF ships. *See* Memorandum Opinion [R. 32] (filed December 19, 2005). In the absence of a statute or DOT regulation requiring that repairs be performed in the United

States, there is no basis to trigger application of the MOA.  Furthermore, given the distinction between the United States and Guam as previously recognized by the Court, *see* Memorandum Opinion [R. 10] at pp. 5-12, it appears that enforcement, through the MOA, of any statute or DOT regulation requiring repairs to be performed "in the United States" would ***prohibit*** the use of plaintiff's shipyard in Guam for all but necessary voyage repairs.  *See* 10 U.S.C.A. §§ 101(a)(1) & (3) (defining "United States" and "Guam" as separate and distinct entities).  Plaintiff presumably does not seek that outcome.

The Ship Manager Contract likewise creates no right that plaintiff may enforce to demand that non-emergency repairs either to all RRF ships or to all RRF ships activated for duty under the Prepositioning Program be performed in the United States or Guam.  The pertinent portion of the Ship Manager Contract provides:

> All repair work and/or upgrading work required in conjunction with the contract (including surveys and correction of sea trial deficiencies, or any other deficiencies that may be noted up to time of delivery and acceptance previously noted or not) necessary to meet all requirements of this contract shall be accomplished in a U.S. ship repair facility, unless the work is for emergency, or mission essential repairs, or for pre-positioned ships which are deployed overseas, or for any vessel forward deployed outside of the United States.

Ship Manager Contract, Section C, ¶ 2.4.6.  Significantly, plaintiff has not alleged that defendants or MARAD's ship managers are violating this provision.  The allegations in plaintiff's Complaint are based on the 1993 Ship Manager Contract which has been superseded and is no longer in effect.  *See* Complaint [R. 1], ¶¶ 29-30 at pp. 6-7.[4]  Although plaintiff has not formally withdrawn those allegations, plaintiff has advanced no argument based on the Ship Manager Contract since defendants pointed out the contract's correct, current language.[5]  Indeed, the only reference to the Ship Manager Contract that appears in plaintiff's opposition to defendants' motion to dismiss or for summary judgment is the statement that plaintiff is not seeking "in any way to affect or

---

[4] Plaintiff's Complaint cites the "1996 MARAD Ship Manager Contract."  Although not material to the resolution of plaintiff's claims, defendants note that the Complaint in fact quotes MARAD's 199**3** Ship Manager Contract.  *See* [First] Declaration of William H. Cahill, ¶ 6, filed with Defendants' Opposition to Plaintiff's Motion for Temporary Restraining Order [R. 6].

[5] The current contract language quoted in the text has been used in MARAD's Ship Manager Contract since 2000, when the contract quoted in plaintiff's Complaint was replaced.  The 2000 Ship Manager Contract is still available on MARAD's website at http://www.marad.dot.gov/acquisition/group22.html.  Section H.1 of the 2000 Ship Manager Contract corresponds to the portion of the current Ship Manager Contract at issue here.  *See* http://www.marad.dot.gov/acquisition/PDF/Section%20H.doc.

limit the operating agreement between MARAD and the private operator" of the SS PETERSBURG. *See* Memorandum in Opposition to Defendants' Motion to Dismiss or for Summary Judgment [R. 27] at p. 7.

Plaintiff has not and cannot dispute that the Ship Manager Contract currently in effect contains explicit exceptions for repairs to "pre-positioned ships which are deployed overseas" and for "any vessel forward deployed outside of the United States." These exceptions are clearly applicable to RRF ships such as the SS PETERSBURG, which is prepositioned in Guam. *See* Memorandum Opinion [R. 10] at pp. 3, 5-7, 11 (filed August 24, 2005). Therefore, the Ship Manager Contract contains no provision that could be enforced to bar the use of foreign shipyards to perform non-emergency repairs either "to all RRF ships, or . . . to all RRF ships activated for duty with the Navy's MSC Prepositioning Program," as plaintiff requests. *See* Complaint [R. 1], Prayer for Relief ¶ 6 at pp. 9-10.

The provisions of the MOA and the Ship Manager Contract at issue here are significantly different from the kinds of agency statements that the Court of Appeals has previously found create enforceable rights in third parties. For example, those provisions are not at all akin to the "highly-refined procedures for treatment of applications for grants under the Urban Crime Prevention Program" in *Massachusetts Fair Share v. Law Enforcement Assistance Admin.*, 758 F.2d 708, 711-12 (D.C. Cir. 1985). They are not analogous to the personnel manuals in *Doe v. Hampton*, 566 F.2d 265, 280-82 (D.C. Cir.

1977), and *Mazaleski v. Treusdell*, 562 F.2d 701, 717 & n. 38 (D.C. Cir. 1977). Nor can they be classified as "common law" administrative rules arising from an agency's course of conduct. *See Sangamon Valley Television Corp. v. United States*, 269 F.2d 221, 224-25 (D.C. Cir. 1959). In each of the latter cases, the agency statements at issue were expressly designed to regulate or protect third parties and "sufficiently communicated an intention to be bound . . . .so as to create a legally enforceable right grounded in federal law." *See Jackson*, 27 F.3d at 585. By contrast, the nature and function of the MOA and the Ship Manager Contract, like the Department of Justice guidelines in *Miller*, belie any intent to establish rules that plaintiff may enforce.

The parties to an agreement obviously intend to be bound thereby. The fact that an agreement binds and may be enforced by the parties, however, does not make the agreement enforceable by anyone else. *Cf. Jackson*, 27 F.3d at 583 ("merely admitting the existence of a policy . . . is not tantamount to conceding its enforceability by third parties"). Defendants are not aware of any case in which the Court of Appeals has applied the *Accardi* doctrine to permit a third party to enforce an agreement similar to the MOA or the Ship Manager Contract. In fact, applying the *Accardi* doctrine under the circumstances presented here would transgress well established rules of contract law governing third-party beneficiaries.

The Court of Appeals has pointed out that it is a "basic contract principle that third party beneficiaries of a Government contract are generally presumed to be merely

*incidental* beneficiaries, and may not enforce the contract absent clear intent to the contrary." *Beckett v. Air Line Pilots Ass'n*, 995 F.2d 280, 288 (D.C. Cir. 1993) (emphasis in original) (citing RESTATEMENT (SECOND) OF CONTRACTS, § 313(2) & comment a). Thus, plaintiff, as a non-party to the MOA and Ship Manager Contract, may enforce those agreements only if the provisions thereof are intended for plaintiff's direct, specific benefit. *See Ables v. United States*, 2 Cl. Ct. 494, 500 (1983), *aff'd*, 732 F.2d 166 (Fed. Cir. 1984) (table); *accord, Dureiko v. United States*, 62 Fed. Cl. 340, 363-64 (2004). Merely receiving a benefit from the performance of an agreement is not sufficient for this purpose. *See H.F. Allen Orchards, Inc. v. United States*, 4 Cl. Ct. 601, 607 (1984), *aff'd*, 749 F.2d 1571 (Fed. Cir. 1984), *cert. denied*, 474 U.S. 818 (1985).

Although plaintiff has not explicitly advanced the theory that it may enforce the MOA and the Ship Manager Contract as a third-party beneficiary of those agreements, any such notion is groundless. Plaintiff is not referred to, either directly or indirectly, in either the MOA or the Ship Manager Contract, and neither agreement contains a clear statement of any obligation owed to plaintiff. Because neither agreement can reasonably be construed to require that non-emergency repairs either to all RRF ships or to all RRF ships activated for duty under the Prepositioning Program be performed in the United States or Guam, it is apparent that neither agreement is intended for plaintiff's direct, specific benefit. Consequently, plaintiff is, at most, an incidental beneficiary of the MOA

and the Ship Manager Contract and so may not enforce their provisions against defendants.

Like the Claims Manual in *Schweiker*, the MOA and the Ship Manager Contract are not regulations and have no legal force or binding effect except as between the parties to those agreements. But plaintiff is not a party to the MOA or to a Ship Manager Contract. Furthermore, as the Court has already held in its December 19, 2005 Memorandum Opinion [R. 32], the "Buy America" requirement in 10 U.S.C.A. § 7310(a) does not apply to RRF vessels. Therefore, the underlying existence of an enforceable right -- which the Court of Appeals recognized in *National Latino Media Coalition*, *Jackson*, and *Miller* as the touchstone for binding an agency to its internal procedures -- is absent in this case. Plaintiff simply has no right, under the MOA, the Ship Manager Contract, or otherwise, to demand that non-emergency repairs to RRF ships be performed in United States or Guam.

## Conclusion

At the outset of this case, the Court observed that plaintiff cited no authority for "its standing to enforce the provisions of a contract to which it is not a party." *See* Memorandum Opinion [R. 10] at p. 12 (filed August 24, 2005). Plaintiff's attempt to rely on the MOA and the Ship Manager Contract is fatally flawed for precisely that reason. The language, context, and application of the MOA and the Ship Manager Contract demonstrate that those contracts do not endow plaintiff with an enforceable right to

require that non-emergency repairs either to all RRF vessels or to all RRF vessels activated for duty under the Prepositioning Program be performed in the United States or Guam.

Therefore, based on the foregoing and on the entire record herein, defendants respectfully renew their request that the Court dismiss plaintiff's entire complaint with prejudice and enter judgment in defendants' favor.

        Respectfully submitted,

_____
KENNETH L. WAINSTEIN
D.C. Bar No. 451058
United States Attorney

_____
R. CRAIG LAWRENCE
D.C. Bar No. 171538
Assistant United States Attorney

_____
DANIEL F. VAN HORN
D.C. Bar No. 924092
Assistant United States Attorney

_____
KATHLEEN M. KONOPKA
Assistant United States Attorney
United States Attorney's Office
Civil Division, Room E-4816
555 Fourth Street, N.W.
Washington, D.C. 20530
(202) 514-7168
daniel.vanhorn@usdoj.gov

OF COUNSEL:

JANIS RODRIGUEZ, Esq.
Maritime Administration
U.S. Department of Transportation

ALAN W. MENDELSOHN, Esq.
CHARNA SWEDARSKY, Esq.
Department of the Navy